FILED
2018 Jun-18  PM 04:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

ELECTRONICALLY FILED
9/17/2018 5:07 PM
01-CV-2018-902024.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Cas<br>01<br>Date of Filing:<br>05/17/2018 | Judge Code: |
|---|---|---|---|

## GENERAL INFORMATION

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**

**EMERSON HAMILTON ET AL v. CHC COMPANIES, INC ET AL**

**First Plaintiff:**  ☐ Business  ☑ Individual      **First Defendant:**  ☑ Business  ☐ Individual
☐ Government  ☐ Other       ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☑ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/ Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ INITIAL FILING      A ☐ APPEAL FROM DISTRICT COURT      O ☐ OTHER

R ☐ REMANDED      T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES  ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**    ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**

LAT021          5/17/2018 5:07:49 PM          /s/ WILLIAM ALBERGOTTI LATTIMO
                    Date                   Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:**    ☐ YES  ☑ NO  ☐ UNDECIDED

ELECTRONICALLY FILED
9/17/2018 5:07 PM
01-CV-2018-902024.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

# IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
## BIRMINGHAM DIVISION

| | |
|---|---|
| EMERSON HAMILTON, BENNIE BRUNO, WILLIE WALKER, TEVELL CRAWFORD, ANTONIO CALHOUN, LEWIS MALLORY, JOSHUA HALL, EARNEST NORWOOD, CORREY KELLEY, NORWOOD MCDONALD, and KHOMENIE DATCHER, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO. _____ ) |
| JUDICIAL CORRECTION SERVICES, LLC f/k/a, JUDICIAL CORRECTION SERVICES, INC. CHC COMPANIES, LLC f/k/a CHC Companies, Inc., CORRECT CARE SOLUTIONS, LLC., Limited Liability Companies, and Susan Fuqua, an individual. | ) ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT

COME NOW, Emerson Hamilton ('Mr. Hamilton'), Bennie Bruno ('Mr. Bruno'), Willie

Walker ('Mr. Walker'), Tavell Crawford ('Mr. Crawford'), Antonio Calhoun ('Mr. Calhoun'),

Lewis Mallory ('Mr. Mallory'), Joshua Hall ('Mr. Hall'), Earnest Norwood ('Mr. Norwood'),

Correy Kelley ('Mr. Kelley'), Norwood McDonald ('Mr. McDonald'), and Khomenie Datcher

('Mr. Datcher') (hereinafter 'Plaintiffs') and bring action alleging that Defendants Judicial

Corrections Services, LLC, CHC Companies, LLC, and Correct Care Solutions, LLC

(Hereinafter collectively referred to as "JCS" or "JCS Inc.")[1], a for-profit probation company

acting under color of law and Susan Fuqua conspired together and with various Alabama

municipalities to violate Plaintiffs' constitutional and statutory rights.

---

[1] Plaintiffs will refer to Corporate Defendants JCS, CHC, and CCS collectively as "JCS" or as "JCS, Inc." due to the mergers, combinations and name changes described herein.

## INTRODUCTION

For many years JCS along with its co-conspirator cities and their courts operated an illegal extortion scheme called private 'probation.' Under this extortion scheme when a person appearing before the city court could not immediately pay fines for traffic violations or other misdemeanor offenses, they were sent to JCS "probation" for collection of those fines and required pay extra money to JCS for monthly 'probation fees'. This scheme was imposed on those persons without any inquiry into the person's ability to pay, without considering sentencing alternatives and without adequate counsel either at the court proceedings, at JCS 'revocation hearings,' or even after the accused was jailed subject to a cash bail set beyond their means.

In many cases at some cities, persons were routinely incarcerated before any determination of guilt and then charged for each day they were in jail with no consideration of their poverty. This practice was carried out by the city magistrates and police without any court order or directive to that effect and with the collection of these jail fees also being pursued by JCS.

While collecting fines in Hoover's city court, JCS secretly paid the Hoover Magistrate Susan Fuqua ('Ms. Fuqua')[2], as its lobbyist to market its interests to other cities. Ms. Fuqua did not register as a lobbyist nor did she reveal the fact that she was being paid by JCS while she promoted JCS to other city magistrates and to city judges. With the Hoover city magistrate and its city prosecutor secretly on the JCS payroll[3] to assist in marketing efforts, JCS ultimately contracted with over 100 Alabama cities to collect fines. Throughout the decade from 2005 to

---

[2]Ms. Fuqua was also the longtime President of Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA')

[3] Charlie Waldrep was Hoover's prosecutor during the times relevant to this complaint. JCS paid Charlie Waldrep's law firm, Waldrep, Stewart and Kendrick, monthly for marketing efforts on its behalf while he was the prosecutor for the City of Hoover where JCS was also working.

2015, JCS Inc. was paid over $50 million dollars from fees collected from the poorest citizens of Alabama under this extortion scheme.

These practices of JCS and its co-conspirators used the threat of jail, arrests and jail time to coerce payments from poor debtors and their family and friends. Unlike any legitimate court/probation process, the JCS scheme was promoted and run by persons and entities who were financially interested in the process. The Plaintiffs bring this action because the policy, practices and actions of JCS have violated their statutory and constitutional rights.

## PARTIES TO THE COMPLAINT

1.      Plaintiff Emerson Hamilton ("Mr. Hamilton") is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

2.      Plaintiff Bennie Bruno ('Mr. Bruno') is over the age of nineteen (19) and is an individual resident of Childersburg, Alabama.

3.      Plaintiff Willie Walker ('Mr. Walker') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

4.      Plaintiff Tavell Crawford ('Mr. Crawford') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

5.      Plaintiff Antonio Calhoun ('Mr. Calhoun') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

6.      Plaintiff Lewis Mallory ('Mr. Mallory') is over the age of nineteen (19) and is an individual resident of Childersburg, Alabama.

7.      Plaintiff Joshua Hall ('Mr. Hall') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

3

8.     Plaintiff Earnest Norwood ('Mr. Norwood') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

9.     Plaintiff Correy Kelley ('Mr. Kelley') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

10.    Plaintiff Norwood McDonald ('Mr. McDonald') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

11.    Plaintiff Khomenie Datcher ('Mr. Datcher') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

12.    Defendant Judicial Correction Services, LLC (hereinafter 'JCS' or 'JCS Inc.') is a Delaware Limited Liability corporation. While operating in the State of Alabama, JCS operated as Judicial Correction Services, Inc. being registered as a foreign corporation and doing business in the State of Alabama and in Jefferson County. JCS marketed itself as "not a social service agency," but a "for profit" company which offered services in Alabama to governmental entities "free of charge" to the cities as "an offender paid system." At all times, JCS has operated under the color of state law. JCS no longer operates in the State of Alabama.

13.    Defendant CHC Companies, LLC. ('CHC') (also hereinafter 'JCS Inc.') is a Delaware Limited Liability corporation. While operating in the State of Alabama CHC operated as CHC Companies, Inc. being registered as a foreign corporation and doing business in the State of Alabama and in this County. It is the successor of JCS, having purchased and merged JCS operations into its own pursuant to a merger agreement executed on September 30, 2011. From September 30, 2011 until its acquisition by CCS in 2014, all the JCS operations were directed and controlled by CHC which continued to use the JCS name, JCS contracts and JCS trademark. CHC's JCS division no longer operates in Alabama.

4

14.     Defendant Correct Care Solutions, LLC ('CCS') (also hereinafter 'JCS Inc.') is a Kansas limited liability corporation, registered as a foreign limited liability company and doing business in the State of Alabama. CCS purchased CHC and merged CHC's operations, its subsidiaries and its headquarters with its own. The CCS home office and headquarters is now in Nashville, Tennessee, from which, upon information and belief, it now controls the operations of its subsidiaries including CHC Companies, Inc., employing and directing employees in the JCS operations. In the fall of 2015, CCS discontinued its JCS operations in Alabama.[4]

15.     Defendant Susan Fuqua ('Ms. Fuqua') is over the age of nineteen (19) and is an individual resident of Jefferson County, Alabama.

## VENUE AND JURISDICTION

16.     Venue exists in this Circuit because Ms. Fuqua resides in this County and because the private company defendants JCS, CHC and CCS (collectively referred to as 'JCS Inc.') did business in this county as Judicial Correction Services, Inc. during the period made basis of this complaint.

17.     Jurisdiction exists in Alabama because JCS, CHC and CCS are foreign companies registered to do business in the state of Alabama and which actively operated as a private 'probation' company before discontinuing operations in the State of Alabama the fall of 2015. These Defendants performed various services within the State of Alabama for several years and therefore this Court has jurisdiction over each and every one of the private company Defendants.

---

[4]Judicial Correction Services, Inc is responsible for its actions before October 1, 2011, CHC is liable for its actions from October 1, 2011 until it was acquired and merged with CCS in 2014, and CCS is liable for its action from the date it acquired the JCS operations in 2014. For simplicity JCS refers to the JCS operations in Alabama but the controlling entities are the legal entities from which the Plaintiffs seek damages.

18.     This Court has jurisdiction over Defendant Susan Fuqua because she lives in Jefferson County and because of her participation in the conspiracy with the private company Defendants and the co-conspirator cities in the acts alleged herein.

19.     This Court has subject matter jurisdiction over the civil rights and state claims as stated herein. While both federal and state courts have jurisdiction to decide claims under 42 U.S.C. §1983, the Northern District of Alabama recently ruled that under *Rooker-Feldman* and its progeny, federal courts do not have jurisdiction to grant Plaintiffs' the relief they seek herein.[5]

## FACTS

20.     JCS operates a "for profit" enterprise that marketed its services to various municipal governments and contracted with over 100 cities and towns throughout Alabama. JCS's marketing approach to these cities emphasized that its fees would be paid by the "offender" and that its efforts will improve collection of court fines and costs at no cost to the city.  The JCS promises were made in exchange for the city and its court agreeing to require payment of fees to JCS and to include that in every court order of the municipal court which sends a person to JCS for collection.

21.     The JCS approach is highly systemized and uniform throughout the Alabama municipal courts in which it operated, including its prior operation at Harpersville which began in 2005 and was terminated in August 2012.

22.     Under the JCS system, the JCS employees were not required to have criminal justice or legal training, nor were they required to have any social work education or meet any minimum law enforcement standards as is required of state probation officers.  Instead, the only requirements of a JCS employee - who were referred to as a "Probation Officer" - is that the

---

[5] See Judge Proctor's Memorandum -  [2:12-cv-02819-RDP Doc. 626 pp. 45-46]

employee be 21 years old, a non-felon, with two years of college who complete 40 hours of JCS training on its processes. On satisfying those requirements, JCS employees were then labeled "Probation Officers"[6] and even permitted to carry the JCS issued badge in some court while collecting its fees, court fines and costs.

23.     JCS' co-conspirator cities, by contract and practice, unlawfully delegated to their agent JCS many administrative and judicial functions of its municipal court, clothing it with the color of state law for the collection of court fines, costs and the JCS private fees.

24.     The City Council and Mayor control the policy making for the cities throughout Alabama and also hire the municipal court judges for the city courts as well as hire any public defenders.

25.     JCS typically used its own form contract for approval by the mayors and council but these contracts are not submitted for competitive bids.  As a result, the contracts provided JCS with an exclusive franchise at each City for these "services" and also provides that payment of JCS fees must be required in every court order sending persons to JCS for collection of fines and costs.

26.     The form agreement between the cities and JCS attests that the municipal "***court agrees that each court order shall provide*** for the following":

> a probation fee of $35.00 per month flat fee. (Basic or intensive supervision)
> one time probationer set up fee of $10.00. . . . "
> (Exhibit 1)(***emphasis added***).

---

[6] In contrast, even a judicial volunteer is required to meet greater and more specific qualifications, careful screening, specific training and continual oversight established by the Administrative Office of Courts ('AOC').  See Ala. Rule of Judicial Administration Rule 42.

27.    Generally the city, through its Mayor and Council, approved the agreement with JCS. Throughout the period of the contract with JCS, the City police, City court, and City staff participated in the practices and system with JCS.

### General JCS Collection Practices

28.    Beginning in 2001, JCS implemented its system in Alabama cities with which it contracted.  That system used JCS's "Probation Tracker" software which was highly systemized and focused on collections of fines and its fees -- not traditional probation services.  For instance, the "probation officer" did not visit the probationer's home, job or family, and had contact with them only at the JCS office in collecting fees and fines.

That collection focus allows the "offenders" to mail in payments if they live 30 miles from the JCS office. The training manual used by JCS instructs its employees on the use of its computer systems in tracking the payments made by the "offenders" and provides court forms to order probation and payments to JCS. The JCS training system also provides sample letters for use after probation is ordered, threatening the "offender" that failure to report to JCS "as directed may result in a warrant being issued for your arrest" and that their "court date cannot and will not be reset." Similar JCS forms instruct the "offender" that they can avoid the court date if they pay an amount determined by JCS.  Notice to the offender of these JCS set "court dates" was handled by JCS by regular mail with no proof of service and no consideration of returned mail showing no receipt.  Similarly, the setting for any hearing on petitions instituted by JCS was done by JCS and listed on a separate "JCS Docket" which JCS established and which the city then adopts. Finally, the JCS manual instructs its employees on the issuance of warrants of arrest and provides forms for that purpose.

29.     Once on 'probation' to collect the fines, "offenders" who cannot keep up their payments were threatened and/or arrested typically based upon claims of  "Failure to appear" or "violation of a court order" or "probation violation."  Warrants were based upon JCS' requests using JCS forms that stated that the offender failed to appear as directed at the JCS established date after notice from JCS.  Similarly, these arrests resulted from JCS reporting that the "offender" failed to comply with their probation order – that is, they failed to pay or appear at the JCS offices as JCS directed.  The arrests and incarceration on these charges occurred without any determination of contempt or willfulness in these arrests and often additional costs were added without any finding whatsoever. Under this system, the "offender" arrested was jailed for an undetermined period of time with bond set by the city magistrate to approximate the money claims to be owed on the balance at JCS.  Unlike legitimate probation systems where a probationer would be entitled to a finding of the reasons for revocation, appointed counsel and, at worse, suffer jail time equating to the original sentence, JCS' system ignored all those safeguards.

30.     The cities, through their contract, pattern and practice, clothed JCS with the appearance of state authority and in some cities JCS employees even carried badges.[7]  The JCS employees attended each municipal court session and were referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.  Under this system, JCS "offenders" were not permitted to pay fines at the City payment window, but were required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS.

---

[7] 

31.     This public ruse was maintained by the cities for the purposes of imposing and collecting fines, fees and costs from citizens such as the Plaintiffs, and was accomplished by allowing JCS to control the money, determine how much each municipal court "offender" must pay each month, how much JCS would keep for its own fees each month, and how much of the payment JCS would rebate to the city toward the fines assessed.

32.     This system, as a matter of routine, violated the rights of persons such as the Plaintiffs by imposing fines, fees and surcharges to impoverished persons with no hearing or consideration of their poverty and by converting fines to jail time - and, in some cities, adding jail fees for each day a person had to stay in jail.

33.     Despite the lack of legal authority to do so, JCS used threats of revoking probation, increased fines and costs and jail time for purposes of collection.  Under this system, should an individual fail to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked and jailed if the money was not paid. Under the system operated jointly by Alabama municipal courts and JCS, JCS's determination to incarcerate an individual was routinely accepted by city and court personnel without conducting delinquency or probation hearings and without making any findings, much less any ability-to-pay determination or appointment of counsel before taking such punitive action. Under this scheme with the cities, when JCS requested a revocation and no payment was forthcoming, the JCS employee would testify against the 'probationer' in support of its own petition to revoke and advise the judge about how to handle the case.  In fact, JCS' Contract with many cities/cities' court explicitly agreed that JCS, even though a financially interested party, would provide testimony stating: "the [probation] 'officer' will testify as to the circumstances of the case." [8]

---

[8]   The following contracts include this provision: Albertville p. 1 section G, Arab p. 4 section G,  Bay Minette p. 8 Exhibit A 6,Brookwood p. 29 section G, Calera p. 33 Exhibit A 6, Childersburg p. 37 Exhibit A

34.     The lack of indigency or *Bearden* hearings is particularly disturbing since all the court personnel hired by the city, including JCS, have a significant financial stake in the proceedings.

35.     After improperly imposing probation for the collection of fines, jail then followed if the fine, together with the fees added by JCS, were not paid as dictated.  Under this system the "probation" was terminated once full payment was made showing further that the purpose of this "probation" was only for collection.

36.     Under this system with the cities, JCS had a monetary interest to conduct its role in this "probation" in a way that extended a person's probation to keep the person on a payment plan for as long as possible so that it could profit from the collection of more monthly fees.

37.     Under this scheme with the cities, JCS did not undertake determination of the reasons for nonpayment, and did not consider such things as the Plaintiffs' disability, unemployment or assets, in regard to the nonpayment of the fines and routinely sought collection from exempt income such as Social Security Disability payments -even when it had documented these indicia of poverty.

---

6, Citronelle p. 41 Exhibit A 6, Clanton p. 46 Exhibit A 6, Dauphin Island p. 54 Exhibit A 6, Dora p. 58 Exhibit A 6, East Brewton p. 63 Exhibit A 6, Fairhope p. 67 Exhibit A 6, Falkville p. 70 Section G, Fort Payne p. 74 Exhibit A 6, Haleyville p. 87 Exhibit A 6, Hartselle p. 91 Exhibit A 6, Hollywood p. 95 Exhibit A 6, Homewood p. 99 Section G, Hueytown p. 104 Section G, Jackson p. 108 Exhibit A 6, Jacksonville pp. 112, 316 Exhibit A 6, Jemison p. 116 Exhibit A 6, Kinston p. 125 Exhibit A 6, Lake View p. 127 Exhibit A 6, Leeds pp. 131, 143 Exhibit A 6, Town of Level Plains p. 147 Exhibit A 6, Loxely p. 153 Section G, Millbrook p. 157 Exhibit A 6, Montevallo p. 161 Exhibit A 6, Montgomery p. 165 Exhibit A 6, Mount Vernon p. 170 Exhibit A 6, Northport p. 177 Exhibit A 6, Orange Beach p. 180 Section G, Owens Crossroads p. 183 Section G, Ozark p. 187 Section G, Pleasant Grove p. 192 Exhibit A 6, Priceville p. 196 Exhibit A 6 (signed by Mayor and City Judge), Rainbow City p. 200 Section G, Rainsville p. 204 Exhibit A 6, Robertsdale p. 211 Section G, Saraland p. 215 Exhibit A 6, Scottsboro p. 219 Exhibit A 6, Somerville p. 226 Section G, Southside p. 229 Section G, Sylacauga p. 235 Exhibit A 6 (signed by Mayor and City Judge), Talladega p. 243 Section G, Tallassee p. 247 Exhibit A 6, Troy p. 259 Section G, Warrior p. 269 Exhibit A 6, Ashford p. 273 Exhibit A 6, Attalla p. 276 Section G, Blountsville p. 279 Section G, Bridgeport p. 283 Exhibit A 6, Brighton p. 287 Exhibit A 6, Dauphin Island pp. 300, 303 Exhibit A 6, Notasulga pp. 320, 325 Exhibit A 6.

38.     Under this scheme with the cities, JCS had a practice of requesting warrants when a person failed to make sufficient payments and denied any responsibility to consider the person's ability to pay or right to counsel even when JCS had knowledge that the person was poor.  Thereafter, the warrant for arrest would be issued by the city.

39.     Under this scheme with the cities, after the JCS request, the Cities issued arrest warrants, and send City officers go to the homes of debtors to arrest them without any prior notice and opportunity to be heard and without any basic inquiry into whether the debt is owed, actually unpaid, or still valid.

40.     Under this scheme with the cities, after being arrested the person arrested for nonpayment was often kept in jail until the next available court date if they could not pay a cash bond to secure their release.  The amount of the cash bond was often set at the amount claimed to be owed to the City and JCS.

41.     People placed on this "probation" had further restrictions on their liberty, which the City and JCS called "conditions" of probation, which were imposed solely because of their poverty status. These restrictions in the JCS form order included: 1) not changing residence or employment without notifying JCS, 2) avoiding "injurious or vicious habits," 3) not using alcohol or visiting places where "intoxicants, drugs, or dangerous substances were sold, dispensed or used, 4) working diligently at a lawful occupation, 5) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee gives.  In addition to these unlawful constraints, the order states in bold type. "**You were subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly.**"

42.    This JCS extortion scheme with the cities was enormously profitable, and pressured family members with no legal obligation to pay any money to come up with money to get their loved ones released from jail. This scheme and practice also compelled these impoverished people to forgo basic necessities of life in order to pay JCS in an attempt to avoid jail time and extra costs associated with that.

43.    Neither the city nor JCS has legal authority to charge such extra fees to those unable to immediately pay their fines in full. This policy and practice violate state statutes and constitutional rights established by our state and federal constitutions.

44.    Under this scheme with JCS, the cities as financially interested parties take advantage of their control over their police force and jail facilities to deny "offender"/debtors such as the plaintiffs the statutory and constitutional protections that every other Alabama debtor may invoke against a private creditor by allowing JCS to use or threaten debtors with arrest and jail as coercion for payment.

45.    All of the plaintiffs were damaged by the JCS extortion scheme at cities detailed below.

**Factual Allegations Regarding
Conspiracy between JCS and Susan Fuqua**

46.   To further the conspiratorial agreement and understanding between JCS and the municipalities with which it contracted, JCS hired as its paid lobbyist Susan Fuqua ('Ms. Fuqua'), while she was serving as the magistrate for the City of Hoover and as President of the Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA') for which she was one of the initial board members. Ms. Fuqua did not register as a lobbyist or publicly disclose her payments from JCS, but organized and participated in continuing education seminars for city

magistrates and city judges during which she promoted JCS's collection system to other city court personnel.

47.    Ms. Fuqua actively participated in marketing the JCS 'probation' for collection scheme to city magistrates and city officials.

48.    Upon information and belief, Ms. Fuqua profited by JCS' growth in Alabama by continuing to receive payments from JCS and from CHC once CHC purchased and merged the JCS operations with its own.

49.    Upon information and belief, in exchange for her monthly stipend from JCS Inc. (i.e. JCS, CHC and CCS) Ms. Fuqua promoted JCS' business model as one that was legal but did not disclose the constitutional violations that are woven into the 'probation' for collection scheme - such as due process and equal protection violations.

50.    Upon information and belief, Ms. Fuqua presented JCS as a neutral court officer despite the fact that it had financial interests in keeping people on 'probation' and hiding the material facts regarding people's poverty from the city court and its employees.

51.    Upon information and belief, as the president of the AMCCMA for over ten (10) years Ms. Fuqua actively lobbied for JCS' interests without disclosing her role as its paid lobbyist.

52.    Upon information and belief, as the long-time president and founding member of AMCCMA Ms. Fuqua would receive calls from city magistrates with questions and concerns regarding JCS Inc., its operations, and complaints/challenges to JCS' conduct. Ms. Fuqua would dispel these concerns and present JCS Inc. in a positive light all while concealing the fact that she was its paid lobbyist.

53.     These concerted efforts between Ms. Fuqua and JCS Inc. show a conspiratorial agreement and understanding to foster and promote a practice which violates the Plaintiffs' rights to due process and equal protection, all while ignoring the requirement of consideration of poverty as required under the constitution, *Bearden v. Georgia*, and Alabama law.

**Facts Regarding
Conspiracy Between JCS
and Alabama Municipal Courts**

54.     JCS entered agreements and/or reached an understanding with the many Alabama Municipal Courts with which it contracted establishing a practice to deny the Plaintiffs' constitutional rights protected by 42 U.S.C. § 1983.

55.     Over the years JCS contracted with over one hundred Alabama cities for the collection of court fines and costs using substantially the same contract form and provisions and thereafter operating in each court under the same automated software and with personnel assigned to each court being trained under the same manual and processes. Those cities included Hoover, Harpersville, Childersburg, and Sylacauga among others.

56.     After being hired at a city court, JCS and the municipal courts operated in a concerted and consistent fashion showing evidence of an agreement and understanding to deny the Plaintiffs' constitutional rights.

57.     Each JCS contract provided that the municipal judge would include in his/her orders sending people to JCS that those people would be required to pay JCS a set-up fee and monthly fee.

58.     Many of these agreements also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.' (See Paragraph 33 above)

59.     In furtherance of the conspiratorial understanding and agreement between JCS and the Alabama Municipal Courts under contract with JCS, the city judges consistently placed persons on "probation" with JCS for the collection of fines and court costs.

60.     In furtherance of this practice, a persons' poverty was ignored, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. To do so would destroy the business model of JCS which was dependent upon the ongoing assignment of "probationers" who were ordered to pay its fees.  Persons who could pay their fines were not sent to JCS.  Those who were sent, were all impoverished to the degree they could not pay simple fines and costs.  Instead of consideration of their poverty however, and in furtherance of the conspiratorial understanding and agreement with JCS, the city judges placed persons on probation without further inquiry.

61.     These actions were in furtherance of the conspiratorial understanding and agreement with JCS, with full understanding that JCS had financial interests in expanding the number of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent since JCS agreed to not charge indigent people probation fees.

62.     In furtherance of this practice and agreement between JCS and the Alabama municipal courts, the courts routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS provided to the court its petition for revocation as the tool to acquire the warrant.

63.     The petitions for revocation sought by JCS under its agreement and understanding with Alabama municipal courts were predicated on failure of the individual to pay the fines and fees demanded and those petitions were dismissed when such payment was forthcoming. The

"probation" itself was terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

64.     In furtherance of the conspiratorial agreement and understanding between JCS and the Alabama municipal courts, JCS was allowed to determine the monthly payments required and to allocate payments between JCS or the City without any audit by the City as to the correctness.

65.     This conspiratorial agreement and understanding between JCS and the Alabama municipal courts to violate the constitutional rights of the plaintiffs is further shown by the hundreds of people throughout the state who were kept on JCS probation beyond the statutory maximum of two (2) years; the absence of counsel for those arrested; the explicit language of the JCS forms and petitions presented to the Court; JCS data showing disability and unemployment of those assigned for collection; the absence of any investigation of poverty as reasons for nonpayment by either JCS or the Court, and the Court's participation in conformity with the JCS contract by assigning persons for collection of fines and costs to a party with a known financial interest in expanding and extending fee payments.

66.     These concerted efforts between the Alabama municipal courts and JCS, show a conspiratorial agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS for collection, all while ignoring the requirement of consideration of poverty as required under the constitution, *Bearden v. Georgia*, and Alabama law.

67.     This conspiratorial practice existed in Hoover, Harpersville, Childersburg and Sylacauga among other cities and resulted in damage to the plaintiffs as hereinafter described.

## PROCEDURAL HISTORY
### Of related litigation Against JCS and Harpersville
### [Case No. 58-CV-2010-900183]

68.     On March 3, 2010, Richard Garrett and others ("Shelby Co. Plaintiffs") filed a complaint against Harpersville and others including Judge Larry Ward requesting injunctive and declaratory relief.

69.     On May 25, 2012, the Shelby County Court certified "the class claims for declaratory and injunctive relief.

70.     Judge Harrington enumerated the most egregious abuses committed by JCS and Harpersville in his July 11, 2012 order :

1. Defendants placed on "probation" without an adjudication or sentencing order and/or without receiving a suspended sentence;

2. Defendants placed on "probation" with JCS only when unable to pay the entire amount of assessed fines and court costs on the day of trial;

3. Defendants incarcerated for a probation violation (failure to pay, failure to appear, contempt of court  . . .) without an adjudication or sentencing Order;

4. Defendants incarcerated for failure to appear in court, though only "ordered" to do so by JCS;

5. A defendants' failure to appear or failure to pay often results in a new criminal charge with incarceration and additional fines and fees for contempt of court with no valid court order or adjudication;

6. Defendants not afforded a hearing as required by Rule 26.11 of the Alabama Rules of Criminal Procedure;

7. Defendants placed on "extended" probation for many years beyond the two year maximum;

8. Defendants interminably held in the county work release program until all fines and fees are paid in full;

9. Defendants charged unconscionable fines and fees.

10. Defendants placed on "probation" are charged an initial "set up fee" of $10.00 and a monthly "probation fee" of $35.00 (arbitrarily raised to $45.00 per month at some point in time, though the Harpersville/JCS contract allows for only $35.00 per month) which is charged as long as the defendant is on probation. For example, under the Harpersville/JCS contract a defendant who is unable to pay a fine of $200.00 on the day of trial is placed on probation. If that defendant paid $50.00 per month to the JCS probation office, the defendant will not have satisfied his probation for 14 months at a total cost of $700.00. (JCS probation fees would be one month at $10.00 + $35.00 and 13 months at $35.00-unless the defendant was charged $45.00 per month in which case the first two monthly payments would only cover JCS charges, requiring an additional 40 months of payments totaling $2,100.00.)

11. Multiple incarcerations were imposed upon the plaintiffs in the case at bar with no adjudication or imposition of sentence and for probation violations over which the court had absolutely no jurisdiction.

12. Fines and fees charged to the plaintiffs in the case at bar reached into the thousands upon thousands of dollars.
(Exhibit CITE pp. 2-3)

71.     On July 17, 2012 the Plaintiffs filed their third amended complaint against Harpersville and JCS.

72.     The Harpersville city court was abolished on August 8, 2012 pursuant to the city council's Ordinance No. 12-0808. In addition to abolishing the city court, this Ordinance transferred jurisdiction for city crimes to the District Court of Shelby County. The very next day, August 9, 2012, the Sheriff of Shelby County executed a search warrant upon Harpersville's municipal court and its police department and seized the City's records.

73.  On August 16, 2012, Judge Harrington entered an order immediately abolishing Harpersville's city court and transferring jurisdiction for all Harpersville city crimes to the District Court of Shelby County, Alabama. This order also enjoined Harpersville and its agent, JCS, from collecting any "outstanding fines, fees, costs or judgments."

74.     With no city records, the case became dormant for an extensive period of time with no action on the damage claims. With no progress of the case on March 18, 2015, the Shelby County Circuit Court entered an Order continuing the case generally.

75.     While the Shelby County case was stalled, Plaintiffs in *Ray v. JCS, et. al.*, filed their complaint on August 28, 2012 in the U.S. District Court for the Northern District of Alabama and vigorously pursued JCS in a statewide damage class action.

76.     During the pendency of the *Garrett* Shelby County lawsuit, following a ruling in this matter by Judge Hub Harrington and the closure of the Harpersville city court, Attorney General Luther Strange seized the records of the City of Harpersville city court and kept those in his office for many months while instituting no litigation or prosecution concerning the same. Only after many months of silence from that office, those records finally returned to the District Attorney's office in Shelby County (Exhibit CITE - E) and ultimately were placed in the hands of the attorneys at Balch, Bingham acting as counsel for the City of Harpersville where they currently reside.

77.     On March 16, 2018, the parties in the Shelby County action filed a joint motion to dismiss requesting that the court approve a secret settlement with the named plaintiffs and to approve dismissal of the class claims without prejudice and without notice to the class. (58-cv-2010-900183 - Doc. 727)

78.     On April 3, 2018, Balch & Bingham on behalf of Harpersville filed a proposed order which the court adopted approving the secret settlement with no notice to the class members and with no disclosure of amounts paid to the plaintiffs or their counsel in consideration of the dismissal. (Docs. 736 & 738)

79.     Though the named Plaintiffs and their counsel filed the Shelby County action as representatives of a putative class, certification of the damage class was never sought and no notice whatsoever was given to other putative class members whose rights are affected thereby. The class claims in the Shelby County case have however tolled the statute of limitations for the claims of the putative class members there.

80.     None of these Plaintiffs have received any compensation for the damages they have suffered from the JCS scheme.

### JCS's Conspiracy with Harpersville

81.     The Town of Harpersville contracted with JCS on March 3, 2005. The JCS form contract was signed by the city mayor.  As in other cities, Harpersville agreed to have its court order the payment of fees to JCS by each person sent to "probation" for fine collection.

82.     Harpersville also hired Larry Ward as its part time municipal judge.  Ward's full time job was selling municipal bonds and giving cities financial advice - not practicing law. In fact, Ward never practiced law but had assisted Harpersville in issuing municipal bonds whose payments were thereafter largely funded by revenue from city fines which Ward levied. Upon information and belief, Ward facilitated the sale of Harpersville municipal bond warrants by his employer Morgan Keegan in 2010 which were underwritten based on Harpersville financial statements showing approximately 50% of the city revenue coming from its city court fines levied under Larry Ward.

83.     During his tenure at Harpersville, Larry Ward had a personal, financial interest in ensuring that the Harpersville court generated money for the Town to support the bond issue all of which was known to the Town officials who participated in the bond issue.

84.    Like Larry Ward, JCS had a significant financial stake in the proceedings, as it only made money if people continued to be placed on 'probation' and ordered to pay fees all of which constituted a denial of due process to those appearing before the city court.

85.    As part of the practice at Harpersville with JCS, Larry Ward typically presigned blank 'probation' orders provided to him by JCS which the JCS employees then filled out without any oversight being undertaken by the City.  Many times "probation" was assigned for collection even though there was no underlying suspended jail sentence and often for charges upon which there had been no finding of guilt.

86.    The Town's focus on revenue collection and its knowing employment of JCS and Ward, each with financial interests in a judicial process, established a long-term practice of abuse routinely denying due process and other rights to persons such as the plaintiffs as was found by Judge Harrington in the order referenced above.

87.    To give JCS the appearance of authority, a JCS employee with City approval often sat in the mayor's chambers and received 'probationers' who were escorted into the chambers by Harpersville police after being sent to "probation."

88.    On March 4, 2014 the Alabama Judicial Inquiry Commission issued Advisory Opinion 14-926, after conducting an investigation of Larry Ward. (Exhibit 1 - CITE) and entered a lengthy opinion critical of the deficiencies in his actions as a city judge operating at Harpersville jointly with JCS.

89.    After reviewing Ward's improper actions with JCS at Harpersville, the Judicial Inquiry Commission gave directions on how municipal courts should operate:

A. COURT RECORDS
That orders of the court are duly signed by the judge in a timely manner; that blank orders are never signed by the judge to be filled in by staff; that execution of orders not be delegated to staff by use of signature stamps; that all plea

agreements, waivers of counsel, and other forms be properly executed and maintained; that counsel be appointed for indigent defendants where appropriate; that all orders and records of the court be retained by the court clerk as required by law; that the amount of fines imposed and court costs and fees assessed be limited to those allowed by law; that proper corrective action be taken upon discovery that the amount of such fines, costs, or fees was excessive and that traffic tickets be timely forwarded to the Department of Public Safety as required by law.

## B. PROBATION

That probation be used only when a suspended sentence is imposed following conviction of an offense; that probation be imposed only after a properly executed order of conviction has been entered; that all probation orders be executed by the judge at the time the defendant is placed on probation and advised of the conditions of probation; that periods of probation be neither imposed nor extended beyond the time authorized by law; that petitions for revocation of probation be processed in accordance with due process requirements, including proper notice to the defendant; and written findings of the grounds for revocation of probation be recorded.

## C. COUNSEL, INCARCERATION, AND PRE-TRIAL DIVERSION

That incarcerated defendants be provided timely initial appearance hearings as provided by law; that defendants be informed of their right to counsel; that defendants be given a reasonable time to secure an attorney prior to arraignment or a decision on pre-trial diversion; that any bond set should be reasonable, with consideration of the defendant's ability to make bond; that defendants not remain incarcerated beyond a court date due simply to administrative failures in the court; that defendants not be incarcerated for nonpayment of fines, costs, and restitution without the judge first conducting an inquiry as to the reasons for nonpayment; that defendants not be incarcerated for failure to pay fines, costs, and restitution beyond the maximum time allowed by law for such incarceration; that incarcerated defendants be properly credited on fines and costs with time served; that defendants not be incarcerated for nonpayment of fines, costs, and restitution, where the defendant has failed to pay because of indigency; and that any finding of contempt for nonpayment of fine, costs, and restitution be based on a petition for contempt and a hearing after notice.

## D. PRIVATE PROBATION

That private probation or other services used by the court be reviewed on a consistent basis to ensure there is no usurpation of the authority of the court, and to prevent such agencies from creating the perception that they have the authority to make the final determination of conditions of probation or to incarcerate offenders for noncompliance with court orders; that such agencies not be delegated the authority to make indigency determinations or other determinations relative to incarceration for noncompliance; and that all actions regarding

probation be subject to review by the judge to ensure that such actions do not violate an offender's rights of due process or equal protection of the law.

E. JUDICIAL ENGAGEMENT
That sufficient time is committed by the judge to the court to insure that the judge and the other officials of the court protect the due process rights of all individuals appearing before the court.
(Exhibit 1 - pp. 2-4)

90.     When the Judicial Inquiry Commission findings were made, JCS was operating in 112 cities.   Ward was serving as a city judge in several other cities as well, including Childersburg.

**Factual Allegations Regarding
Conspiracy between JCS
and Childersburg**

91.     JCS entered into a contract with Childersburg and its court in 2005 signed by the City's former mayor hiring JCS for the collection of court fines and costs.   That relationship continued until it terminated in May of 2015, after Childersburg was sued in *Ray cite*.   During that ten years there was concerted consistent action between JCS and the municipal court showing evidence of their agreement, practice and understanding, to deny the Plaintiffs' constitutional rights.

92.     Again the contract was the JCS form which provided that the municipal judge, (Larry Ward), would order payment to JCS of a set-up fee and monthly fees in his orders which sent people to JCS. In practice, those "orders" were preprinted and supplied by JCS to Ward who signed them in blank for JCS's use.

93.     This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

94.     In furtherance of the understanding and agreement between JCS and the Childersburg Municipal Court, Judge Ward consistently sent persons appearing before him to "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when those were assessed. This referral to JCS "probation" occurred whether there was a suspended jail sentence or not, and required those individuals to pay additional JCS fees.

95.     In ordering people to JCS "probation" for collection of fines and court costs, Ward consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed.  Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Ward placed persons on probation without further inquiry allowing JCS to use his pre signed blank orders as the basis for this referral.

96.     The actions of Judge Ward in furtherance of the conspiratorial understanding and agreement with JCS, were done with full understanding and acknowledgment that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation" and that its interests were harmed if an individual sent to JCS was formally declared to be indigent because JCS agreed to not charge people probation fees who the court declared to be indigent.

97.     This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to appoint counsel to those he ordered to JCS 'probation', by the use of JCS' pre-printed probation order, by Judge Ward pre-signed the orders in blank, and by language included in those forms above the

offender's signature line stating: "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

98.     In furtherance of this understanding between JCS and the City of Childersburg Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS requested a petition to revoke probation.  The warrants issued by the city court were based upon JCS' institution of the petition for revocation. The agreement and understanding between JCS and the city municipal court in Harpersville was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant from the City.

99.     In furtherance of this conspiratorial agreement and understanding, after JCS petitioned for revocation beginning the process to acquire a warrant, neither JCS nor the municipal court took steps to provide counsel for the persons pursued or to inform them of this right. Notice about these proceedings, if any, was given by JCS - not the city court.

100.    The petitions for revocation sought by JCS under its agreement and understanding with Childersburg Municipal Court were all predicated on failure of the individual to pay the fines and fees demanded.  The petitions were dismissed if such payment was forthcoming and "probation" itself was promptly terminated when the fees, fines and costs were fully paid.

101.    In furtherance of the conspiratorial agreement and understanding between JCS and the city court of Childersburg, JCS was allowed to determine the monthly payments required and the allocation of payments between JCS or the City without any review by the City.

102.    This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the hundreds of people who were kept on JCS

probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

103.    These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty as required under constitutional law, *Bearden v. Georgia*, and Alabama law.

**Facts Regarding
Conspiracy between JCS
and Sylacauga's City Court**

104.    JCS entered into a contract with Sylacauga and its City court in 2009 for the collection of fines and costs.  The contract was signed by the Sylacauga mayor, Sam Wright, and the city judge, Barry Vaughn, (Exhibit 5 - CITE) after which there was concerted consistent action between JCS and the municipal court showing evidence of their agreement and understanding, to deny the Plaintiffs' constitutional rights.

105.    This agreement provided that the municipal judge, Barry Vaughn, would order people he sent to JCS to pay JCS a $10 set-up fee and a $40 monthly fee.

106.    This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

107.    In furtherance of the understanding and agreement between JCS and the Sylacauga Municipal Court, Barry Vaughn consistently placed persons appearing before him on "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

108.    In ordering people to JCS "probation" for collection of fines and court costs, Judge Vaughn consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Vaughn placed persons on probation without further inquiry.

109.    The actions of the Sylacauga judge were in furtherance of the conspiratorial understanding and agreement with JCS, and with knowledge that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation."  Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent since JCS agreed to not charge indigent people probation fees.

110.    This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court to make any indigency determinations and by JCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

111.    This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court there to appoint counsel for those he ordered to JCS 'probation.' Additionally, Judge Vaughn allowed JCS to use his signature stamp to 'sign' JCS' pre-printed probation order.  That form order included the following language above the offender's signature line. "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

112.    In furtherance of this understanding between JCS and the City of Sylacauga Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to

pay or failure to obey court order after JCS requested a petition to revoke probation. The agreement and understanding between JCS and the city municipal court was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant.

113.   The petitions for revocation sought by JCS under its agreement, practice and understanding with Sylacauga's Municipal Court were all based upon failure of the individual to pay the fines and fees demanded. The petitions were dismissed if such payment was forthcoming and "probation" itself was terminated when the fees, fines and costs were fully paid. These petitions were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

114.   In furtherance of the conspiratorial agreement and understanding between JCS and Sylacauga's city court, JCS was allowed to determine the monthly payments required and to allocate payments between JCS or the City.

115.   This conspiratorial agreement and understanding between JCS and Sylacauga's municipal court is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

116.   These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty as required under constitutional law, *Bearden v. Georgia*, and Alabama law.

## THE PLAINTIFFS

117.   Plaintiffs are individuals who were unable to fully pay fines, fees, and costs levied by Alabama municipal courts, and who, as a result, were assigned to JCS for "probation" under

JCS for purposes of collecting the fine. Plaintiffs are currently or were formerly impoverished and, despite that poverty, were incarcerated for failure to pay charges and fees for services allegedly rendered by JCS to its co-conspirator cities with which it contracted.

**EMERSON HAMILTON**

118.    Emerson Hamilton ("Mr. Hamilton") is over the age of nineteen (19) and is a resident of Sylacauga, Alabama.

119.    Mr. Hamilton's difficulties with JCS began shortly after Hoover began using JCS in 2004.

120.    On April 28, 2004, Mr. Hamilton was put on JCS 'probation' for a No Driver's License charge.

121.    JCS records indicate that Mr. Hamilton was assessed a city fine of $25 and court costs of $158.

122.    During this time Susan Fuqua (Ms. Fuqua) was the magistrate at Hoover.

123.    Upon information and belief, during this time Ms. Fuqua was being paid monthly by JCS to be its lobbyist. Similarly, the Judge at Hoover, Brad Bishop, was a resource to JCS reviewing pending legislation and the city prosecutor, Charlie Waldrep, served as legal counsel for JCS.

124.    Ms. Fuqua did not register as a lobbyist for JCS but she actively marketed JCS services to cities and city magistrates while also holding the position of President for the Alabama Municipal Magistrate Association ('AMMA').

125.    Ms. Fuqua kept her lobbyist position with JCS a secret so those appearing before her and the city employees had no reason to know that Ms. Fuqua had a financial interest in JCS' economic success.

126.    Upon information and belief, Ms. Fuqua participated in implementing the JCS system in Hoover's court where JCS operated.

127.    JCS records show that Mr. Hamilton paid JCS a total of $403 to collect the $183 he owed the city of Hoover for his traffic ticket. JCS kept $220 of this and sent $183 to Hoover.

128.    In 2006, Mr. Hamilton was jailed by the Town of Harpersville for a city crime and the city demanded a cash bond for his release.

129.    Since Mr. Hamilton was poor, neither he nor his family could pay the cash bond demanded so he remained in jail until the next date for city court.

130.    Pursuant to the JCS scheme, Mr. Hamilton was put on JCS 'probation' for five (5) city crimes even though there is no record of a guilty plea or adjudication for three (3) of the five (5) 'crimes' for which JCS was collecting money.  Further, the 'probation order' was not signed, and there was no jail sentence to suspend for these five (5) city crimes.

131.    Despite no legal authority to place Mr. Hamilton on probation, JCS filled out the probation form that JCS preprinted assigning Mr. Hamilton to 'probation' requiring him to pay its fees.  There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel.

132.    JCS' preprinted probation order listed "conditions" of probation containing unconstitutional restrictions on his liberty, which were imposed solely because he was poor. These restrictions included: 1) not changing residence or employment without notifying your Probation Officer, 2) avoiding "injurious or vicious habits," 3) working diligently at a lawful

occupation, unless a full time student, 4) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee gives. In addition to these unlawful constraints, the order states in bold type - **"You were subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."**

133.    When Mr. Hamilton told the people at the City court that he was unable to immediately pay the money it demanded, he was instructed to sign the probation papers so that he could escape jail by participating in the JCS "payment plan."

134.    Neither the City, nor the City court, nor JCS, had the authority to place Mr. Hamilton on probation for unadjudicated crimes or for crimes for which there was no jail sentence but, despite this lack of authority, JCS began demanding $2,338 from Mr. Hamilton.

135.    Despite his poverty, Mr. Hamilton paid as much as he could - anywhere from $40 - $100 each visit - to keep his freedom and not be jailed.

136.    JCS determined how much of Mr. Hamilton's payments it would keep for its fees and how much it would send Harpersville as credit against his fines, court costs, and jail fees (Harpersville added $31/day for each day it kept him in jail.) For example, when Mr. Hamilton paid JCS $50, JCS sometimes kept $20 for its fees and sometimes kept $10.

137.    JCS kept Mr. Hamilton on 'probation' under these void orders until March 2011 when he completely paid all the money JCS demanded. During the process however, Mr. Hamilton was arrested several times for his inability to pay JCS as it demanded.

138.    In fact, JCS' detailed visit notes state: "3/7/2011 CFR: DEF WAS ARRESTED AND PAID THIS CASE OFF TO BE RELEASED"

139.    In 2006 Mr. Hamilton was ordered to JCS 'probation' with the city of Talladega court for three (3) traffic tickets when he could not pay. There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel.

140.    The Talladega judge did not sign the pre-printed JCS probation order and Mr. Hamilton was not sentenced to jail for his traffic crimes and as such had no legal authority to place Mr. Hamilton on probation

141.    Nevertheless, JCS employees using an unsigned void order and pretending to have court authority demanded that Mr. Hamilton pay $1,157, its fees and be subjected to its 'probation' requirements.

142.    Mr. Hamilton was also placed on JCS 'probation' in Sylacauga and Childersburg pursuant to this same JCS scheme and based upon void orders. There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel there either.

143.    Throughout these nine (9) years of probation, Mr. Hamilton has endured constant threats of jail and jailing. JCS routinely requested that Mr. Hamilton be arrested when he was unable to pay as JCS demanded - despite the fact that he was legally innocent of some of the city 'crimes', that some JCS 'probations' had no valid probation order, and that he had no jail sentences to suspend.[9]

144.    When Mr. Hamilton was unable to pay to the satisfaction of JCS, warrants were issued and he was jailed pursuant to this extortion scheme with the cities courts.

---

[9] See DOJ Report pg. 55 "The large number of warrants issued by the court, by any count, is due exclusively to the fact that the court uses arrest warrants and the threat of arrest as its primary tool for collecting outstanding fines for municipal code violations. With extremely limited exceptions, every warrant issued by the Ferguson municipal court was issued because: 1) a person missed consecutive court appearances, or 2) a person missed a single required fine payment as part of a payment plan. Under current court policy, the court issues a warrant in every case where either of those circumstances arises—regardless of the severity of the code violation that the case involves. Indeed, the court rarely issues a warrant for any other purpose."

145.    The joint practices of JCS and its co-conspirator city courts using void orders impeded Mr. Hamilton's ability to travel, and the threat of his arrest remains looming. When CCS decided to discontinue its JCS operations in Alabama in the fall of 2015 its records show that Mr. Hamilton was on Warrant status in three (3) cities - Sylacauga, Harpersville, and Talladega.

146.    Upon information and belief, JCS did not request that these warrants be recalled. As such, Mr. Hamilton still lives under the threat of being incarcerated by this extortion scheme all arising from void orders issued under this scheme.

147.    Throughout this period no meaningful inquiry was made to Mr. Hamilton's ability to pay the fines, costs and fees at any of the brief court appearances. Though Hamilton has been poor and unemployed at times, he still was incarcerated for his inability to pay. The jail sentences imposed for nonpayment were always subject to cancellation or amendment should Mr. Hamilton's family or friends be able to pay an amount satisfactory to JCS and as often explicitly stated in the arrest warrants.

148.    Mr. Hamilton was not provided legal representation at any of these court proceedings, and no inquiry was made as to his ability to hire legal counsel.  Warrants for arrest were issued based on a report from JCS that Mr. Hamilton had failed to make payments to the satisfaction of JCS or had failed to appear at the collection office as directed. The arrests and incarcerations of Mr. Hamilton occurred without any determination of contempt, willfulness or the ability to pay as required by Ala. Code 15-18-62.

149.    On his repeated arrests, Mr. Hamilton was held for days either without bail or with cash bail demanded in the balance of fines and fees claimed. Likewise, Mr. Hamilton was

not afforded written charges, legal representation, a constitutionally adequate hearing, findings of fact or any of the components of due process.

150.    Though Mr. Hamilton has been jailed on various occasions upon JCS' request, he has not been afforded full credit for that time in jail against his fines and costs.  Instead, on some occasions he was charged for each day he was incarcerated. There is no legal basis for such charges.

151.    Throughout this period of time, JCS provided no services to Mr. Hamilton and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Hamilton was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees without any due process.

152.    Mr. Hamilton paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and demanded based upon void orders and yet he was still arrested and jailed. This violated Mr. Hamilton's Fourteenth Amendment rights of due process, equal protection and to be free from unlawful seizure.


**BENNIE BRUNO**

153.    Bennie Bruno ("Mr. Bruno") is over the age of nineteen (19) and is a resident of Childersburg, Alabama.

154.    Mr. Bruno's difficulties with JCS began shortly after Harpersville began using JCS to collect its municipal court fines and fees.

155.    In 2005, Mr. Bruno was ordered to the JCS "payment" plan by a void order after he was unable to immediately pay his city fines and fees in full for his traffic tickets. There was no investigation into his ability to pay and he was not provided counsel.

156.     According to its agreement with JCS the Harpersville city judge, Larry Ward, ordered Mr. Bruno to JCS 'probation' for collection of money even though Mr. Bruno was not sentenced to jail.

157.     Mr. Bruno stayed on the JCS 'probation' under this void order from 2005 until the Harpersville court was closed in 2012 despite the fact that legitimate probation for a misdemeanor can only last two (2) years.

158.     During his seven (7) years on JCS 'probation' under this void order, Mr. Bruno was arrested and spent several days in jail for his inability to pay. JCS collected $1,090 of revenue from Mr. Bruno.

159.     Upon information and belief, in addition to the $1,090 JCS demanded and kept for itself JCS collected an additional $3,665 for fines and fees that Mr. Bruno did not owe the city, as he was legally innocent of the 'crimes' for which he nevertheless was charged money.

160.     Though Mr. Bruno was jailed under this void order upon JCS' request, he was not afforded full credit for that time against his fines and costs.

161.     Upon information and belief, Mr. Bruno was instead charged $31 for each day he was incarcerated. There is no legal basis for such charges.

162.     Throughout this period of time, JCS provided no services to Mr. Bruno and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Bruno was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees without any due process and in violation of equal protection.

163.  Mr. Bruno paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed all arising from these

void orders. This violated Mr. Bruno's Fourteenth Amendment rights to due process, equal protection and to be free from unlawful seizure.


**WILLIE WALKER**

164.    Willie Walker ("Mr. Walker") is over the age of nineteen (19) and is a resident of Harpersville, Alabama.

165.    Mr. Walker's difficulties with JCS began in Harpersville after he was ordered to JCS "probation" by a void order in January 2008 because he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

166.    Mr. Walker was not given a jail sentence yet he was illegally ordered to probation by a void order of Larry Ward, the part-time Harpersville municipal court judge.

167.    Upon information and belief, there is no legal finding of guilt for Mr. Walker's crimes for which the payments were demanded.

168.    After being ordered to JCS probation, Mr. Walker continued to be unable to pay the money JCS demanded so JCS requested that a warrant be issued for his arrest.

169.    Pursuant to JCS' request, a warrant was issued for Mr. Walker's non-payment and in the fall of 2009, Mr. Walker was arrested in his home and taken to the Shelby County Jail.

170.    Mr. Walker was not given an opportunity to bond out of jail and was kept in jail until May of 2010, due to his non-payment.

171.    After his release from jail, JCS reactivated Mr. Walker's probation ultimately requesting another warrant for his arrest in October 2010 all of which resulted from the void orders.

172.   Mr. Walker was also ordered to JCS probation by Larry Ward in Childersburg under a void order there.

173.   Mr. Walker's Childersburg 'probations' were also as a result of his inability to immediately pay city fines and fees, as he was not given jail sentences for any of these city crimes. There was no investigation into his ability to pay and he was not provided counsel there either.

174.   Mr. Walker paid as he could but was unable to pay as JCS demanded. As such, Mr. Walker was arrested and jailed upon JCS' request.

175.   Mr. Walker spent almost two weeks in jail on the bogus charge of FTOCO and was not given credit for these jail days against the city money he owed.

176.   Though Mr. Walker was jailed upon JCS' request, he was not afforded full credit for that time against his fines and costs.

177.   The Sylacauga city court also used a void order to put Mr. Walker on JCS probation for city fines and fees when he could not pay.   There was no investigation into his ability to pay and he was not provided counsel.

178.   The pre-printed JCS probation order used in Sylacauga shows no jail sentence yet Mr. Walker was required to pay JCS its extra set-up fee and monthly 'probation' fees.

179.   During his six (6) years on JCS 'probation' Mr. Walker was arrested several times and spent approximately six months in jail for his inability to pay and all resulting from the void order. Additionally, Mr. Walker paid JCS over $6,000.

180.   Throughout this period of time, JCS provided no services to Mr. Walker and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Walker was

unable to pay these fines and poor JCS sought to charge and collect these unlawful fees without any due process.

181.    Mr. Walker paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed. This violated Mr. Walker's Fourteenth Amendment right to due process, equal protection and to be free from unlawful seizure.

**ANTONIO CALHOUN**

182.    Plaintiff Antonio Calhoun ('Mr. Calhoun') is over the age of nineteen (19) and an individual resident of Talladega, Alabama.

183.    Upon information and belief, in October 2009, Mr. Calhoun was arrested by Harpersville police and taken to the Shelby County jail where he was held pursuant to a cash bond demanded for his release.

184.    Neither Mr. Calhoun nor any of his family or friends could pay the $528 cash bond to secure his release so he was kept in jail for four (4) days being released to go to Harpersville court.

185.    At the Harpersville Court Mr. Calhoun wore his jail jumpsuit and shackles and was ordered to JCS probation under a void order as a condition of his release from jail.

186.    Pursuant to its agreement with Harpersville, JCS demanded monthly fees for itself and added jail fees to Mr. Calhoun's balance for each of the days he was kept in jail.

187.    Despite evidence that Mr. Calhoun was poor and that he could not pay the cash bond demanded for his release, JCS kept Mr. Calhoun on 'probation' to collect the money

Harpersville said Mr. Calhoun owed it. There was no investigation into his ability to pay and he was not provided counsel.

188.    Mr. Calhoun was also ordered to JCS probation by Larry Ward at Childersburg under another void order.

189.    Mr. Calhoun's Childersburg void probation order listed only traffic citations for which a jail sentence was not given and as such no sentence existed to "suspend."

190.    Throughout the years he was on JCS probation under these void orders, Mr. Calhoun was arrested several times and spent days in jail based on this illegal scheme of collection.

191.    All of the money paid to JCS for Mr. Calhoun's 'probation' was paid under duress in an attempt to keep Mr. Calhoun from being arrested and jailed and all as the result of void orders.

192.    At all times relevant to the claims herein, Mr. Calhoun was poor.  JCS Inc. provided no services and knowingly continued to demand money despite knowledge of his poverty.


**TAVELL CRAWFORD**

193.    Plaintiff Tavell Crawford ('Mr. Crawford') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama.

194.    Like the other Plaintiffs, Mr. Crawford was subjected to the illegal JCS extortion scheme by the conspiracy with the city courts in Harpersville, Sylacauga and Hoover when he was unable to immediately pay in full court fines and fees demanded.  He was ordered to JCS probation by a void order of the city court.

195.     In Sylacauga JCS demanded that Mr. Crawford repay many fines that had previously been paid in full shortly after the traffic ticket had been adjudicated. Despite the fact that Mr. Crawford had previously paid his traffic tickets in full JCS demanded additional repayment as a condition of his 'probation.'

196.     Pursuant to JCS' scheme JCS demanded minimum monthly payments as a requirement for Mr. Crawford to be compliant with his 'probation' and requested that warrants be issued for his arrest when payments were not made as JCS demanded.

197.     Upon information and belief, many of the traffic crimes for which Mr. Crawford was ordered to JCS 'probation' did not have a jail sentence yet Mr. Crawford was required to pay JCS its extra set-up fee and monthly 'probation' fees and follow its requirements or face the possibility of arrest and jail with cash demanded for his release.

198.     During his seven (7) years on JCS 'probation' Mr. Crawford was arrested several times and spent several days in jail for his inability to pay. Additionally, Mr. Crawford paid JCS over $5,000. There was no investigation into his ability to pay and he was not provided counsel.

199.     Throughout this period of time, JCS provided no services to Mr. Crawford and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Crawford was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees without any due process.

200.     Mr. Crawford paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed all pursuant to void orders. This violated Mr. Crawford's Fourteenth Amendment right to due process, equal protection and to be free from unlawful seizure.

**LEWIS MALLORY**

201.    Plaintiff Lewis Mallory ('Mr. Mallory') is over the age of nineteen (19) and an individual resident of Childersburg, Alabama.

202.    All of Mr. Mallory's illegal 'probations' with JCS Inc. were in courts where Larry Ward was the part time judge and were all due to void orders.

203.    JCS Inc. kept Mr. Mallory subject to this conspiratorial extortion scheme for over seven (7) years.

204.    At the Harpersville court Larry Ward ordered Mr. Mallory to JCS Inc. 'probation' when he could not immediately pay in full fines for traffic tickets, which Mr. Mallory believes he was never adjudicated guilty. There was no investigation into his ability to pay and he was not provided counsel.

205.    Despite a necessary finding of guilt as a prerequisite for owing a city money, JCS Inc. filled in the pre-signed JCS probation order and began demanding money from Mr. Mallory.

206.    Mr. Mallory was also ordered to pay JCS 'probations' from the City of Childersburg where Larry Ward was the part-time judge. There are no adjudications or pleas of guilt from Mr. Mallory on any city crimes at Childersburg. In fact, the City of Childersburg does not have a single order evidencing Mr. Mallory's guilt of any crime.

207.    The orders underlying this "probation" were void but JCS Inc. still demanded that he pay almost $7,500 while it collected $45 a month as its profit.

208.    To enforce its demands, Mr. Mallory was arrested and jailed at the request of JCS Inc. when he did not pay as JCS demanded.

209.    Pursuant to the JCS Inc. scheme at Childersburg, Mr. Mallory was jailed for the bogus offense of FTOCO. There is no statute or ordinance defining FTOCO as a crime and there is no legal standard upon which to validly arrest someone for this bogus offense.

210.    Despite no legal basis and no probable cause Mr. Mallory was arrested, jailed, charged an additional 'warrant fee' of $317 and remained in jail until a cash bond was paid to secure his freedom all of which began with void orders from the city court.

211.    Mr. Mallory was subject to the same JCS conspiratorial extortion scheme at the city of Lincoln where JCS Inc. demanded $1,515 from Mr. Mallory.

212.    All total - over the seven (7) years Mr. Mallory was entrapped by the JCS scheme and use of void orders under which he paid JCS over $12,000, and was arrested, jailed, and suffered endless threats of incarceration and added fees.

213.    Pursuant to JCS' conspiratorial agreements with the cities of Harpersville, Lincoln and Childersburg, JCS charged extra fees while it attempted to collect the illegal charges and requested warrants for Mr. Mallory's arrest when he did not pay as demanded.

214.    Throughout the years, Mr. Mallory was arrested several times and spent days in jail based on this illegal scheme of collection based upon void orders.

215.    All of the money paid to JCS for Mr. Mallory's 'probation' was paid under duress in an attempt to keep Mr. Mallory from being arrested and jailed and as the result of void orders.

216.    At all times relevant to the claims herein, Mr. Mallory was poor.  In fact, JCS Inc. documented the fact that he was unemployed for many years. Despite its knowledge of Mr. Mallory's poverty, JCS Inc. provided no services and knowingly continued to demand money that Mr. Mallory did not legally owe.

217.    These actions based upon void orders resulted in denial of Mr. Mallory's fourteenth amendment right to due process, equal protection and to be free from unlawful seizure.

## JOSHUA HALL

218.    Plaintiff Joshua Hall ('Mr. Hall') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama, having lived in the area his whole life.

219.    Mr. Hall's problems with JCS began in 2006 shortly after Childersburg began using JCS.

220.    Like many others, Mr. Hall was ordered to JCS 'probation' when he could not pay for the collection of city fines and fees under void orders of Larry Ward.

221.    Mr. Hall was legally innocent of the two (2) city 'crimes' at Childersburg for which JCS was collecting money - having neither plead nor been adjudicated guilty of either 'crime.'

222.    Once in the JCS system with mounting fees and fines, Mr. Hall was continually unable to obtain a driver's license as the city would request that his driver's license be revoked for nonpayment of court fees. There was no investigation into his ability to pay and he was not provided counsel.

223.    This ruse continued until JCS Inc. finally left the state in 2015 leaving Mr. Hall with no license, thousands of dollars paid to JCS Inc. for bogus charges such as FTOCO, several 'probations' with the city of Childersburg, Harpersville, and Sylacauga, arrests, many days in jail under cash bonds demanded for his release- all pursuant to void orders.

224.    When JCS stopped working in the Harpersville city court, Mr. Hall was on warrant status with that city and was not told if that warrant had been recalled even though the city court with JCS was labeled a 'sanctioned extortion' scheme by Circuit Judge Hub Harrington.

225.    Throughout the years using void orders of the city court, Mr. Hall was arrested several times and spent days in jail based on this illegal scheme of collection.

226.    All of the money paid to JCS for Mr. Hall's 'probation' was paid under duress in an attempt to keep Mr. Hall from being arrested and jailed.

227.    At all times relevant to the claims herein, Mr. Hall was poor.  JCS Inc. provided no services and knowingly continued to demand money despite knowledge of his poverty.

228.    The actions resulting from void orders denied Mr. Hall's fourteenth amendment right to due process, equal protection and to be free from unlawful seizure.


**EARNEST NORWOOD**

229.    Earnest Norwood ('Mr. Norwood') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama.

230.    Mr. Norwood became disabled in early 2000 after having several back surgeries relating to work injuries.

231.    Mr. Norwood's problems with JCS Inc. began when Larry Ward under a void order sent him to JCS probation when he could not immediately pay in full a traffic ticket in Childersburg.

232.    Like the other Plaintiffs Mr. Norwood told Larry Ward and JCS Inc that he was on disability and received a limited, fixed income and could not pay but that fact did not matter

to Larry Ward or JCS Inc. There was no investigation into his ability to pay and he was not provided counsel.

233.    Mr. Norwood was on JCS Inc probation from 2007 until June 2012 for various city charges in Harpersville, Childersburg and Calera all resulting from void orders of the city court.

234.    Upon information and belief, Mr. Norwood was legally innocent of many of these charges but despite his legal innocence he was ordered to JCS 'probation' for the collection of the city fines and fees that were assessed on these bogus 'crimes.'

235.    Under this conspiratorial scheme and using void orders, JCS Inc. nevertheless consistently threatened Mr. Norwood with jail if he did not pay.

236.    In fact, on one occasion JCS Inc. ordered Mr. Norwood to pick up trash on the road as a penalty for not paying the amount JCS demanded. When Mr. Norwood was unable to bend and pick up trash as JCS Inc. demanded due to his back injury, JCS Inc. called the police and had Mr. Norwood taken to Shelby County jail where he was deprived of his medications and only released the next morning when his pain became unbearable.

237.    Throughout the years, Mr. Norwood was arrested, jailed and continually threatened with jail based on void orders and this illegal, conspiratorial scheme of extortion.

238.    All of the money paid to JCS Inc. for Mr. Norwood's 'probation' was paid under duress in an attempt to keep Mr. Earnest from being arrested and jailed all resulting from void orders.

239.    At all times relevant to the claims herein, Mr. Norwood was poor. JCS provided no services and knowingly continued to demand money despite knowledge of his poverty.

240.    These actions constituted a denial of Mr. Norwood's rights under the fourteenth amendment to due process, equal protection and to be free from unlawful seizure.


**COREY KELLEY**

241.    Plaintiff Corey Kelley ('Mr. Kelley') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama, having lived in the area including Childersburg/Harpersville his whole life.

242.    Mr. Kelley's difficulties with JCS began in Harpersville after he was ordered by a void order to JCS "probation" in November 2008 because he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

243.    Upon information and belief, Mr. Kelley was not given a jail sentence yet he was illegally ordered to probation by Larry Ward, the part-time Harpersville municipal court judge. Mr. Kelley's 'probations' were ordered as a result of his inability to immediately pay city fines and fees, as he was not given jail sentences for any of these city crimes.

244.    After being illegally ordered to JCS probation, Mr. Kelley continued to be unable to pay the money JCS demanded so JCS requested that a warrant be issued for his arrest.

245.    Pursuant to JCS' request, a warrant was issued for Mr. Kelley's non-payment. In the fall of 2010, Mr. Kelley was arrested pursuant to JCS Inc.'s request and taken to the Shelby County Jail for the offense of 'probation violation' which resulted from void orders.

246.    Upon information and belief, Mr. Kelley stayed in jail for eight (8) days because neither he nor his family could pay the cash bond that was demanded for his freedom.

247.     After his release from jail, JCS Inc. reactivated by void orders Mr. Kelley's probation.

248.     On November 17, 2010, three (3) days before the two year maximum statutory probation period for his probation was set to expire, Mr. Kelley's probation was inexplicably "reinstated" for an additional two (2) years at JCS Inc.'s request again using void orders of the city court.

249.     JCS Inc. again used a blank, pre-signed Probation Order form, provided by Judge Larry Ward before the hearing, to fill in its chosen "requirements" for the reinstatement-i.e., continuation of Mr. Kelley's probation.

250.     JCS Inc. did not list any new charges or offenses on the pre-signed Order, instead leaving the listed "offense" blank, and simply filling in a new "fine" amount.  JCS employee Lisha Kidd, who filled out the form, decided to continue to charge Mr. Kelley $145 per month, an amount which built into it JCS's own monthly $45 "probation fee."

251.     Thereafter, JCS continued to demand payments from Mr. Kelley, threatening him with additional jail time if he refused to pay.  Mr. Kelley continued making payments to JCS as he was able in 2011 and for part of 2012.

252.     When Mr. Kelley again became unable to pay, in May 2012, JCS Inc. again requested that a warrant be issued for his arrest despite no court hearing nor any finding of Mr. Kelley's willful refusal to pay.

253.     Mr. Kelley was unable to pay as JCS demanded and was arrested and jailed upon JCS' request.

254.     Though Mr. Kelley was jailed upon JCS' request, he was not afforded full credit for that time he spent in jail against his fines and costs.

255.     During his four (4) years on JCS Inc. 'probation' Mr. Kelley was arrested several times and spent several days in jail because he could not pay, all resulting from void orders of the city courts.

256.     Throughout this period of time, under this conspiratorial scheme JCS provided no services to Mr. Kelley and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Kelley was unable to pay these fines and was poor JCS Inc. sought to extort these unlawful fees under this conspiratorial agreement with the city courts.

257.     Mr. Kelley paid JCS Inc. thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

258.     These actions violated Mr. Kelley's Fourteenth Amendment rights to due process, equal protection and to be free from unlawful seizure.


**NORWOOD McDONALD**

259.     Plaintiff Norwood McDonald ('Mr. McDonald') is over the age of nineteen (19) and an individual resident of Harpersville, Alabama, having lived in the Childersburg/Harpersville area his whole life.

260.     Mr. McDonald has been disabled his entire life and is known throughout the community as a person with special needs.

261.     Mr. McDonald's difficulties with JCS began in Harpersville after he was illegally ordered by a void order to JCS 'probation' in February 2007 because he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

262.    Mr. McDonald was not given a jail sentence but was illegally ordered to probation by Larry Ward, the part-time Harpersville municipal court judge.

263.    JCS Inc. used blank, pre-signed Probation Order forms which had been provided by Judge Larry Ward and filled in the blanks on the form, demanding that Mr. McDonald pay $431 in fines and court costs at a minimum monthly amount of $85 each month.

264.    Pursuant to its conspiratorial agreement with Harpersville, JCS Inc. kept $45 from each $85 monthly payment for its fees and also charged Mr. McDonald a $10 for "file setup."

265.    Later in 2007, Mr. McDonald was again illegally ordered to JCS 'probation' when he could not immediately pay in full the city fines demanded. This time JCS Inc. demanded that Mr. McDonald fill out an intake form. On this form Mr. McDonald listed "disable" for employer. He was, and continues to be, mentally disabled receiving government disability checks each month as his only income all of which was known to JCS.

266.    Despite knowing that Mr. McDonald was disabled and on a limited, fixed income which was below the federal poverty amount, JCS Inc. using a void order demanded Mr. McDonald pay a minimum of $145 per month in costs, fees, and fines, $45 of which would again go to JCS as "payment" for their "probation services."  JCS Inc. again charged Mr. McDonald an additional $10 for "file setup."

267.    Using money from his disability payments, Mr. McDonald paid the amounts charged by JCS every month from February 2007 through November 2009 which included $1,110 in "probation fees" it demanded from Mr. McDonald.

268.    Under this scheme, JCS staggered "probations" from city courts based upon these void orders to increase its fees and would "hold" one while collecting on another.  Even though legitimate city probation can last no longer than two years, this limitation was ignored by JCS

under these void orders.   Even though Mr. McDonald, who is mentally disabled, had completed two-and-a-half years' worth of payments and committed no new offenses since his November 2007 hearing date, JCS continued to charge Mr. McDonald monthly fees in December 2009, and throughout 2010.

269.    Thus, in November 2009, though there was no new charge and no new hearing, JCS Inc. charged Mr. McDonald a new $10 "file setup" fee, and continued to demand $145 per month for the old 'probation' it had placed on 'hold.'

270.    JCS Inc. continued to keep $45 of each monthly payment for itself, as "payment" for its "probation services."  Using the money from his disability payments, and with the threat of arrest hanging over him if he failed to pay, Mr. McDonald continued to pay JCS's fees during this time.  From November 2009 through June 2010, JCS made $360 in exclusively "probation fees" from Mr. McDonald.

271.    JCS Inc. and its co-conspirator Harpersville kept Mr. McDonald in this cycle continuing to demand $145 each month from his disability check in order to keep his freedom all by virtue of void orders of the city court and the JCS scheme.

272.    All told, from February 2007 through January 2012 JCS Inc. extorted a total of $2,460 in "probation fees" from Mr. McDonald by demanding money from his governmental disability payments.

273.    Throughout this period of time, JCS provided no services to Mr. McDonald and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. McDonald was disabled, unable to pay these fines, and poor, under this conspiratorial extortion scheme JCS Inc. demanded these unlawful fees without any due process.

274.     Mr. McDonald paid JCS Inc. thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

275.     These actions violated Mr. McDonald's Fourteenth Amendment rights to due process, equal protection and to be free from unlawful seizure.


**KHOMEINI DATCHER**

276.     Plaintiff Khomeini Datcher ('Mr. Datcher') is over the age of nineteen (19) and an individual resident of Harpersville.

277.     Mr. Datcher's difficulties with JCS Inc. and its co-conspirator cities- Childersburg, Sylacauga and Harpersville began in 2006.

278.     In fact, Mr. Datcher was ordered to five (5) separate JCS 'probations' through the Town of Harpersville, three (3) separate JCS 'probations' through the City of Childersburg, and two (2) separate JCS 'probations' through the City of Sylacauga, all of which were based upon void orders of the city courts.

279.     All of these 'probations' were instituted because Mr. Datcher was unable to immediately pay the city fines and fees the city demanded when he appeared in city court.

280.     Upon information and belief, there was no finding that Mr. Datcher willfully refused to pay. Rather, there was no meaningful inquiry into Mr. Datcher's poverty prior to ordering him to the JCS 'payment plan' in any of these court appearances and he was not provided counsel.

281.     Mr. Datcher was ordered to JCS 'probation' for the collection of purported city debts pursuant to the JCS agreement with its co-conspirator cities.

282.     In fact, Mr. Datcher was legally innocent of many of the underlying city crimes for which JCS Inc. was demanding money.

283.     On March 18, 2011, Mr. Datcher was arrested by Childersburg police and charged with the city crime of trespass.  He was ordered to appear in Childersburg Municipal Court.  At that time, JCS was already aware that Mr. Datcher was unemployed, and received Supplemental Security Income ("SSI") benefits.

284.     Mr. Datcher appeared in Childersburg Municipal Court on the trespass charge on May 12, 2011.  The part-time judge for the Childersburg Municipal Court was Larry Ward.  Mr. Datcher did not plead guilty of the trespass charge and the court did not adjudicate Mr. Datcher guilty of the trespass charge.

285.     Mr. Datcher was legally innocent of the city crime of trespass.

286.     At the time of Mr. Datcher's appearance in Court, on May 12, 2011, JCS had a pre-signed "Order of Probation" form, which had been signed by part-time judge Larry Ward prior to Mr. Datcher's appearance in Court.  Though there had been no adjudication of the charge, on that day, a JCS Inc. employee, Lisha Kidd, filled in the form, requiring Mr. Datcher to pay $145 per month, with $45 of each $145 monthly fee going directly to JCS. That void order was then used by JCS in its collection scheme.

287.     Though he was unemployed and received only monthly SSI benefits, Mr. Datcher began making payments based upon the court order JCS Inc. filled out.

288.     Mr. Datcher did not know that JCS Inc. was a private company. Rather, he believed the 'probation' officer was a city agent - as they presented themselves to be.

289.     On May 3, 2011, Mr. Datcher was arrested and charged with "menacing" and "resisting arrest."  He appeared in Childersburg Municipal Court on June 9, 2011 for both these

charges.  Mr. Ward was still the Childersburg Municipal Court judge at the time.  Again, the Childersburg Municipal Court did not adjudicate the charges against Mr. Datcher and Mr. Datcher did not plead guilty to these charges.

290.    At the time of Mr. Datcher's appearance in Court, on June 9, 2011, JCS Inc. had a pre-signed "Order of Probation" form, which had been signed by part-time judge Larry Ward prior to Mr. Datcher's appearance in Court.  Though there had been no adjudication of the charge, on that day, a JCS Inc. employee, filled in the form, requiring Mr. Datcher to pay $160 per month, with $45 of each $160 monthly fee going to JCS Inc.

291.    Throughout the remainder of 2011, 2012, 2013, and for the first five and a half (5.5) months of 2014, Mr. Datcher continued to make payments on this "probation," paying JCS $654 during this time just for JCS's "probation fees" all pursuant to void orders.

292.    In accordance with its policy, when Mr. Datcher was unable to pay, JCS Inc. threatened Mr. Datcher with jail time.  This "probation period" did not conclude until June 20, 2014, over three (3) full years after it began.

293.    Meanwhile, on July 3, 2013, JCS changed the status of Mr. Datcher's June 9, 2011 probation from "hold" to "active."  Thus, on June 20, 2014, when his initial "probation period" had supposedly been completed, JCS Inc. continued to demand money from Mr. Datcher to avoid being arrested and jailed.

294.    Using void orders, JCS Inc. forced Mr. Datcher to continue to make these payments until November 17, 2014, almost three and a half (3.5) years after this "probation" began.

295.    Throughout this period of time, JCS Inc. provided no services to Mr. Datcher and acted merely as a collection agency charging additional fees. Despite knowledge that Mr.

Datcher was disabled, unable to pay these fines, and poor, under this conspiratorial extortion scheme JCS Inc. demanded these unlawful fees all under void orders.

296.    Mr. Datcher paid JCS Inc. thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

297.    These actions violated Mr. Datcher's Fourteenth Amendment rights to due process, equal protection and to be free from unlawful seizure.

**Count One - Declaratory Relief**
**Probation Orders with No Jail Sentence Are Void.**
**Enforcing Void Probation Orders Violates Due Process.**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

298.    Plaintiffs aver that JCS, Inc., acting under color of state law in violation of 42 U.S.C. § 1983, denied them their right to due process.

299.    JCS, Inc. operated a for profit enterprise that marketed its services to various municipal and county governments and contracted with over 100 cities and towns throughout Alabama, including Harpersville, to collect unpaid fines and court costs from people brought before municipal courts in traffic and other misdemeanor cases.

300.    JCS, Inc.'s marketing approach to these cities emphasized that its fees would be paid by the "offender" before the municipal court and that its efforts would improve collection of court fines and costs at no cost to the city.

301.    JCS, Inc.'s agreement with the city and the city's court effectively sold the city's police power to JCS, Inc. by including monthly fees to JCS, Inc. and agreeing to order people to probation.

302.    Each person has a constitutional right to reject or accept probation but this right was eliminated by the JCS, Inc. agreement with its co-conspirator city/city courts to order people to probation.

303.    JCS, Inc.'s scheme used probation as a collection tool. JCS, Inc. did not use any civil methods of collection to collect the city fines and fees.

304.    Legitimate Probation is a substitute for imprisonment and is only offered when someone has a jail sentence imposed as punishment for a crime for which the person has plead or been adjudicated guilty. Additionally, the person has the right to accept or reject the offer of probation and has an attorney present as an advisor.

305.    The JCS, Inc. scheme used 'probation' solely as a tool to collect money and once the money was paid the 'probation' ended. This 'probation' scheme criminalized people who could not immediately pay city fines and fees when assessed.

306.    The Alabama State Manager for JCS, Inc., Colleen Ray, described JCS, Inc.'s business model in an email to her boss, Karen Lloyd, when she proposed a new line of business for the JCS division saying:

Most defendants in Alabama get placed on probation with JCS because they can't pay their fine in full and once they do pay their fine in full they are terminated as far as a case with JCS. However, if we are monitoring the interlock they could be with JCS up to two years so I am proposing that after they pay their fine in full if we continue to monitor the interlock we charge a $20.00 interlock monitoring fee. This would provide additional income for JCS Alabama in that we would still be generating revenue instead of terminating the case once they have paid in full.

307.    JCS, Inc. routinely used a form contract to establish its relationship with its customer cities and similarly trained its employees using a training manual replete with forms for courts to use during proceedings, and for courts and JCS, Inc. to use to contact the "offenders" from whom they were collecting.

308.    Under the system established by JCS, Inc., its employees were not required to have criminal justice or legal training, have any social work education, or meet any minimum law enforcement standards, as is required of state probation officers.  Instead, JCS, Inc. required only that its employees be at least 21 years old, have no felony convictions, have at least two years of college, and complete 40 hours of training by JCS, Inc. on its processes.  Upon satisfying those requirements, JCS, Inc. employees were then labeled "Probation Officers," permitted to carry a JCS, Inc. issued badge in some municipalities, and collect fees, court fines, and costs.

309.    The agreement drafted by JCS, Inc. and agreed to by the cities' mayor and city council generally stated that the municipal "*court agrees that each court order shall provide for the following:*

> a probation fee of $35.00 per month flat fee
>
> One time probationer set up fee of $10.00. . . . " (emphasis added).

JCS, Inc. used similar contracts with other cities and sometimes set the monthly fee at $45.

310.    Under this system and by agreement with cities such as Harpersville, many administrative and judicial functions of the municipal court were unlawfully delegated to JCS, Inc., clothing it with the color of state law for the collection of court fines, costs and private fees.

311.    JCS, Inc. is, by virtue of its contracts with municipalities such as Harpersville, clothed with the appearance of a state actor and its actions were interwoven with those of the municipalities.  Under JCS, Inc.'s contracts and its operations, JCS, Inc. employees were represented to the Plaintiffs to be "probation officers" acting "on behalf of" the municipalities. (Exhibit M - CITE).

312.    In accord with the contract language, the JCS, Inc. system provided "Order of Probation" forms to municipal courts with the printed requirement on each form that the "offender" pay JCS, Inc. $35 per month plus $10 for a file setup charge.  *See* Exhibit A.  The monthly fee of $35 was since the agreement increased to $45 per month for each "offender" at Childersburg. The orders supplied by JCS, Inc. required the individual to pay JCS, Inc. the fines, costs, and additional monthly fees as required under its contract.

313.    Under the JCS, Inc. contract, policy, and procedures, municipal courts such as Childersburg's automatically required "probation" for any person who was unable to immediately pay in full the fine and/or costs when levied by the municipal court. JCS, Inc. probation is imposed even in cases where the debtor does not receive any jail sentence, was never convicted of a jailable offense, or where probationers were assessed court costs but were not convicted of anything at all.

314.    JCS, Inc. is only allowed to continue "probation" as long as the person has an outstanding balance of fines, costs and fees. Once the city is paid in full, JCS, Inc.' "probation" ends. As explained by JCS, Inc. in its marketing materials that it used with its co-conspirator cities: "The faster they complete their sentence [i.e., pay their fines, costs and JCS, Inc. fees], the sooner they may be released from supervision".

## How much does it cost?

It costs the city or county nothing. Not a dime. We are an offender paid system. Simply the offender pays a monthly supervision fee during the term of their probation. The faster they complete their sentence, the sooner they may be released from supervision.

## If they don't have money for the fine, where will they find the money for these new supervision fees?

We have found that in the long run, supervised probation is less expensive than unsupervised probation for the offender. In approximately half the cases of unsupervised probation, the offender will fail to complete the orders of the court. Failing the orders of the court generally results in loss of driving privilege, jail, vehicle impounding, FTP/FTA charges, loss of employment, domestic problems and the list goes on. Recovering from these is extremely expensive. For example, reinstatement of driving privilege can cost $275.00 or more.

We believe it is a greater kindness to provide the structure that supervised probation can yield. Left to self manage, most probationers will wind up in warrant status.

**Facing possible incarceration due to the inability to pay court fines and costs?**



*At Judicial Correction Services, our staff is available to assist you in court, after the judge has determined innocence or guilt and all court fines and fees have been set*

59

315.    Under the JCS, Inc. contract, if a person can pay their city fines and fees in full within a few days of being assigned to JCS, Inc. "probation," they are not charged fees other than a $10 set up fee and the "probation" ceases. [within 7 days at Childersburg & Sylacauga]

316.    All of the Plaintiffs were placed on "probation" with JCS, Inc. under this practice even when they had not been sentenced to serve any jail time and only owed money for city crimes.

317.    That "probation" requirement, pursuant to the agreement between JCS, Inc. and the cities, was required to be part of every printed order at the municipal courts, such as Harpersville Municipal Court, which also required payment of monthly fees to JCS, Inc.

318.    All of the Plaintiffs were ordered to JCS, Inc. as a 'payment plan' and were not offered alternative methods of punishment such as a reduced fine or a payment plan with no added, extra fees.

319.    All the Plaintiffs were ordered to JCS, Inc. without being provided an attorney.

320.    As a result of JCS, Inc.'s policy and practice, people who failed to pay fines, fees and costs were subject to arrest, detention, and incarceration.

321.    Incarceration of individuals who could not pay their fines, costs, and added JCS, Inc. fees was accomplished by JCS, Inc., which sought warrants against these individuals for charges of failure to pay, failure to comply or "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act.

322.    Ordering people to probation simply for collection of money violates due process.

323.    Ordering people to probation when they were not sentenced to jail violates due process.

324.    Plaintiffs request that this Court declare that JCS, Inc.'s 'Probation orders' that do not contain a jail sentence are null and void and to order JCS, Inc., to repay all the money it collected pursuant to these void orders.

325.    Plaintiffs request money damages from JCS, Inc. for the threats, intimidation, arrests and jailing that they endured as a result of these void orders from which JCS Inc. profited.

**Count Two - Declaratory Relief**
**Probation Orders for No Crime Are Void**
**Enforcing Void Probation Orders Violates Due Process**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

326.    Plaintiffs aver that JCS, Inc., acting under color of state law in violation of 42 U.S.C. § 1983, denied them their right to due process.

327.    Many of the Plaintiffs were put on JCS, Inc. probation without any court order showing an adjudication or plea of guilt for the underlying offense for which they were placed on 'probation.'

328.    Ordering people to probation simply for collection of money violates due process.

329.    Ordering people to probation for 'crimes' for which they are legally innocent violates due process.

330.    Plaintiffs request that this Court declare that JCS, Inc.' 'Probation orders' that were based on 'crimes' for which the person was legally innocent are null and void and to order JCS, Inc. to repay all the money it collected pursuant to these void orders.

331.    Plaintiffs request money damages from JCS, Inc. for the threats, intimidation, arrests and jailing that they endured as a result of these void orders from which JCS, Inc. profited.

**Count Three - Declaratory Relief**
**Blank and Unsigned Probation Orders Are Void**
**Enforcing Void Probation Orders Violates Due Process**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

332.    Plaintiffs aver that JCS, Inc., acting under color of state law in violation of 42 U.S.C. § 1983, denied them their right to due process.

333.    Some of the Plaintiffs were put on JCS, Inc. probation without any valid probation order - the probation order upon which JCS, Inc. based its collection does not exist, or is blank or is unsigned.

334.    Ordering people to probation simply for collection of money violates due process.

335.    Ordering people to probation with no valid court order violates due process.

336.    Plaintiffs request that this Court declare that JCS, Inc.' 'Probation orders' that: 1) do not exist, or 2) are blank, or 3) are unsigned - are null and void and to order JCS, Inc. to repay all the money it collected pursuant to these void orders.

337.    Plaintiffs request money damages from JCS, Inc. for the threats, intimidation, arrests and jailing that they endured as a result of these void orders from which JCS, Inc. profited.

**Count Four - Declaratory Relief**
**Probation Orders Placing a Financially Interested Party**
**As a 'Neutral' Court Officer Are Void**
**Violating Due Process**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

338.    Plaintiffs request that this Court declare the JCS, Inc. 'Probation Orders' used against the plaintiffs to be void because the 'probation' terms violate due process by placing a financially interested party in the position of a court officer, who is supposed to be neutral.

339.    All the JCS, Inc. probation orders required payments to JCS, Inc. and placed restrictions on the person's liberty – these restrictions were only eliminated when the amount of money JCS, Inc. demanded was paid.

340.    JCS, Inc. had a personal, financial interest to conduct its role as a probation officer in a way that maximized its personal profit and not necessarily as a neutral public court officer.

341.    JCS, Inc. used rooms inside the City buildings that also housed the Municipal Courts, and its employees often sat in the courtroom near the judge and advised the judge about how to handle the cases of "probationers" and potential "probationers."

342.    Despite lacking the authority to do so, JCS, Inc., a private actor with a financial stake in the outcome, played the role of a neutral probation office, threatening (a) increased fines and costs, (b) probation revocation, and (c) arrests and jail time, all for the purpose of extorting the collection.

343.    Under this system, JCS, Inc. set payment amounts and reporting schedules and recommended when the individual's "probation" should be revoked, or when to impose additional fines and costs.

344.    Under JCS, Inc.' system, JCS, Inc.'s determination to request incarceration of an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of indigency. Despite the fact that city-paid 'public defenders' were assigned to many of these indigent individuals, they were still subject to punitive action.

345.    JCS, Inc. conspired with the cities and the city's court to control and dictate these functions and, as a consequence, this routinely resulted in periods of "probation" imposed for purposes of collecting fines and fees that routinely exceeded the two-year statutory maximum, all of which resulted in the unlawful detention and incarceration of individuals, including the Plaintiffs.

346.    Neither JCS, Inc. nor the municipal court judges or magistrates employed by the city did any investigation into the indigency of the plaintiffs.

347.    JCS, Inc. expressly denies that it had any responsibility to inquire or determine why people did not make their payments or whether they were able to pay.  Therefore, when an "offender" was unable to pay the fine and additional fees required by JCS, Inc., JCS, Inc. and its co-conspirator cities, such as Harpersville, cooperated with each other to violate the requirement that a determination be made in this circumstance, and then to violate these individuals' due process rights, based solely on their initial inability to make such payments.

348.    The Due Process Clause of the Fourteenth Amendment prohibits neutral judicial officials and neutral civil and criminal law enforcement actors from having a personal financial interest in the cases prosecuted and decided by them in our legal system. The cities have contracted with JCS, a private, for-profit corporation and, critically, made the resolution of the Plaintiffs' cases contingent on the demands, advice, recommendations, discretionary decisions, enforcement actions, testimony, and representations of this private entity.

349.    In contrast to the traditional and longstanding role of the probation officer—such as the role performed by Alabama State Probation Officers and United States Probation Officers—JCS, Inc. had a direct financial stake in every decision that they made regarding case supervision, enforcement, and revocation. JCS, Inc. had a personal, financial interest to conduct

its role as a probation officer in a way that maximized its personal profit and not as a neutral public court officer.

350.    This non-neutral actor profited significantly from its decisions about whether to place people on probation, what conditions to require, what information to provide probationers about their rights and obligations, how to enforce those conditions, and what testimony to provide. There is a substantial risk that those financial interests will affect this actor's judgment, the mere existence of which denies due process to people such as the plaintiffs. But in this case, there is overwhelming evidence that these financial interests actually affected every decision of JCS, Inc.'s probation officers. Because this private entity had a significant, personal, financial interest in how these cases were managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, JCS, Inc.'s policies and practices violated the longstanding due process restrictions against such self-interested financial arrangements in American courts of justice.

351.    Under the Defendants' scheme, JCS, Inc. could not only decide whether to initiate revocation proceedings, but it could also influence what conditions were imposed. It could then make rules and determine whether and when to petition for revocation based on the perceived violation of those rules or other conditions. It also controlled how probationers were supervised and what information was provided to or withheld from them concerning their legal rights. Then, JCS, Inc. served as the main witness or, as often happened, JCS, Inc.'s allegations were treated as evidence at any post-adjudication proceeding. JCS Inc.'s recommendations included whether the person should be placed back on probation for an extended period (and charged additional fees) and/or jailed.

352.   All the Plaintiffs were impoverished at the time of the charges levied against them and when they were arrested and jailed.  Each was unable to pay the fines and/or costs and fees demanded by JCS Inc. due to their poverty, and their incarcerations were based on JCS, Inc.'s recommendation.

353.   Under the policy and practice of JCS, Inc. and the municipalities with which it contracted, unpaid fines and costs were unlawfully converted to undetermined numbers of days in jail. The "offenders" were sometimes charged by the day for their time in jail, and were often given no credit for time spent in jail against the fines levied.

JCS, Inc. controlled the money collected from debtors, the required payment amounts and schedules, and the location where the money must be paid. Furthermore, it controlled how much of each payment was credited to its own collection "services" each month, and how much of it was forwarded to the towns such as Harpersville to pay down the underlying fines and/or costs.

354.   Despite lacking the authority to do so, JCS, Inc., at its discretion, used threats of revoking probation, increased fines and costs, and jail time for purposes of collection.  Under this system, should an individual fail to pay to the satisfaction of JCS, Inc., JCS, Inc. would determine that the individual's "probation" should be revoked.  Under the system operated jointly by JCS, Inc. and municipal courts such as Harpersville's, JCS, Inc.' recommendation of incarcerating an individual and/or imposing unreasonable bond requirements was routinely accepted without conducting delinquency or probation hearings, and without making any findings, much less any determination of ability to pay before taking such punitive action, nor was counsel appointed.

355.   In this process of converting fines and/or costs to jail time, JCS, Inc. and municipal courts failed to give adequate notice of the nature of any lawful charge, failed to

conduct hearings, failed to make written findings concerning (a) the reasons for revoking probation or (b) the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs.

356.   Under this joint policy and practice of JCS, Inc. and municipal courts, when a simple fine was transformed into a jail sentence of an undetermined length of time, JCS, Inc. and the courts also failed to provide counsel for the "offenders."

357.   Under the practice and policy of JCS, Inc., after an adjudication under which a fine was levied, additional fees, costs and other charges were added to the "offender's" bill with JCS, Inc., for each new arrest, alleged probation violation, or contempt proceeding including, in some cases, those relating to charges from years earlier.

358.   JCS, Inc.'s policy and practice of (a) imposing onerous fees on debtors who were unable to promptly pay in full municipal fines or costs, and (b) threatening them with arrest if they failed to make payments, deprived Plaintiffs of their rights under the Due Process Clause.

359.   JCS, Inc.'s policy and practice of seeking the arrest and imprisonment of debtors for failure to pay without (a) any determination that the nonpayment was willful or (b) any other inquiry into indigency or ability to pay likewise deprived Plaintiffs of their rights under the Due Process Clause.

360.   These Due Process violations were also the result of an agreement or understanding between JCS, Inc. and Alabama municipal courts to (a) impose JCS, Inc. probation on debtors who were unable to pay municipal fines or costs all at once, (b) implement JCS, Inc.'s terms of probation, and (c) execute JCS, Inc.'s requests to arrest and imprison debtors for nonpayment without any determination that the nonpayment was willful or any other inquiry

into indigency or ability to pay. Municipal courts throughout Alabama conspired with JCS, Inc. to deprive Plaintiffs of their rights under the Due Process Clause, and JCS, Inc. conspired with those courts to do the same.

361.    As a proximate consequence of these deprivations of due process, Plaintiffs suffered injuries to their liberty and dignity, incurring fines, costs, and fees far in excess of the initial penalties levied against them, facing the constant threat of arrest for nonpayment even when they were never convicted of a jailable offense or any other offense, having fines and/or costs converted to jail sentences, being unlawfully incarcerated for indefinite periods of time, and having their probation extended for longer than the statutory 24-month maximum.

362.    Plaintiffs request that this Court declare that JCS, Inc.' 'Probation orders' which placed a financially interested party in a position of a court agent to be null and void, and to order JCS, Inc. to repay all the money it collected pursuant to these void orders.

363.    Plaintiffs request money damages from JCS, Inc. for the threats, intimidation, arrests and jailing that they endured as a result of these void orders from which JCS, Inc. profited.

### Count Five-JCS Probation Orders
### Are Void for violation of Equal Protection

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

364.    JCS and its co-conspirator cities have acted jointly under color of state law in violation of 42 U.S.C. § 1983, to deny the Plaintiffs' rights to equal protection secured by the Fourteenth Amendment by imposing probation orders based upon wealth classification.

365.    JCS, though a private company, has been clothed with the color of state law by the specific actions of its co-conspirator cities pursuant to its agreement with each city and its city court.

366.     As referenced above, by agreement, JCS employees attended all municipal court sessions, collected city fines and costs, were labeled as "probation officers," carried badges, and regularly represented themselves as acting "on behalf of the City." Additionally, the JCS forms were used at the municipal court, and fees for JCS were included in every court order pursuant to its contract with each city.

367.     Under its illegal contractual agreement, the actions of JCS were inextricably intertwined with its co-conspirator cities. JCS' practice and policy automatically required "probation" by court order for any person who, despite having no jail sentence, was financially unable to fully pay the fine and costs when levied by the municipal court.  That probation requirement was part of the agreement between each city and JCS, and was part of every pre-printed order at the municipal court, which also required payment of monthly fees to JCS.

368.     Persons who were financially able to fully pay the levied fine and costs were not ordered to "probation."  As a result, those persons were not charged any JCS fees and were not subjected to threats of arrest and incarceration in the collection process.

369.     Conversely, individuals such as the Plaintiffs, who were unable to fully pay the fine and costs when levied by the municipal court, were ordered to "probation" with JCS, and thus became susceptible to being arrested and jailed. No such threat was given to those who could pay.

370.     This "order" requirement was part of JCS' standard contract.  In other words, JCS's contract with these cities required all such individuals, who were initially unable to pay, to be "ordered" to "probation" with JCS. This contractual requirement itself exceeded the statutory and constitutional authority of the municipalities; and the municipalities agreement to such a

requirement also infringed upon the role of the municipal courts , in violation of the separation of powers doctrine between branches of government.

371.    Once ordered to "probation" for purposes of paying fines and costs, the policy and practice of JCS routinely imposed incarceration and additional costs on individuals who were unable to pay fines and costs, without any determination of willfulness as would lawfully be required under Alabama statutes.  See Ala Code Section 15-18-62.

372.    This disparate treatment in the issuance of probation orders based upon the wealth of the "offender" before the municipal court is a violation of equal protection and cannot be justified on any legitimate rational state interest basis.

373.    This inequality of treatment also exceeded the authority of the municipal courts, which are required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  See Ala. Code Section 12-14-8. JCS' policy of using 'probation' for debt collection was not uniform with the procedures established by the Alabama Administrative Office of Courts because it added fees only to "offenders" who could not pay immediately, creating its own "rules" for penalizing individuals who could not pay as it directed.

374.    The orders requiring additional JCS fees resulted in disparate treatment between those who could immediately pay the fine from those who were unable to immediately pay the fine. Furthermore, as a result of these "orders", those "offenders" within the JCS scheme were processed and fined differently than "offenders" in jurisdictions that did not allow JCS to charge additional fees on those who could not pay.  There is no state authority for such disparate treatment.

375.     By virtue of this illegal probation order, entered pursuant to the agreement and conspiratorial actions with the Cities, JCS deprived the Plaintiffs of all the civil debt protections available to other debtors and required the plaintiffs to pay the additional costs and fees under this disparate system. Many were unlawfully jailed for their inability to pay as demanded.

376.     The JCS probation orders constitute a denial of equal protection and as such are due to be declared void.

377.     Due to the imposition of these void orders by JCS and its conspirator cities, the Plaintiffs suffered injuries, including (a) having fines converted to jail sentences, (b) being unlawfully incarcerated for undetermined periods of time with the loss of their liberty and injury to their dignity, (c) having fines in excess of statutory limits levied against them, and (d) incurring other illegal charges for JCS fees, costs and restitution, all while being desperately poor.

### Count Six - Conspiracy between JCS Inc.
### And Susan Fuqua to Violate Plaintiffs' Civil Rights

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

378.     Defendants JCS Inc. and Susan Fuqua are liable for their conspiracy to commit the tortious conduct described herein.

379.     JCS Inc. actively concealed its payments to Ms. Fuqua and her role as its lobbyist. In fact, Plaintiffs in the federal lawsuit Ray et. al. v JCS et. al. [ND AL 2:12-cv-02819-RDP] vigorously pursued discovery regarding JCS' corporate structure and its agents here in Alabama. Nevertheless, JCS did not disclose material, relevant information that was repeatedly requested by the plaintiffs. In particular, the plaintiffs in that action requested that JCS produce the agreement in which JCS shareholders sold the company to CHC Companies, Inc., executed on September 30, 2011. JCS produced a highly redacted copy several years after it was requested.

71

CHC Companies, Inc. finally produced an unredacted copy of the agreement with appendices and exhibits after Judge Cornelius ordered it to be produced after conducting an in camera review. This document was finally produced on July 18, 2017, and it revealed that Susan Fuqua had a verbal agreement with JCS under which she was paid as an independent contractor, for her to assist JCS in marketing and keep it informed on court issues that could affect it.

380.    Ms. Fuqua concealed the fact that JCS Inc. was paying her and that she was a lobbyist for JCS and its related companies. In fact, the long-time city judge Brad Bishop provided sworn testimony in 2017 that he was unaware that Ms. Fuqua was a paid lobbyist for JCS, despite working with her since 2004.

381.    Ms. Fuqua did not file the requisite notice required by the Alabama Ethics Commission for lobbyists for any of the years in which she was paid by JCS Inc.

382.    Ms. Fuqua's participation on behalf of JCS furthered the conspiratorial actions by JCS and the various Alabama cities in which it operated.

383.    Plaintiffs request money damages from these co-conspirators for the threats, intimidation, arrests and jailing that they endured as a result of their conspiracy to violate their constitutional rights, from which these co-conspirators profited.

**Count Seven**
**False Imprisonment**
**Private Company Defendants ('JCS Inc.')**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

384.     Many of the Plaintiffs were falsely arrested and imprisoned pursuant to requests by JCS Inc. and its joint practice with its co-conspirator cities.

385.    JCS Inc. participated in falsely imprisoning the Plaintiffs by asking the City to arrest people when they did not pay as JCS Inc. demanded. Under the practice at the city, these

requests by JCS Inc. for arrests were routinely followed resulting in the arrest and jailing of the plaintiffs.

386.    When a person did not pay JCS Inc. as it demanded, JCS Inc. would mail documents demanding that the person appear in the city court while stating that the hearing would be cancelled if the money JCS Inc. demanded was paid.

387.    JCS Inc. did not use any civil methods of debt collection and did not deliver its notifications in a way that ensured the person received it (such as certified letters or hand delivery).

388.    These threats by JCS Inc. were taken seriously by those threatened since JCS Inc. and the City employees jointly participated in the common practice of using the city police to arrest and jail persons to enforce this 'probation' for collection policies.

389.    The Cities honored JCS Inc.'s request to arrest and jail people, despite the fact that neither JCS Inc. nor the city alleged that the people were willfully refusing to pay.

390.    JCS Inc. employees also provided testimony in support of its requests to arrest and jail persons when people did appear at the hearings JCS Inc. set. This testimony was readily accepted by the city and warrants were issued without inquiry into the validity of a private company demanding someone appear in court and without inquiry into whether the party had notice of the hearing.

391.    JCS Inc. had a financial interest in people staying on 'probation' and being arrested as payments were more likely to be received from the family and friends of the person incarcerated.

392.    These arrests and jailings were unlawful as they were used to extort money which JCS Inc. split with its co-conspirator cities - all of which damaged the plaintiffs.

393.    Plaintiffs request money damages from JCS Inc. for the threats, intimidation, arrests and jailing that they endured as a result of its requests for warrants despite no probable cause from which the Plaintiffs suffered damages and from which JCS Inc. profited.

**Count Eight**
**Abuse of Process**
**Private Company Defendants ('JCS Inc.')**

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

394.    JCS Inc. abused the process of probation in the municipal courts wrongfully using the process of probation to collect money. JCS Inc. conspired with the municipal courts themselves to accomplish this unlawful task.

395.    JCS Inc.'s pre-printed probation orders were approved by each city with which it contracted and all of these probation orders unlawfully granted JCS the authority to  charge a setup fee, and monthly 'probation fees'.

396.    JCS Inc. did not use any civil methods of debt collection. Rather, it solely relied upon its 'probation' scheme to extort money from the poorest Alabamians, such as the Plaintiffs, who were desperately poor - for its own profit.

397.    JCS Inc. actively participated in its 'probation' for collection scheme for its profit and then withdrew the threats and its demands for court appearances if it successfully extracted the money demanded.

398.    JCS Inc. intentionally and maliciously used its 'probation' for collection scheme to increase its profits, harassing and threatening Plaintiffs. JCS Inc. failed to give Plaintiffs adequate information about their rights to due process, and denied them equal protection. Additionally, JCS Inc. failed to provide the Plaintiffs' notice of or access to a process for

evaluating their poverty, and JCS regularly mislead the city court by withholding evidence of the Plaintiffs' poverty when Plaintiffs were unable to pay.

399.    JCS Inc. is liable for its acts and its policies that abused the criminal process to collect money and to increase its profits.

400.    Plaintiffs request money damages from JCS Inc. for its abuse of process from which it profited.

### Count Nine
### Money Had and Received
### Private Company Defendants ('JCS Inc.')

 Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

401.    JCS Inc. charged the plaintiffs extra fees if they did not pay the fines and fees owed from an alleged city crime within a certain number of days. Pursuant to its contract and joint practice with its co-conspirator cities, JCS Inc. charged a $10 setup fee and charged an additional $35-$45 monthly fee for each month the person was on JCS Inc.'s 'probation.'

402.    JCS Inc. also determined and assessed a minimum, monthly fee each person had to pay it to 'stay current'.

403.    When a person made a payment to JCS Inc., the JCS Inc. employee decided the amount it would keep and the amount it would send to its co-conspirator City to reduce the person's city debt.

404.    These extra fees were not charged to those who immediately paid the city fines and costs when adjudicated, or to people who paid the fines online, or to people who were allowed to make periodic payments to the city at the window.

405.    Neither JCS Inc. nor its co-conspirator cities had legal authority to charge these extra fees.

406.     Charging extra fees for non-payment is beyond the authority of the municipal court, which is required by Alabama statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. See Ala. Code Section 12-14-8.

407.     These extra fees resulted in people being charged amounts that exceeded statutory maximums for the city 'crime' for which the fees were assessed.

408.     JCS Inc. unlawfully charged and collected these extra fees which were also paid under duress to avoid arrest and jail.

409.     JCS Inc. owes the Plaintiffs for money had and received from the payment of these illegal charges.

### Count Ten - Declaratory Relief
### JCS's Contracts Binding a Court Are Void
### Violating Due Process

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

410.     A real controversy exists between these parties concerning the validity of the JCS, Inc. form contract, and the legality of the actions taken under that contract, such that declaratory relief is appropriate. Plaintiffs seek relief declaring the contract between JCS, Inc. and its coconspirator cities void.

411.     First, Plaintiffs request the Court to declare that the JCS, Inc. contracts with its coconspirator cities void *ab initio* because the agreements exceeded the statutory and constitutional limitations on municipalities, as the mayor and city council had no authority to contractually bind its municipal court.

412.     The agreement between JCS, Inc. and its coconspirator cities violated the separation of powers doctrine embodied in the Alabama Constitution. *See* ALA. CONST., Art. III, § 43.   As a result, those agreements are void and due to be declared a nullity.

413.     Alabama state law also dictates a separation of the branches of government. Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, Ala. Code § 11-43-43, while the mayor of the city is responsible for executive duties. Ala. Code § 11-43-83.  If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. Ala. Code § 12-2-7 *et. seq.*; ALA. CONST.*,* Art. VI, § 139.

414.     Municipalities are prohibited from adopting laws, ordinances and policies that conflict with state law.  Ala. Code § 11-45-1.  *See also* ALA. CONST. Art. IV § 89.

415.   A city mayor has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

416.     All of the cities that contracted with JCS, Inc. exceeded their statutory authority and acted in conflict with state statute and constitutional limitations when they agreed with JCS, Inc. to bind their municipal court to include fees for JCS, Inc. in every probation order entered by its hired judge. That action essentially sold the court process for purposes of increasing income to the city.

417.     The illegal agreement and policy of JCS, Inc. invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

418.     Second, the JCS, Inc. contract violated the uniformity requirements of Alabama law.

419.     Alabama Code § 12-14-8 requires uniformity in processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  But under the JCS, Inc. contract, people who could not immediately pay a fine or court costs were charged fees, while those who could immediately pay were not. Also, "offenders" within the JCS, Inc. scheme

with its coconspirator cities were processed and fined differently than "offenders" in municipal jurisdictions that did not contract with JCS, Inc. This violates the uniformity requirements of Alabama Code § 12-14-8.

420.    The JCS, Inc. contract also violates the procedures established by the Alabama Administrative Office of Courts by imposing fees only on "offenders" who cannot pay immediately and creating other "rules" for further penalizing individuals who cannot pay as directed.  "Offenders" who are able to immediately pay are charged one rate, but those who are unable to pay immediately are required to pay monthly fees to JCS, Inc.

421.    Third, the contracts between JCS, Inc. and Alabama cities, including Childersburg, created an exclusive franchise for provision of private "probation" services. Upon information and belief, these contracts were not competitively bid, as required by ALA. CONST. Art. I, § 22 and Ala. Code § 41-16-50. Because the contracts were not bid, they are void and unenforceable.

422.    Plaintiffs request the Court to declare the actions of JCS, Inc. under these contracts to be unconstitutional under the authority discussed above.  Under this void agreement; JCS, Inc. implemented policies and practices to prosecute persons such as the Plaintiffs when it had no jurisdiction or authority to do so under Alabama law, intentionally coercing payment of fines and costs from impoverished people. These efforts have resulted in the illegal prosecution and incarceration of Plaintiffs, in an exceedance of the limited jurisdiction of the municipal courts.

423.    Fourth, the contracts between JCS, Inc. and Alabama cities, including Childersburg, violated public policy.

424.    It is unlawful for a government to sell its police power. Each city contract with JCS that included an agreement to include JCS payments "in every court order" sold its police power to enforce collection of city money. This violates public policy as well as the state and federal constitution.

425.    Further, JCS, Inc. added increased punishment, fines and costs after adjudication and even where there had been no adjudication of guilt, all without jurisdiction or authority for such under Alabama law.

426.    JCS, Inc. systematically applied *Ala. Code* § 15-18-62 in an unconstitutional fashion denying the Plaintiffs constitutionally protected rights.

427.    Alabama Code Section 15-18-62 provides for the imprisonment for the failure to pay fines and costs in limited circumstances and only upon the finding of a **willful nonpayment**.

428.    Under JCS, Inc.'s scheme, "offenders" before the Municipal Courts using JCS, Inc. were systematically imprisoned for nonpayment with no determination of willfulness and with no consideration of their poverty or ability to pay.

429.    The result of this consistent systematic policy and practice of JCS, Inc. is essentially a debtor's prison for fines and charges levied by JCS, Inc. under a void contract with the various municipalities for which it worked.

### Count Eleven
### JCS Breached its Contract
### Damaging Third Party Beneficiary Plaintiffs

Plaintiffs incorporate by reference the previous paragraphs and make them a part hereof.

430.    If the Court does not find the JCS contract void *ab initio* for the reasons stated above, then, in the alternative the Plaintiffs' assert additional claims as third party beneficiaries of the contract provisions between JCS and the Alabama cities involved under these facts.

431.    That contract states:  "JCS shall comply with all provisions of state and federal law." (JCS Contract Exhibit A)

432.    The plaintiffs like other JCS "probationers" were the intended beneficiaries of the contract provisions requiring compliance with state and federal law.

433.    As stated in detail above, JCS' entire 'probation' for collection scheme was predicated upon void city court orders which violated many state and federal laws. As such, JCS Inc. breached its contract causing damage to the plaintiffs.

432.    JCS breached each of its contracts by not complying with state statues and violating the civil rights of each 'probationer' by requiring extra fees, threatening arrests and jailing, and requesting warrants when money was not paid as JCS demanded. All of these JCS Inc. activities were purportedly legitimized by 'probation orders' that were void, as each probation order was based on an illegal agreement.

433.    All of the Plaintiffs were damaged by JCS' breach of its contract.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully pray that the Court will assume jurisdiction of this cause and upon the final hearing:

1.    Declare the Defendants' conduct described in the above counts are unconstitutional;

2.    Declare that the contracts between JCS and the Cities that contain the provision in which the city agrees "to include in every order" a requirement to pay JCS are void *ab initio*;

3.    Enter an injunction and other declaratory relief which declares the JCS contract with municipalities that contain the provision that JCS would provide testimony against the

'probationer' to be void *ab initio* and in violation of the statutory and constitutional limitations on municipalities (see paragraph 33);

4.     Award the Plaintiffs such damages as this Court shall find the Plaintiffs have sustained, together with punitive, or exemplary damages as the law shall permit;

5.     Award Plaintiffs restitution equal to any amounts paid on fines and all fees collected by JCS/CHC/CCS based upon void contracts and void probation orders;

6.     Award to the Plaintiffs damages under 42 U.S.C. § 1983;

7.     Award Plaintiffs restitution equal to any amounts paid on fines and all fees collected by JCS/CHC/CCS, and the annulment of any remaining unpaid fines that are found unconstitutional and/or unlawful;

8.     Award to the Plaintiffs the cost of this matter, including a reasonable attorneys' fee;

9.     Award to the Plaintiffs such other, further and more general relief as the Court may deem appropriate under these circumstances including cost of these proceedings.

## JURY DEMAND

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

Respectfully submitted this 17th day of May, 2018.

*/s/ Lloyd W. Gathings*
Lloyd W. Gathings (GAT001)
Will Lattimore (LAT021)

81

**OF COUNSEL:**
Gathings Law
2204 Lakeshore Drive, Suite 406
Birmingham, AL 35209
Telephone: 205.322.1201
Facsimile: 205.322.1202
lgathings@gathingslaw.com
wlattimore@gathingslaw.com

**PLEASE SERVE DEFENDANTS WITH THE COMPLAINT VIA CERTIFIED MAIL AS FOLLOWS:**


**CHC Companies, Inc.**
**c/o Registered Agent Corporate Creations Network, Inc.**
**6 Office Parkway Circle #100**
**Mountain Brook, AL 35223**

**Correct Care Solutions, LLC**
**c/o Registered Agent Corporate Creations Network, Inc.**
**6 Office Parkway Circle #100**
**Mountain Brook, AL 35223**

**Judicial Correction Services, Inc.**
**c/o Registered Agent Corporate Creations Network, Inc.**
**6 Office Parkway Circle #100**
**Mountain Brook, AL 35223**

**Susan Fuqua**
**169 Highland Crest Parkway**
**Hoover, AL 35226**



AlaFile E-Notice

01-CV-2018-902024.00

To: WILLIAM ALBERGOTTI LATTIMORE II
Wlattimore@gathingslaw.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following complaint was FILED on 5/17/2018 5:07:58 PM

Notice Date:     5/17/2018 5:07:58 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov



AlaFile E-Notice

01-CV-2018-902024.00

To:  CHC COMPANIES, INC
6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL, 35223

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following complaint was FILED on 5/17/2018 5:07:58 PM

Notice Date:     5/17/2018 5:07:58 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov



AlaFile E-Notice

01-CV-2018-902024.00

To:  CORRECT CARE SOLUTIONS, LLC
6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL, 35223

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following complaint was FILED on 5/17/2018 5:07:58 PM

Notice Date:     5/17/2018 5:07:58 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov



AlaFile E-Notice

01-CV-2018-902024.00

To:   JUDICIAL CORRECTION SERVICES, LLC
      6 OFFICE PARKWAY CIRCLE
      SUITE 100
      MOUNTAIN BROOK, AL, 35223

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following complaint was FILED on 5/17/2018 5:07:58 PM

Notice Date:    5/17/2018 5:07:58 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov



AlaFile E-Notice

01-CV-2018-902024.00

To:  SUSAN FUQUA
     169 HIGHLAND CREST PARKWA
     HOOVER, AL, 35226

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following complaint was FILED on 5/17/2018 5:07:58 PM

Notice Date:     5/17/2018 5:07:58 PM

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov

| State of Alabama<br>Unified Judicial System<br>Form C-34  Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>01-CV-2018-902024.00 |
| --- | --- | --- |

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
## EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL

**NOTICE TO:** CHC COMPANIES, INC, 6 OFFICE PARKWAY CIRCLE SUITE 100, MOUNTAIN BROOK, AL 35223

<em>(Name and Address of Defendant)</em>

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM ALBERGOTTI LATTIMORE II ,

<em>[Name(s) of Attorney(s)]</em>

WHOSE ADDRESS(ES) IS/ARE: 2204 LAKESHORE DRIVE, SUITE 406, BIRMINGHAM, AL 35209 .

<em>[Address(es) of Plaintiff(s) or Attorney(s)]</em>

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of EMERSON HAMILTON

<em>[Name(s)]</em>

pursuant to the Alabama Rules of the Civil Procedure.

| 5/17/2018 5:07:58 PM | /s/ ANNE-MARIE ADAMS | By: |
| --- | --- | --- |
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.   /s/ WILLIAM ALBERGOTTI LATTIMORE II

<em>(Plaintiff's/Attorney's Signature)</em>

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____ .

<em>(Date)</em>

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

<em>(Name of Person Served)</em>          <em>(Name of County)</em>

Alabama on _____ .

<em>(Date)</em>

| _____ | _____ | _____ |
| --- | --- | --- |
| *(Type of Process Server)* | *(Server's Signature)* | *(Address of Server)* |
| | _____ | _____ |
| | *(Server's Printed Name)* | *(Phone Number of Server)* |

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>01-CV-2018-902024.00 |
|---|---|---|

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL

**NOTICE TO:** CORRECT CARE SOLUTIONS, LLC, 6 OFFICE PARKWAY CIRCLE SUITE 100, MOUNTAIN BROOK, AL 35223

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM ALBERGOTTI LATTIMORE II

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 2204 LAKESHORE DRIVE, SUITE 406, BIRMINGHAM, AL 35209

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of EMERSON HAMILTON

*[Name(s)]*

pursuant to the Alabama Rules of the Civil Procedure.

| 5/17/2018 5:07:58 PM | /s/ ANNE-MARIE ADAMS | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.          /s/ WILLIAM ALBERGOTTI LATTIMORE II

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____.

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*      *(Name of County)*

Alabama on _____.

*(Date)*

| *(Type of Process Server)* | *(Server's Signature)* | *(Address of Server)* |
|---|---|---|
| | *(Server's Printed Name)* | *(Phone Number of Server)* |

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev. 4/2017 | SUMMONS<br>- CIVIL - | Court Case Number<br>01-CV-2018-902024.00 |
|---|---|---|

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**
**EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL**

**NOTICE TO:** JUDICIAL CORRECTION SERVICES, LLC, 6 OFFICE PARKWAY CIRCLE SUITE 100, MOUNTAIN BROOK, AL 35223

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM ALBERGOTTI LATTIMORE II

*(Name(s) of Attorney(s))*

WHOSE ADDRESS(ES) IS/ARE: 2204 LAKESHORE DRIVE, SUITE 406, BIRMINGHAM, AL 35209

*(Address(es) of Plaintiff(s) or Attorney(s))*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

**TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:**

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of EMERSON HAMILTON

*[Name(s)]*

pursuant to the Alabama Rules of the Civil Procedure.

| 5/17/2018 5:07:58 PM | /s/ ANNE-MARIE ADAMS | By: |
|---|---|---|
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.     /s/ WILLIAM ALBERGOTTI LATTIMORE II

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____.

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*          *(Name of County)*

Alabama on _____.

*(Date)*

_____          _____          _____

*(Type of Process Server)*          *(Server's Signature)*          *(Address of Server)*

_____          _____

*(Server's Printed Name)*          *(Phone Number of Server)*

| State of Alabama<br>Unified Judicial System<br>Form C-34   Rev. 4/2017 | **SUMMONS**<br>**- CIVIL -** | **Court Case Number**<br>01-CV-2018-902024.00 |
| --- | --- | --- |

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
### EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL

**NOTICE TO:** SUSAN FUQUA, 169 HIGHLAND CREST PARKWA, HOOVER, AL 35226

*(Name and Address of Defendant)*

THE COMPLAINT OR OTHER DOCUMENT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT, AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT OR OTHER DOCUMENT, WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE PLAINTIFF(S) OR ATTORNEY(S) OF THE PLAINTIFF(S), WILLIAM ALBERGOTTI LATTIMORE II ,

*[Name(s) of Attorney(s)]*

WHOSE ADDRESS(ES) IS/ARE: 2204 LAKESHORE DRIVE, SUITE 406, BIRMINGHAM, AL 35209 .

*[Address(es) of Plaintiff(s) or Attorney(s)]*

THE ANSWER MUST BE MAILED OR DELIVERED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT OR OTHER DOCUMENT WERE SERVED ON YOU OR A JUDGMENT BY DEFAULT MAY BE RENDERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT OR OTHER DOCUMENT.

### TO ANY SHERIFF OR ANY PERSON AUTHORIZED BY THE ALABAMA RULES OF CIVIL PROCEDURE TO SERVE PROCESS:

☐ You are hereby commanded to serve this Summons and a copy of the Complaint or other document in this action upon the above-named Defendant.

☑ Service by certified mail of this Summons is initiated upon the written request of EMERSON HAMILTON pursuant to the Alabama Rules of the Civil Procedure.

*[Name(s)]*

| 5/17/2018 5:07:58 PM | /s/ ANNE-MARIE ADAMS | By: |
| --- | --- | --- |
| *(Date)* | *(Signature of Clerk)* | *(Name)* |

☑ Certified Mail is hereby requested.     /s/ WILLIAM ALBERGOTTI LATTIMORE II

*(Plaintiff's/Attorney's Signature)*

## RETURN ON SERVICE

☐ Return receipt of certified mail received in this office on _____ .

*(Date)*

☐ I certify that I personally delivered a copy of this Summons and Complaint or other document to _____

_____ in _____ County,

*(Name of Person Served)*          *(Name of County)*

Alabama on _____ .

*(Date)*

_____          _____          _____

*(Type of Process Server)*     *(Server's Signature)*          *(Address of Server)*

_____          _____

          *(Server's Printed Name)*          *(Phone Number of Server)*

# NOTICE TO CLERK

### REQUIREMENTS FOR COMPLETING SERVICE BY
### CERTIFIED MAIL OR FIRST CLASS MAIL

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL

01-CV-2018-902024.00

To:  CLERK BIRMINGHAM
clerk.birmingham@alacourt.gov

TOTAL POSTAGE PAID: $51.60

Parties to be served by Certified Mail - Return Receipt Requested

CHC COMPANIES, INC                                          Postage: $12.90
6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL 35223

CORRECT CARE SOLUTIONS, LLC                                 Postage: $12.90
6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL 35223

JUDICIAL CORRECTION SERVICES, LLC                           Postage: $12.90
6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL 35223

SUSAN FUQUA                                                 Postage: $12.90
169 HIGHLAND CREST PARKWA
HOOVER, AL 35226

Parties to be served by Certified Mail - Restricted Delivery - Return Receipt Requested

Parties to be served by First Class Mail

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $ _____
☐ Return Receipt (electronic)       $ _____
☐ Certified Mail Restricted Delivery  $ _____
☐ Adult Signature Required          $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

7017 2620 0001 0494 2481

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

A CHC COMPANIES, INC

6 OFFICE PARKWAY CIRCLE
SUITE 100

MOUNTAIN BROOK, AL 35223

*S/C*
*D-1*

01-CV-2018-902024.00

9590 9402 2798 7069 5041 80

2. Article Number *(Transfer from service label)*

7017 2620 0001 0494 2481

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by *(Printed Name)*      C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☒ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $ _____
☐ Return Receipt (electronic)        $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required           $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage

$

Total Postage and Fees

$

*Sent To*

*Street and Apt. No., or PO Box No.*

*City, State, ZIP+4®*

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

7017 2620 0001 0494 2498

---

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. CORRECT CARE SOLUTIONS, LLC

   6 OFFICE PARKWAY CIRCLE
   SUITE 100
   S/C
   MOUNTAIN BROOK, AL 35223     D-2

   01-CV-2018-902024.00

   9590 9402 2798 7069 5041 73

2. Article Number (Transfer from service label)

   7017 2620 0001 0494 2498

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X                                          ☐ Agent
                                           ☐ Addressee

B. Received by (*Printed Name*)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)          $
☐ Return Receipt (electronic)        $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required           $
☐ Adult Signature Restricted Delivery $

Postmark
Here

Postage
$

Total Postage and Fees
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions

7017 2620 0001 0494 2504

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

JUDICIAL CORRECTION SERVICES, LLC

6 OFFICE PARKWAY CIRCLE
SUITE 100
MOUNTAIN BROOK, AL 35223

S/C
D-3

01-CV-2018-902024.00

9590 9402 3580 7305 0652 22

2. Article Number *(Transfer from service label)*
7017 2620 0001 0494 2504

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by *(Printed Name)*      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| Certified Mail Fee | |
|---|---|
| $ | |

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy) $ _____
☐ Return Receipt (electronic) $ _____
☐ Certified Mail Restricted Delivery $ _____
☐ Adult Signature Required $ _____
☐ Adult Signature Restricted Delivery $ _____

Postmark
Here

Postage
$
Total Postage and Fees
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

7017 2620 0001 0494 2511

---

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | **A. Signature**<br>X ☐ Agent ☐ Addressee<br>**B. Received by (Printed Name)**   **C. Date of Delivery** |
| 1. SUSAN FUQUA<br>169 HIGHLAND CREST PARKWA<br>HOOVER, AL 35226<br>S/C<br>D-4<br>01-CV-2018-902024.00 | **D. Is delivery address different from item 1?** ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| 9590 9402 3580 7305 0652 39 | 3. Service Type<br>☐ Adult Signature<br>☐ Adult Signature Restricted Delivery<br>☑ Certified Mail®<br>☐ Certified Mail Restricted Delivery<br>☐ Collect on Delivery<br>☐ Collect on Delivery Restricted Delivery<br>☐ Insured Mail<br>☐ Insured Mail Restricted Delivery (over $500) | ☐ Priority Mail Express®<br>☐ Registered Mail™<br>☐ Registered Mail Restricted Delivery<br>☐ Return Receipt for Merchandise<br>☐ Signature Confirmation™<br>☐ Signature Confirmation Restricted Delivery |
| 2. Article Number *(Transfer from service label)*<br>7017 2620 0001 0494 2511 | |

PS Form 3811, July 2015 PSN 7530-02-000-9053        Domestic Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. SUSAN FUQUA

   169 HIGHLAND CREST PARKWA

   HOOVER, AL 35226

   S/C

   D-4

   01-CV-2018-902024.00

   9590 9402 3580 7305 0652 39

2. Article Number (Transfer from service label)

   2620 0001 0494 2511

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

☐ Agent
☐ Addressee

B. Received by (Printed Name)        C. Date of Delivery

Susan Fuqua                          5-19-18

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
   ☐ Adult Signature
   ☐ Adult Signature Restricted Delivery
   ☑ Certified Mail®
   ☐ Certified Mail Restricted Delivery
   ☐ Collect on Delivery
   ☐ Collect on Delivery Restricted Delivery
   ☐ Insured Mail
   ☐ Insured Mail Restricted Delivery (over $500)

   ☐ Priority Mail Express®
   ☐ Registered Mail™
   ☐ Registered Mail Restricted Delivery
   ☑ Return Receipt for Merchandise
   ☐ Signature Confirmation™
   ☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                    Domestic Return Receipt



USPS TRACKING#



First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 3580 7305 0652 39

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

FILED IN OFFICE
CIRCUIT CIVIL DIVISION

MAY 21 2018

ANNE-MARIE ADAMS
CLERK

ANNE-MARIE ADAMS, CLERK
ROOM 400 JEFF CO COURTHOUSE
716 RICHARD ARRINGTON JR BLVD., NO.
BIRMINGHAM, ALABAMA 35203





AlaFile E-Notice

01-CV-2018-902024.00

Judge: DONALD E. BLANKENSHIP

To:   LATTIMORE WILLIAM ALBERGO
       Wlattimore@gathingslaw.com

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following matter was served on 5/19/2018

**D004 FUQUA SUSAN**

**Corresponding To**

CERTIFIED MAIL

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. A CHC COMPANIES, INC

   6 OFFICE PARKWAY CIRCLE
   SUITE 100

   MOUNTAIN BROOK, AL 35223

   01-CV-2018-902024.00



9590 9402 2798 7069 5041 80

2. Article Number (Transfer from service label)

   7017 2620 0001 0494 2481

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X
☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

**USPS TRACKING #**

9590 9402 2798 7069 5041 80

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

FILED IN OFFICE
CIRCUIT CIVIL DIVISION

MAY 23 2018

ANNE-MARIE ADAMS
CLERK

ANNE-MARIE ADAMS, CLERK

ROOM 400 JEFF CO COURTHOUSE

716 RICHARD ARRINGTON JR BLVD., NO.

BIRMINGHAM, ALABAMA 35203



AlaFile E-Notice

01-CV-2018-902024.00

Judge: DONALD E. BLANKENSHIP

To:  LATTIMORE WILLIAM ALBERGO
Wlattimore@gathingslaw.com

---

# NOTICE OF NO SERVICE

---

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following matter was not served on 5/23/2018

**D001 CHC COMPANIES, INC**

**Corresponding To**

OTHER

UNSIGNED CERTIFIED MAIL CARD

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. CORRECT CARE SOLUTIONS, LLC

   6 OFFICE PARKWAY CIRCLE
   SUITE 100

   MOUNTAIN BROOK, AL 35223

   S/c

   D-2

   01-CV-2018-902024.00



9590 9402 2798 7069 5041 73

2. Article Number (Transfer from service label)

7017 2620 0001 0494 2498

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☑ Addressee

B. Received by (Printed Name)   C. Date of Delivery
V Godfrey                        5/21/18

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

## USPS TRACKING #



9590 9402 2798 7069 5041 73

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

FILED IN
OFFICE
CIRCUIT CIVIL DIVISION

MAY 22 2018

ANNE-MARIE ADAMS
CLERK

• Sender: Please print your name, address, and ZIP+4® in this box•

ANNE-MARIE ADAMS, CLERK

ROOM 400 JEFF CO COURTHOUSE

716 RICHARD ARRINGTON JR BLVD., NO.

BIRMINGHAM, ALABAMA 35203



63-010100





AlaFile E-Notice

01-CV-2018-902024.00

Judge: DONALD E. BLANKENSHIP

To:  LATTIMORE WILLIAM ALBERGO
     Wlattimore@gathingslaw.com

# NOTICE OF SERVICE

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following matter was served on 5/21/2018

**D002 CORRECT CARE SOLUTIONS, LLC**
**Corresponding To**
AUTHORIZED SERVICE

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov

**SENDER:** *COMPLETE THIS SECTION*

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

JUDICIAL CORRECTION SERVICES, LLC

6 OFFICE PARKWAY CIRCLE  S/C
SUITE 100
MOUNTAIN BROOK, AL 35223  D-3

01-CV-2018-902024.00



9590 9402 3580 7305 0652 22

2. Article Number *(Transfer from service label)*

7017 2620 0001 0494 2504

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X ___Godfrey___   ☑ Agent
                   ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery
___Godfrey___      5-2-18

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☑ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt

USPS TRACKING# MAY 18



9590 9402 3580 7305 0652 22

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

* Sender: Please print your name, address, and ZIP+4® in this box*

FILED IN OFFICE

CIRCUIT CIVIL DIVISION

MAY 22 2018

ANNE-MARIE ADAMS
CLERK

ANNE-MARIE ADAMS, CLERK

ROOM 400 JEFF CO COURTHOUSE

716 RICHARD ARRINGTON JR BLVD., NO.

BIRMINGHAM, ALABAMA 35203





AlaFile E-Notice

01-CV-2018-902024.00

Judge: DONALD E. BLANKENSHIP

To: LATTIMORE WILLIAM ALBERGO
Wlattimore@gathingslaw.com

---

# NOTICE OF SERVICE

---

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

EMERSON HAMILTON ET AL V. CHC COMPANIES, INC ET AL
01-CV-2018-902024.00

The following matter was served on 5/21/2018

**D003 JUDICIAL CORRECTION SERVICES, LLC**
**Corresponding To**
AUTHORIZED SERVICE

ANNE-MARIE ADAMS
CIRCUIT COURT CLERK
JEFFERSON COUNTY, ALABAMA
JEFFERSON COUNTY, ALABAMA
716 N. RICHARD ARRINGTON BLVD.
BIRMINGHAM, AL, 35203

205-325-5355
anne-marie.adams@alacourt.gov