FILED

2018 Oct-12  AM 10:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **EMERSON HAMILTON,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CASE NO. 2:18-CV-933-RDP** |
| | ) |
| **JUDICIAL CORRECTION SERVICES,** | ) |
| **LLC f/k/a, JUDICIAL CORRECTION** | ) |
| **SERVICES, INC.** | ) |
| | ) |
| **Defendants.** | |

## THIRD AMENDED COMPLAINT

Come now the plaintiffs, Emerson Hamilton, Bennie Bruno, Willie Walker, Tevell Crawford, Antonio Calhoun, Lewis Mallory, Joshua Hall, Earnest Norwood, Correy Kelley, Norwood McDonald, and Khomenie Datcher, and amend their complaint as ordered by the Court, so as to cause their complaint to read as follows:

### AMENDED COMPLAINT

### INTRODUCTION

1.     For many years JCS, along with its co-conspirator cities and their courts, operated an illegal extortion scheme called private 'probation.' Under this extortion scheme when a person appearing before the city court

1

could not immediately pay fines for traffic violations or other misdemeanor offenses, they were sent to JCS "probation" for collection of those fines and required pay extra money to JCS for monthly 'probation fees'.  This scheme was imposed on those persons without any inquiry into the person's ability to pay, without considering sentencing alternatives and without adequate counsel either at the court proceedings, at JCS 'revocation hearings,' or even after the accused was jailed subject to a cash bail set beyond their means.

2.    In many cases at some cities, persons were routinely incarcerated before any determination of guilt and then charged for each day they were in jail with no consideration of their poverty.  This practice was carried out by the city magistrates and police without any court order or directive to that effect and with the collection of these jail fees also being pursued by JCS.

3.    While collecting fines in Hoover's city court, JCS secretly paid the Hoover Magistrate Susan Fuqua ('Ms. Fuqua')[1], as its lobbyist to market its interests to other cities.  Ms. Fuqua did not register as a lobbyist while she promoted JCS to other city magistrates and to city judges.  With the Hoover city magistrate and its city prosecutor secretly on the JCS

---

[1] Ms. Fuqua was also the longtime President of Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA')

payroll as a lobyistto assist in marketing efforts, JCS ultimately contracted with over 100 Alabama cities to collect fines. Throughout the decade from 2005 to 2015, JCS Inc. was paid over $50 million dollars from fees collected from the poorest citizens of Alabama under this extortion scheme.

4.     These practices of JCS and its co-conspirators used the threat of jail, arrests and jail time to coerce payments from poor debtors and their family and friends. Unlike any legitimate court/probation process, the JCS scheme was promoted and run by persons and entities who were financially interested in the process. The Plaintiffs bring this action because the policy, practices and actions of JCS have violated their statutory and constitutional rights.

## PARTIES TO THE COMPLAINT

5.     Plaintiff Emerson Hamilton ("Mr. Hamilton") is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

6.     Plaintiff Bennie Bruno ('Mr. Bruno') is over the age of nineteen (19) and is an individual resident of Childersburg, Alabama.

7.     Plaintiff Willie Walker ('Mr. Walker') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

8.     Plaintiff Tavell Crawford ('Mr. Crawford') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

9.     Plaintiff Antonio Calhoun ('Mr. Calhoun') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

10.    Plaintiff Lewis Mallory ('Mr. Mallory') is over the age of nineteen (19) and is an individual resident of Childersburg, Alabama.

11.    Plaintiff Joshua Hall ('Mr. Hall') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

12.    Plaintiff Earnest Norwood ('Mr. Norwood') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

13.    Plaintiff Correy Kelley ('Mr. Kelley') is over the age of nineteen (19) and is an individual resident of Sylacauga, Alabama.

14.    Plaintiff Norwood McDonald ('Mr. McDonald') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

15.    Plaintiff Khomenie Datcher ('Mr. Datcher') is over the age of nineteen (19) and is an individual resident of Harpersville, Alabama.

16.    Defendant Judicial Correction Services, LLC (hereinafter 'JCS' or 'JCS Inc.') is a Delaware Limited Liability corporation. While operating in the State of Alabama, JCS operated as Judicial Correction Services, Inc. being registered as a foreign corporation and doing business in the State of Alabama and in Jefferson County. JCS marketed itself as "not a social service agency," but a "for profit" company which offered services in

4

Alabama to governmental entities "free of charge" to the cities as "an offender paid system." At all times, JCS has operated under the color of state law. JCS no longer operates in the State of Alabama.

17. Defendant CHC Companies, LLC. ('CHC') (also hereinafter "JCS") is a Delaware Limited Liability corporation. While operating in the State of Alabama CHC operated as CHC Companies, Inc. being registered as a foreign corporation and doing business in the State of Alabama and in this County. It is the successor of JCS, having purchased and merged JCS operations into its own pursuant to a merger agreement executed on September 30, 2011. From September 30, 2011 until its acquisition by CCS in 2014, all the JCS operations were directed and controlled by CHC which continued to use the JCS name, JCS contracts and JCS trademark. CHC's JCS division no longer operates in Alabama.

18. Defendant Correct Care Solutions, LLC ('CCS') (also hereinafter "JCS") is a Kansas limited liability corporation, registered as a foreign limited liability company and doing business in the State of Alabama. CCS purchased CHC and merged CHC's operations, its subsidiaries and its headquarters with its own. The CCS home office and headquarters is now in Nashville, Tennessee, from which, upon information and belief, it now controls the operations of its subsidiaries including CHC

5

Companies, Inc., employing and directing employees in the JCS operations. In the fall of 2015, CCS discontinued its JCS operations in Alabama.[2]

19.   CHC Companies, Inc. (f/k/a Correctional Healthcare Companies, Inc.) continues to do business as Correctional Healthcare Companies, Inc.  Pursuant to its September 30, 2011, merger agreement with JCS, CHC Companies, Inc. d/b/a Correctional Healthcare Companies, Inc. assumed the "assets, rights, privileges, powers and franchises of, and be subject to all the liabilities, restrictions, disabilities and duties" of JCS. Doug Goetzl, CHC Companies, Inc.'s CEO executed this agreement on behalf of CHC.

20.   The Defendant Correct Care Solutions, LLC ("CCS" is a Kansas limited liability corporation, registered as a foreign limited liability company and doing business in the State of Alabama.  On June 24, 2014, CCS purchased CHC Companies, Inc. and has merged CHC's operations, its subsidiaries and its headquarters with its own.  The CCS home office and headquarters is now in Nashville, Tennessee, from which it now directs and

---

[2] Judicial Correction Services, Inc., is responsible for its actions before October 1, 2011, CHC is liable for its actions from October 1, 2011 until it was acquired and merged with CCS in 2014, and CCS is liable for its action from the date it acquired the JCS operations in 2014. For simplicity JCS refers to the JCS operations in Alabama but the controlling entities are the legal entities from which the Plaintiffs seek damages.

controls the operations of all its merged corporations including CHC Companies, Inc.  The JCS operations have been fully integrated with the operations of other CHC companies and is part of a division known as CCS's State and Federal Division, which is managed by Don Houston. CCS controls the accounting, litigation and other operational aspects of the JCS operations contained within this division and employs all the personnel within the JCS operations and that division.

21.   Defendant Susan Fuqua ('Ms. Fuqua') is over the age of nineteen (19) and is an individual resident of Jefferson County, Alabama. For many years JCS, along with many Alabama cities and courts with which it contracted, including the cities and courts of Talladega, Hoover, Sylacauga, Lincoln, Calera, Harpersville and Childersburg, Alabama operated an illegal extortion scheme called private "probation." Under this extortion scheme when a person appearing before the city court could not immediately pay fines for traffic violations or other misdemeanor offenses, they were ordered to JCS "probation" and required to pay extra money to JCS for monthly "probation fees."  The actions taken by JCS in this extorted collection had no legal basis, resulted from a void contract, void "orders" and were done in violation of state law.

## VENUE AND JURISDICTION

22.    Venue exists in this Circuit Court of Jefferson County because Ms. Fuqua resides in this Jefferson County and because the private company defendants JCS, CHC and CCS (collectively referred to as 'JCS Inc.') did business in Jefferson County as Judicial Correction Services, Inc. during the period made basis of this complaint.

23.    Jurisdiction exists in Alabama because JCS, CHC and CCS are foreign companies registered to do business in the state of Alabama and which actively operated as a private 'probation' company before discontinuing operations in the State of Alabama the fall of 2015. These Defendants performed various services within the State of Alabama for several years and therefore Alabama State Court has jurisdiction over each and every one of the private company Defendants.

24.    This Jefferson County Circuit Court has jurisdiction over Defendant Susan Fuqua because she lives in Jefferson County and because of her participation in the conspiracy with the private company Defendants and the co-conspirator cities in the acts alleged herein.

## FACTS

25.    JCS solicited contracts with cities throughout Alabama and ultimately contracted with at least 112 cities, including Talladega, Hoover,

Sylacauga, Lincoln, Calera, Harpersville and Childersburg, Alabama. These contracts were marketed to the city mayors and council as a no cost contract which gave JCS an exclusive franchise in those cities to collect court fines and fees. This agreement was based upon the cities' agreement to require persons appearing before its courts to be "ordered" to pay fees to JCS.   As a result, the contracts provided JCS with an exclusive franchise at each city court for these "services" and also provided that payment of JCS fees must be required in every court order sending persons to JCS for collection of fines and costs.  The "probation order" form which included the provision ordering the payment of JCS fees was printed by JCS and provided to the city courts at which JCS operated, including Talladega, Hoover, Sylacauga, Lincoln, Calera, Harpersville and Childersburg, Alabama.

26.   The JCS contracts with the cities were no bid contracts and though this collection system was described as "probation," the JCS personnel were not probation officers and were instead trained in collection.  Once the fines, fees and costs were collected the "probation" was terminated.

27.    The form agreement between the Alabama cities and JCS attests that the municipal "court agrees that each court order shall provide for the following":

    i.    a probation fee of $35.00 per month flat fee. (Basic or intensive supervision)

    ii.    one time probationer set up fee of $10.00. . . . " (Exhibit A)(emphasis added).

28.    Generally the city, through its mayor and council, approved the agreement with JCS on behalf of the city and its court. By Alabama statute, the cities also established its court and approved the employment of their municipal court judge(s).  Throughout the period of the contract with JCS, the city police, city court, and city staff of the cities previously named herein fully participated in the practices and system with JCS.

**General JCS Collection Practices**

29.    The JCS contract used throughout Alabama required that both the city and its court agree to the terms. In fact, the court "probation order" which required fees for JCS was the contract consideration from the city and its court in order to receive JCS's promise of free collection services. That contract document began the JCS relationship in each city but was not competitively bid as is required by law.

30.    The JCS contract terms require that the city court "order" the payment of monthly fees to JCS by each person sent to JCS for collection. The "probation order" itself was a form preprinted by JCS and then provided to the city courts in which JCS operated and provided for the payment of JCS fees.  Those "probation orders" were often signed in blank by the city judge and given to JCS to fill out when a person was sent for collection.  Many times the orders were not signed at all while others had stamped signatures applied by JCS.  The only persons sent to JCS for collection were those who could not pay the fines and costs demanded on city charges.  Those who were capable of paying the fines and costs were not subjected to JCS and not ordered to this "probation" and charged added fees.

31.    After the contract was in place with an Alabama city and the form "probation orders" supplied to the city court, JCS, in conjunction with the cities and their city courts, applied its collection system in a substantially similar fashion throughout Alabama.

32.    The JCS approach is highly systemized and was uniform throughout the Alabama municipal courts in which it operated.  That system used JCS's "Probation Tracker" software which is highly systemized and focused on collections of fines and its fees -- not traditional probation

services.  For instance, the "probation officer" did not visit the probationer's home, job or family, and had contact with them only at the JCS office in collecting fees and fines.

33.    The cities, through their contract, pattern and practice, clothed JCS with the appearance of state authority and some cities have even allowed JCS employees to carry badges.[3] The JCS employees attended each municipal court session and were referred to as "probation officers" in the operation of the municipal court and city clerk's office, though none have such authority under Alabama statutes.  Under this system and as part of its exclusive franchise, the "offenders" were not permitted to pay fines at the city payment window, but were required to make all payments, including those for fines, restitution, probation fees and court costs, to JCS. Throughout the process, JCS was financially interested in and was paid from these strong-arm collection efforts.

34.    The JCS extortion scheme was enormously profitable, and pressured family members who had no legal obligation to pay any money to come up with money to get their loved ones released from probation, and from ongoing threats and jail. This scheme and practice also compelled these impoverished people to forgo basic necessities of life in

order to pay JCS in an attempt to avoid jail time and extra costs associated with that.

## JCS in Alabama Municipal Courts

35.   Over the years, JCS contracted with over one hundred Alabama cities, including Talladega, Hoover, Sylacauga, Lincoln, Calera, Harpersville and Childersburg, Alabama, for the collection of court fines and costs using substantially the same contract form and thereafter operating in each court under the same automated software with its personnel assigned to each court being trained under the same manual and processes and with an understanding between JCS and the cities to allow the JCS system to be applied there.

36.   After being hired at a city court, JCS and the municipal courts operated in a concerted and consistent fashion showing evidence of their agreement and understanding in carrying out the JCS collection system.

37.   Each JCS contract required that the municipal judge would include in his/her orders sending people to JCS that those people must pay JCS a set-up fee and a monthly fee.  Those fees continued until the fines, costs and fees were paid but are not authorized by Alabama law.

38.    Many of these city contract agreements also stated that JCS, despite its financial interests, would provide testimony "as to the circumstances of the case" as a "probation officer."

39.    In compliance with the conspiratorial understanding and agreement between JCS and the Alabama Municipal Courts under contract with JCS, the city judges consistently ordered persons appearing before the city court to "probation" with JCS for the collection of fines and court costs when they could not immediately pay. This "probation order" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

40.    In ordering people to JCS "probation" for collection of fines and court costs, a persons' poverty was not considered and ability-to-pay hearings were not undertaken. To do so would destroy the business model of JCS which was dependent upon the ongoing flow of "probationers" who would be ordered to pay its fees.  Persons who could pay their fines were not sent to JCS "probation" and not charged additional fees.  Those who were ordered to JCS were therefore all impoverished to the degree they could not pay simple fines and costs.  Instead of consideration of their poverty, however, and in furtherance of the conspiratorial understanding

and agreement with JCS, the city judges ordered persons on probation using the JCS form order without further inquiry.

41. The actions of the city judges in furtherance of the conspiratorial understanding and agreement with JCS were done with full knowledge that JCS had financial interests in expanding the number of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared by the court to be indigent because JCS had agreed not to charge those people probation fees.

42. This conspiratorial agreement and understanding between JCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to make any indigency determinations and by JCS' policy position that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

43. This conspiratorial agreement and understanding between JCS and the Alabama municipal courts is further shown by the consistent failure of the city judges to appoint counsel to those ordered to JCS "probation" and by the use of JCS' preprinted probation order form which includes

language above the offender's signature line purporting to "waive" right to counsel.

44.   Based upon these "probation orders" if payment was not forthcoming, JCS provided to the court its Petition for Revocation as the tool used to acquire an arrest warrant which the courts routinely issued for failure to appear, failure to pay or failure to obey court order which were all used as further leverage to extort payment.

45.   Neither JCS nor the Alabama municipal courts with which it contracted took steps to provide counsel for the persons pursued under these "revocations" and arrested under this system or to inform them of this right.

46.   Using the "probation order" as its basis, the JCS Petitions for Revocation were predicated on failure of the individual to pay the fines and fees demanded. Those petitions were dismissed when such payment was forthcoming.   The "probation order" itself was terminated when the fees, fines and costs were fully paid.

47.   Using the "probation order" from its co-conspirator Alabama municipal courts as a basis, JCS was allowed to determine the monthly payments required of each person and to allocate payments between money going to JCS and money going to the City/court.

48.    Under these "probation orders," hundreds of people throughout the state were kept on JCS probation beyond the statutory maximum of two (2) years; none had counsel; data showing disability and unemployment was ignored; and no investigation of poverty as reasons for nonpayment was undertaken by either JCS or the court. The "probation order" met the court's promise to receive the free JCS collection services and was in conformity with the JCS contract.  Those "orders" also ignored JCS' known financial interest in expanding and extending fee payments.

49.    The JCS contracts and the resulting "probation orders" were the crucial factors underlying this extortion scheme.  That scheme in the JCS cities shows a conspiratorial agreement and understanding between the Alabama municipal courts and JCS that warrants would be issued if money was not paid by the person sent to JCS for collection, all while ignoring the requirement of consideration of poverty as required by law.

50.    The scenario of the city contract leading to a city court "probation order" leading to illegal JCS extortion which violated numerous constitutional rights, played out repeatedly in Alabama cities, including Harpersville, Childersburg, Sylacauga and many others affecting thousands of Alabama citizens.

51.    The illegal JCS scheme was based upon a void contract and void court orders but still resulted in JCS fees of over 30 million dollars being plundered from over 150,000 of Alabama's poorest citizens from at least 2004 until the fall of 2015.

### Factual Allegations Regarding Conspiracy between JCS and Susan Fuqua

52.    To further the conspiratorial agreement and understanding between JCS and the municipalities with which it contracted, JCS hired as its paid lobbyist Susan Fuqua ('Ms. Fuqua'), while she was serving as the magistrate for the City of Hoover and as President of the Alabama Municipal Court Clerks and Magistrates Association ('AMCCMA') for which she was one of the initial board members. Ms. Fuqua did not register as a lobbyist, but organized and participated in continuing education seminars for city magistrates and city judges during which she promoted JCS's collection system to other city court personnel.

53.    Ms. Fuqua actively participated in marketing the JCS 'probation' for collection scheme to city magistrates and city officials.

54.    Upon information and belief, Ms. Fuqua profited by JCS' growth in Alabama by continuing to receive payments for lobbying services from

JCS and from CHC once CHC purchased and merged the JCS operations with its own.

55.    Upon information and belief, in exchange for her monthly lobbying stipend from JCS Inc. (i.e. JCS, CHC and CCS) Ms. Fuqua promoted JCS' business model as one that was legal but did not disclose the voidable violations of Alabama law that are woven into the 'probation' for collection scheme.

56.    Upon information and belief, Ms. Fuqua presented JCS as a neutral court officer despite the fact that it had financial interests in keeping people on 'probation' and hiding the material facts regarding people's poverty from the city court and its employees.

57.    Upon information and belief, as the president of the AMCCMA for over ten (10) years Ms. Fuqua actively lobbied for JCS' interests without disclosing her role as its paid lobbyist.

58.    Upon information and belief, as the long-time president and founding member of AMCCMA Ms. Fuqua would receive calls from city magistrates with questions and concerns regarding JCS Inc., its operations, and complaints/challenges to JCS' conduct. Ms. Fuqua would dispel these concerns and present JCS Inc. in a positive light all while concealing the fact that she was its paid lobbyist.

59.    These concerted efforts between Ms. Fuqua and JCS Inc. show a conspiratorial agreement and understanding to foster and promote a voidable practice which violates the Plaintiffs' rights.

## Factual Allegations Regarding JCS' Conspiracy With Multiple Alabama Municipal Courts

60.    JCS entered agreements and/or reached an understanding with the many Alabama Municipal Courts with which it contracted establishing a practice to deny the Plaintiffs' constitutional rights protected by Alabama law.

61.    Over the years JCS contracted with over one hundred Alabama cities for the collection of court fines and costs using substantially the same contract form and provisions and thereafter operating in each court under the same automated software and with personnel assigned to each court being trained under the same manual and processes. Those cities included Hoover, Harpersville, Childersburg, and Sylacauga among others.

62.    After being hired at a city court, JCS and the municipal courts operated in a concerted and consistent fashion showing evidence of an agreement and understanding to deny the Plaintiffs' rights under Alabama law.

63.    Each JCS contract provided that the municipal judge would include in his/her orders sending people to JCS that those people would be required to pay JCS a set-up fee and monthly fee.

64.    Many of these agreements also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.' (See Paragraph 33 above.)

65.    In furtherance of the conspiratorial understanding and agreement between JCS and the Alabama Municipal Courts under contract with JCS, the city judges consistently placed persons on "probation" with JCS for the collection of fines and court costs.

66.    In furtherance of this practice, a persons' poverty was ignored, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. To do so would destroy the business model of JCS which was dependent upon the ongoing assignment of "probationers" who were ordered to pay its fees.  Persons who could pay their fines were not sent to JCS.  Those who were sent, were all impoverished to the degree they could not pay simple fines and costs.  Instead of consideration of their poverty however, and in furtherance of the conspiratorial understanding and agreement with JCS, the city judges placed persons on probation without further inquiry.

67.     These actions were in furtherance of the conspiratorial understanding and agreement with JCS, with full understanding that JCS had financial interests in expanding the number of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent since JCS agreed to not charge indigent people probation fees.

68.     In furtherance of this practice and agreement between JCS and the Alabama municipal courts, the courts routinely issued arrest warrants for failure to appear, failure to pay or failure to obey a court order after JCS provided to the court its petition for revocation as the tool to acquire the warrant.

69.     The petitions for revocation sought by JCS under its agreement and understanding with Alabama municipal courts were predicated on failure of the individual to pay the fines and fees demanded and those petitions were dismissed when such payment was forthcoming. The "probation" itself was terminated when the fees, fines and costs were fully paid. These petitions used under this agreement and understanding in turn were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

22

70. In furtherance of the conspiratorial agreement and understanding between JCS and the Alabama municipal courts, JCS was allowed to determine the monthly payments required and to allocate payments between JCS or the City without any audit by the City as to the correctness.

71. This conspiratorial agreement and understanding between JCS and the Alabama municipal courts to violate the state's legal rights of the plaintiffs is further shown by the hundreds of people throughout the state who were kept on JCS probation beyond the statutory maximum of two (2) years; the absence of counsel for those arrested; the explicit language of the JCS forms and petitions presented to the Court; JCS data showing disability and unemployment of those assigned for collection; the absence of any investigation of poverty as reasons for nonpayment by either JCS or the Court, and the Court's participation in conformity with the JCS contract by assigning persons for collection of fines and costs to a party with a known financial interest in expanding and extending fee payments.

72. These concerted efforts between the Alabama municipal courts and JCS, show a conspiratorial agreement and understanding that warrants would be issued if money was not paid by the person sent to JCS

for collection, all while allowing voidable orders and actions under Alabama law.

73.    This conspiratorial practice existed in Hoover, Harpersville, Childersburg and Sylacauga among other cities and resulted in damage to the plaintiffs as hereinafter described.

### PROCEDURAL HISTORY
### Of Related Litigation Against JCS and Harpersville
### [Case No. 58-CV-2010-900183]

74.    On March 3, 2010, Richard Garrett and others ("Shelby Co. Plaintiffs") filed a complaint against Harpersville and others including Judge Larry Ward requesting injunctive and declaratory relief.

75.    On May 25, 2012, the Shelby County Court certified "the class claims for declaratory and injunctive relief.

76.    Judge Harrington enumerated the most egregious abuses committed by JCS and Harpersville in his July 11, 2012 order:

a. Defendants placed on "probation" without an adjudication or sentencing order and/or without receiving a suspended sentence;
b. Defendants placed on "probation" with JCS only when unable to pay the entire amount of assessed fines and court costs on the day of trial;
c. Defendants incarcerated for a probation violation (failure to pay, failure to appear, contempt of court  . . .) without an adjudication or sentencing Order;
d. Defendants incarcerated for failure to appear in court, though only "ordered" to do so by JCS;

24

e. A defendants' failure to appear or failure to pay often results in a new criminal charge with incarceration and additional fines and fees for contempt of court with no valid court order or adjudication;

f. Defendants not afforded a hearing as required by Rule 26.11 of the Alabama Rules of Criminal Procedure;

g. Defendants placed on "extended" probation for many years beyond the two year maximum;

h. Defendants interminably held in the county work release program until all fines and foes are paid in full;

i. Defendants charged unconscionable fines and fees.

j. Defendants placed on "probation" are charged an initial "set up fee" of $10.00 and a monthly "probation fee" of $35.00 (arbitrarily raised to $45.00 per month at some point in time, though the Harpersville/JCS contract allows for only $35.00 per month) which is charged as long as the defendant is on probation. For example, under the Harpersville/JCS contract a defendant who is unable to pay a fine of $200.00 on the day of trial is placed on probation. If that defendant paid $50.00 per month to the JCS probation office, the defendant will not have satisfied his probation for 14 months at a total cost of $700.00. (JCS probation fees would be one month at $10.00 + $35.00 and 13 months at $35.00-unless the defendant was charged $45.00 per month in which case the first two monthly payments would only cover JCS charges, requiring an additional 40 months of payments totaling $2,100.00.)

k. Multiple incarcerations were imposed upon the plaintiffs in the case at bar with no adjudication or imposition of sentence and for probation violations over which the court had absolutely no jurisdiction.

l. Fines and fees charged to the plaintiffs in the case at bar reached into the thousands upon thousands of dollars.

77.    On July 17, 2012 the Plaintiffs filed their third amended complaint against Harpersville and JCS.

78.    The Harpersville city court was abolished on August 8, 2012 pursuant to the city council's Ordinance No. 12-0808. In addition to abolishing the city court, this Ordinance transferred jurisdiction for city crimes to the District Court of Shelby County. The very next day, August 9, 2012, the Sheriff of Shelby County executed a search warrant upon Harpersville's municipal court and its police department and seized the City's records.

79.    On August 16, 2012, Judge Harrington entered an order immediately abolishing Harpersville's city court and transferring jurisdiction for all Harpersville city crimes to the District Court of Shelby County, Alabama. This order also enjoined Harpersville and its agent, JCS, from collecting any "outstanding fines, fees, costs or judgments."

80.    With no city records, the case became dormant for an extensive period of time with no action on the damage claims. With no progress of the case on March 18, 2015, the Shelby County Circuit Court entered an Order continuing the case generally.

81.    While the Shelby County case was stalled, Plaintiffs in Ray v. JCS, et. al., filed their complaint on August 28, 2012 in the U.S. District Court for the Northern District of Alabama and vigorously pursued JCS in a statewide damage class action.

82.    During the pendency of the Garrett Shelby County lawsuit, following a ruling in this matter by Judge Hub Harrington and the closure of the Harpersville city court, Attorney General Luther Strange seized the records of the City of Harpersville city court and kept those in his office for many months while instituting no litigation or prosecution concerning the same.  Only after many months of silence from that office, those records finally returned to the District Attorney's office in Shelby County and ultimately were placed in the hands of the attorneys at Balch, Bingham acting as counsel for the City of Harpersville where they currently reside.

83.    On March 16, 2018, the parties in the Shelby County action filed a joint motion to dismiss requesting that the court approve a secret settlement with the named plaintiffs and to approve dismissal of the class claims without prejudice and without notice to the class.

84.    On April 3, 2018, Balch & Bingham on behalf of Harpersville filed a proposed order which the court adopted approving the secret settlement with no notice to the class members and with no disclosure of amounts paid to the plaintiffs or their counsel in consideration of the dismissal.

85.    Though the named Plaintiffs and their counsel filed the Shelby County action as representatives of a putative class, certification of the

damage class was never sought and no notice whatsoever was given to other putative class members whose rights are affected thereby. The class claims in the Shelby County case have however tolled the statute of limitations for the claims of the putative class members there.

86.    None of these Plaintiffs have received any compensation for the damages they have suffered from the JCS scheme.

## JCS's Conspiracy with Harpersville

87.    The Town of Harpersville contracted with JCS on March 3, 2005. The JCS form contract was signed by the city mayor.  As in other cities, Harpersville agreed to have its court order the payment of fees to JCS by each person sent to "probation" for fine collection.

88.    Harpersville also hired Larry Ward as its part time municipal judge.  Ward's full time job was selling municipal bonds and giving cities financial advice - not practicing law. In fact, Ward never practiced law but had assisted Harpersville in issuing municipal bonds whose payments were thereafter largely funded by revenue from city fines which Ward levied. Upon information and belief, Ward facilitated the sale of Harpersville municipal bond warrants by his employer Morgan Keegan in 2010 which were underwritten based on Harpersville financial statements showing

approximately 50% of the city revenue coming from its city court fines levied under Larry Ward.

89.   During his tenure at Harpersville, Larry Ward had a personal, financial interest in ensuring that the Harpersville court generated money for the Town to support the bond issue all of which was known to the Town officials who participated in the bond issue.

90.   Like Larry Ward, JCS had a significant financial stake in the proceedings, as it only made money if people continued to be placed on 'probation' and ordered to pay fees all of which constituted voidable orders and practices under Alabama law to those appearing before the city court.

91.   As part of the practice at Harpersville with JCS, Larry Ward typically presigned blank 'probation' orders provided to him by JCS which the JCS employees then filled out without any oversight being undertaken by the City.   Many times "probation" was assigned for collection even though there was no underlying suspended jail sentence and often for charges upon which there had been no finding of guilt.

92.   The Town's focus on revenue collection and its knowing employment of JCS and Ward, each with financial interests in a judicial process, established a long-term practice of abuse routinely denying due

process and other rights to persons such as the plaintiffs as was found by Judge Harrington in the order referenced above.

93.    To give JCS the appearance of authority, a JCS employee with City approval often sat in the mayor's chambers and received 'probationers' who were escorted into the chambers by Harpersville police after being sent to "probation."

94.    On March 4, 2014 the Alabama Judicial Inquiry Commission issued Advisory Opinion 14-926, after conducting an investigation of Larry Ward and entered a lengthy opinion critical of the deficiencies in his actions as a city judge operating at Harpersville jointly with JCS.

95.    After reviewing Ward's improper actions with JCS at Harpersville, the Judicial Inquiry Commission gave directions on how municipal courts should operate:

> a. COURT RECORDS
> That orders of the court are duly signed by the judge in a timely manner; that blank orders are never signed by the judge to be filled in by staff; that execution of orders not be delegated to staff by use of signature stamps; that all plea agreements, waivers of counsel, and other forms be properly executed and maintained; that counsel be appointed for indigent defendants where appropriate; that all orders and records of the court be retained by the court clerk as required by law; that the amount of fines imposed and court costs and fees assessed be limited to those allowed by law; that proper corrective action be taken upon discovery that the amount of such fines, costs, or fees was

excessive and that traffic tickets be timely forwarded to the Department of Public Safety as required by law.

b. PROBATION

That probation be used only when a suspended sentence is imposed following conviction of an offense; that probation be imposed only after a properly executed order of conviction has been entered; that all probation orders be executed by the judge at the time the defendant is placed on probation and advised of the conditions of probation; that periods of probation be neither imposed nor extended beyond the time authorized by law; that petitions for revocation of probation be processed in accordance with due process requirements, including proper notice to the defendant; and written findings of the grounds for revocation of probation be recorded.

c. COUNSEL, INCARCERATION, AND PRE-TRIAL DIVERSION

That incarcerated defendants be provided timely initial appearance hearings as provided by law; that defendants be informed of their right to counsel; that defendants be given a reasonable time to secure an attorney prior to arraignment or a decision on pre-trial diversion; that any bond set should be reasonable, with consideration of the defendant's ability to make bond; that defendants not remain incarcerated beyond a court date due simply to administrative failures in the court; that defendants not be incarcerated for nonpayment of fines, costs, and restitution without the judge first conducting an inquiry as to the reasons for nonpayment; that defendants not be incarcerated for failure to pay fines, costs, and restitution beyond the maximum time allowed by law for such incarceration; that incarcerated defendants be properly credited on fines and costs with time served; that defendants not be incarcerated for nonpayment of fines, costs, and restitution, where the defendant has failed to pay because of indigency; and that any finding of contempt for nonpayment of fine, costs, and restitution be based on a petition for contempt and a hearing after notice.

d. PRIVATE PROBATION

That private probation or other services used by the court be

reviewed on a consistent basis to ensure there is no usurpation of the authority of the court, and to prevent such agencies from creating the perception that they have the authority to make the final determination of conditions of probation or to incarcerate offenders for noncompliance with court orders; that such agencies not be delegated the authority to make indigency determinations or other determinations relative to incarceration for noncompliance; and that all actions regarding probation be subject to review by the judge to ensure that such actions do not violate an offender's rights of due process or equal protection of the law.

e. JUDICIAL ENGAGEMENT
That sufficient time is committed by the judge to the court to insure that the judge and the other officials of the court protect the due process rights of all individuals appearing before the court.

96.    When the Judicial Inquiry Commission findings were made, JCS was operating in 112 cities.  Ward was serving as a city judge in several other cities as well, including Childersburg.

## Factual Allegations Regarding
## Conspiracy between JCS and Childersburg

97.    JCS entered into a contract with Childersburg and its court in 2005 signed by the City's former mayor hiring JCS for the collection of court fines and costs.  That relationship continued until it terminated in May of 2015, after Childersburg was sued in Ray.  During that ten years there was concerted consistent action between JCS and the municipal court showing evidence of their agreement, practice and understanding, using void orders and voidable practices under Alabama law.

98.    Again the contract was the JCS form which provided that the municipal judge, (Larry Ward), would order payment to JCS of a set-up fee and monthly fees in his orders which sent people to JCS. In practice, those "orders" were preprinted and supplied by JCS to Ward who signed them in blank for JCS's use.

99.    This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

100.  In furtherance of the understanding and agreement between JCS and the Childersburg Municipal Court, Judge Ward consistently sent persons appearing before him to "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when those were assessed. This referral to JCS "probation" occurred whether there was a suspended jail sentence or not, and required those individuals to pay additional JCS fees.

101.  In ordering people to JCS "probation" for collection of fines and court costs, Ward consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed.  Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Ward placed persons on probation without

further inquiry allowing JCS to use his pre-signed blank orders as the basis for this referral.

102.  The actions of Judge Ward in furtherance of the conspiratorial understanding and agreement with JCS, were done with full understanding and acknowledgment that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation" and that its interests were harmed if an individual sent to JCS was formally declared to be indigent because JCS agreed to not charge people probation fees who the court declared to be indigent.

103.  This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to appoint counsel to those he ordered to JCS 'probation', by the use of JCS' pre-printed probation order, by Judge Ward pre-signed  orders in blank, and by language included in those forms above the offender's signature line stating: "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

104.  In furtherance of this understanding between JCS and the City of Childersburg Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey a court order

after JCS requested a petition to revoke probation.  The warrants issued by the city court were based upon JCS' institution of the petition for revocation. The agreement and understanding between JCS and the city municipal court in Harpersville was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant from the City.

105. In furtherance of this conspiratorial agreement and understanding, after JCS petitioned for revocation beginning the process to acquire a warrant, neither JCS nor the municipal court took steps to provide counsel for the persons pursued or to inform them of this right. Notice about these proceedings, if any, was given by JCS - not the city court.

106.  The petitions for revocation sought by JCS under its agreement and understanding with Childersburg Municipal Court were all predicated on failure of the individual to pay the fines and fees demanded.  The petitions were dismissed if such payment was forthcoming and "probation" itself was promptly terminated when the fees, fines and costs were fully paid.

107. In furtherance of the conspiratorial agreement and understanding between JCS and the city court of Childersburg, JCS was allowed to determine the monthly payments required and the allocation of payments between JCS or the City without any review by the City.

108.  This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

109.  These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty.

### Facts Regarding Conspiracy between
### JCS and Sylacauga's City Court

110.  JCS entered into a contract with Sylacauga and its City court in 2009 for the collection of fines and costs.  The contract was signed by the Sylacauga mayor, Sam Wright, and the city judge, Barry Vaughn, after which there was concerted consistent action between JCS and the municipal court showing evidence of their agreement and understanding.

111.  This agreement provided that the municipal judge, Barry Vaughn, would order people he sent to JCS to pay JCS a $10 set-up fee and a $40 monthly fee.

112.  This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a "probation officer."

113. In furtherance of the understanding and agreement between JCS and the Sylacauga Municipal Court, Barry Vaughn consistently placed persons appearing before him on "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

114. In ordering people to JCS "probation" for collection of fines and court costs, Judge Vaughn consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Vaughn placed persons on probation without further inquiry.

115. The actions of the Sylacauga judge were in furtherance of the conspiratorial understanding and agreement with JCS, and with knowledge that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation." Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent since JCS agreed to not charge indigent people probation fees.

37

116.  This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court to make any indigency determinations and by JCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

117.  This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court there to appoint counsel for those he ordered to JCS 'probation.' Additionally, Judge Vaughn allowed JCS to use his signature stamp to 'sign' JCS' pre-printed probation order.  That form order included the following language above the offender's signature line. "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

118.  In furtherance of this understanding between JCS and the City of Sylacauga Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS requested a petition to revoke probation.  The agreement and understanding between JCS and the city municipal court was further

implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant.

119. The petitions for revocation sought by JCS under its agreement, practice and understanding with Sylacauga's Municipal Court were all based upon failure of the individual to pay the fines and fees demanded.  The petitions were dismissed if such payment was forthcoming and "probation" itself was terminated when the fees, fines and costs were fully paid. These petitions were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

120. In furtherance of the conspiratorial agreement and understanding between JCS and Sylacauga's city court, JCS was allowed to determine the monthly payments required and to allocate payments between JCS or the City.

121.  This conspiratorial agreement and understanding between JCS and Sylacauga's municipal court is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

122. These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an

agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty as required under Alabama law.

## FACTS SPECIFIC TO EACH OF THE PLAINTIFFS

123.  Plaintiffs are individuals who were unable to fully pay fines, fees, and costs levied by Alabama municipal courts, and who, as a result, were assigned to JCS for "probation" under JCS for purposes of collecting the fine. Plaintiffs are currently or were formerly impoverished and, despite that poverty, were incarcerated for failure to pay charges and fees for services allegedly rendered by JCS to its co-conspirator cities with which it contracted.

### EMERSON HAMILTON

124.  Emerson Hamilton ("Mr. Hamilton") is over the age of nineteen (19) and is a resident of Sylacauga, Alabama.

125.  Mr. Hamilton's difficulties with JCS began shortly after Hoover began using JCS in 2004.

126.  On April 28, 2004, Mr. Hamilton was put on JCS 'probation' for a No Driver's License charge.

127.  JCS records indicate that Mr. Hamilton was assessed a city fine of $25 and court costs of $158.

128.  During this time Susan Fuqua (Ms. Fuqua) was the magistrate at Hoover.

129.  Upon information and belief, during this time Ms. Fuqua was being paid monthly by JCS to be its lobbyist. Similarly, the Judge at Hoover, Brad Bishop, was a resource to JCS reviewing pending legislation.

130.  Ms. Fuqua did not register as a lobbyist for JCS but she actively marketed JCS services to cities and city magistrates while also holding the position of President for the Alabama Municipal Magistrate Association ('AMMA').

131.  Ms. Fuqua kept her lobbyist position with JCS a secret so those appearing before her and the city employees had no reason to know that Ms. Fuqua had a financial interest in the cities' agreement to contract with JCS.

132.  Upon information and belief, Ms. Fuqua participated in implementing the JCS system in Hoover's court where JCS operated.

133.  JCS records show that Mr. Hamilton paid JCS a total of $403 to collect the $183 he owed the city of Hoover for his traffic ticket. JCS kept $220 of this and sent $183 to Hoover.

134.  In 2006, Mr. Hamilton was jailed by the Town of Harpersville for a city crime and the city demanded a cash bond for his release.

135.  Since Mr. Hamilton was poor, neither he nor his family could pay the cash bond demanded so he remained in jail until the next date for city court.

136.  Pursuant to the JCS scheme, Mr. Hamilton was put on JCS 'probation' for five (5) city crimes even though there is no record of a guilty plea or adjudication for three (3) of the five (5) 'crimes' for which JCS was collecting money.  Further, the 'probation order' was not signed, and there was no jail sentence to suspend for these five (5) city crimes.

137.  Despite no legal authority to place Mr. Hamilton on probation, JCS filled out the probation form that JCS preprinted assigning Mr. Hamilton to 'probation' requiring him to pay its fees.  There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel.

138.  JCS' preprinted probation order listed "conditions" of probation containing unconstitutional restrictions on his liberty, which were imposed solely because he was poor. These restrictions included: 1) not changing residence or employment without notifying your Probation Officer, 2) avoiding "injurious or vicious habits," 3) working diligently at a lawful occupation, unless a full time student, 4) "truthfully answer all inquiries" by the JCS employees and "comply with all instructions" the JCS employee

gives. In addition to these unlawful constraints, the order states in bold type - "You were subject to arrest for violation of any condition imposed by this order, and your probation may be revoked accordingly."

139.  When Mr. Hamilton told the people at the City court that he was unable to immediately pay the money it demanded, he was instructed to sign the probation papers so that he could escape jail by participating in the JCS "payment plan."

140.  Neither the City, nor the City court, nor JCS, had the authority to place Mr. Hamilton on probation for unadjudicated crimes or for crimes for which there was no jail sentence but, despite this lack of authority, JCS began demanding $2,338 from Mr. Hamilton.

141.  Despite his poverty, Mr. Hamilton paid as much as he could - anywhere from $40 - $100 each visit - to keep his freedom and not be jailed.

142.  JCS determined how much of Mr. Hamilton's payments it would keep for its fees and how much it would send Harpersville as credit against his fines, court costs, and jail fees (Harpersville added $31/day for each day it kept him in jail.) For example, when Mr. Hamilton paid JCS $50, JCS sometimes kept $20 for its fees and sometimes kept $10.

143.   JCS kept Mr. Hamilton on 'probation' under these void orders until March 2011 when he completely paid all the money JCS demanded. During the process however, Mr. Hamilton was arrested several times for his inability to pay JCS as it demanded.

144.   In fact, JCS' detailed visit notes state: "3/7/2011 CFR: DEF WAS ARRESTED AND PAID THIS CASE OFF TO BE RELEASED"

145.   In 2006 Mr. Hamilton was ordered to JCS 'probation' with the city of Talladega court for three (3) traffic tickets when he could not pay. There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel.

146.   The Talladega judge did not sign the pre-printed JCS probation order and Mr. Hamilton was not sentenced to jail for his traffic crimes and as such had no legal authority to place Mr. Hamilton on probation

147.   Nevertheless, JCS employees using an unsigned void order and pretending to have court authority demanded that Mr. Hamilton pay $1,157, its fees and be subjected to its 'probation' requirements.

148.   Mr. Hamilton was also placed on JCS 'probation' in Sylacauga and Childersburg pursuant to this same JCS scheme and based upon void orders. There was no investigation into Mr. Hamilton's ability to pay and he was not provided counsel there either.

149.  Throughout these nine (9) years of probation, Mr. Hamilton has endured constant threats of jail and jailing. JCS routinely requested that Mr. Hamilton be arrested when he was unable to pay as JCS demanded - despite the fact that he was legally innocent of some of the city 'crimes', that some JCS 'probations' had no valid probation order, and that he had no jail sentences to suspend.[3]

150.  When Mr. Hamilton was unable to pay to the satisfaction of JCS, warrants were issued and he was jailed pursuant to this extortion scheme with the cities courts.

151.  The joint practices of JCS and its co-conspirator city courts using void orders impeded Mr. Hamilton's ability to travel, and the threat of his arrest remains looming. When CCS decided to discontinue its JCS operations in Alabama in the fall of 2015 its records show that Mr. Hamilton was on Warrant status in three (3) cities - Sylacauga, Harpersville, and Talladega.

---

[3] See DOJ Report pg. 55 "The large number of warrants issued by the court, by any count, is due exclusively to the fact that the court uses arrest warrants and the threat of arrest as its primary tool for collecting outstanding fines for municipal code violations. With extremely limited exceptions, every warrant issued by the Ferguson municipal court was issued because: 1) a person missed consecutive court appearances, or 2) a person missed a single required fine payment as part of a payment plan. Under current court policy, the court issues a warrant in every case where either of those circumstances arises—regardless of the severity of the code violation that the case involves. Indeed, the court rarely issues a warrant for any other purpose."

152.  Upon information and belief, JCS did not request that these warrants be recalled. As such, Mr. Hamilton still lives under the threat of being incarcerated by this extortion scheme all arising from void orders issued under this scheme.

153.  Throughout this period no meaningful inquiry was made to Mr. Hamilton's ability to pay the fines, costs and fees at any of the brief court appearances. Though Hamilton has been poor and unemployed at times, he still was incarcerated for his inability to pay. The jail sentences imposed for nonpayment were always subject to cancellation or amendment should Mr. Hamilton's family or friends be able to pay an amount satisfactory to JCS and as often explicitly stated in the arrest warrants.

154.  Mr. Hamilton was not provided legal representation at any of these court proceedings, and no inquiry was made as to his ability to hire legal counsel.  Warrants for arrest were issued based on a report from JCS that Mr. Hamilton had failed to make payments to the satisfaction of JCS or had failed to appear at the collection office as directed. The arrests and incarcerations of Mr. Hamilton occurred without any determination of contempt, willfulness or the ability to pay as required by Ala. Code 15-18-62.

155.  On his repeated arrests, Mr. Hamilton was held for days either without bail or with cash bail demanded in the balance of fines and fees claimed. Likewise, Mr. Hamilton was not afforded written charges, legal representation, an adequate hearing, or findings of fact.

156.  Though Mr. Hamilton has been jailed on various occasions upon JCS' request, he has not been afforded full credit for that time in jail against his fines and costs.  Instead, on some occasions he was charged for each day he was incarcerated. There is no legal basis for such charges.

157.  Throughout this period of time, JCS provided no services to Mr. Hamilton and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Hamilton was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees.

158.  Mr. Hamilton paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and demanded based upon void orders and yet he was still arrested and jailed.

**BENNIE BRUNO**

159.  Bennie Bruno ("Mr. Bruno") is over the age of nineteen (19) and is a resident of Childersburg, Alabama.

160.  Mr. Bruno's difficulties with JCS began shortly after Harpersville began using JCS to collect its municipal court fines and fees.

161.  In 2005, Mr. Bruno was ordered to the JCS "payment" plan by a void order after he was unable to immediately pay his city fines and fees in full for his traffic tickets. There was no investigation into his ability to pay and he was not provided counsel.

162.  According to its agreement with JCS the Harpersville city judge, Larry Ward, ordered Mr. Bruno to JCS 'probation' for collection of money even though Mr. Bruno was not sentenced to jail.

163.  Mr. Bruno stayed on the JCS 'probation' under this void order from 2005 until the Harpersville court was closed in 2012 despite the fact that legitimate probation for a misdemeanor can only last two (2) years.

164.  During his seven (7) years on JCS 'probation' under this void order, Mr. Bruno was arrested and spent several days in jail for his inability to pay. JCS collected $1,090 of revenue from Mr. Bruno.

165.  Upon information and belief, in addition to the $1,090 JCS demanded and kept for itself, JCS collected an additional $3,665 for fines and fees that Mr. Bruno did not owe the city, as he was legally innocent of the 'crimes' for which he nevertheless was charged money.

166.  Though Mr. Bruno was jailed under this void order upon JCS' request, he was not afforded full credit for that time against his fines and costs.

167.  Upon information and belief, Mr. Bruno was instead charged $31 for each day he was incarcerated. There is no legal basis for such charges.

168.  Throughout this period of time, JCS provided no services to Mr. Bruno and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Bruno was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees in violation of Alabama law.

169.   Mr. Bruno paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed all arising from these void orders.

**WILLIE WALKER**

170.  Willie Walker ("Mr. Walker") is over the age of nineteen (19) and is a resident of Harpersville, Alabama.

171.  Mr. Walker's difficulties with JCS began in Harpersville after he was ordered to JCS "probation" by a void order in January 2008 because he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

172.  Mr. Walker was not given a jail sentence yet he was illegally ordered to probation by a void order of Larry Ward, the part-time Harpersville municipal court judge.

173.  Upon information and belief, there is no legal finding of guilt for Mr. Walker's crimes for which the payments were demanded.

174.  After being ordered to JCS probation, Mr. Walker continued to be unable to pay the money JCS demanded so JCS requested that a warrant be issued for his arrest.

175. Pursuant to JCS' request, a warrant was issued for Mr. Walker's non-payment and in the fall of 2009, Mr. Walker was arrested in his home and taken to the Shelby County Jail.

176.  Mr. Walker was not given an opportunity to bond out of jail and was kept in jail until May of 2010, due to his non-payment.

177. After his release from jail, JCS reactivated Mr. Walker's probation ultimately requesting another warrant for his arrest in October 2010 all of which resulted from the void orders.

178.  Mr. Walker was also ordered to JCS probation by Larry Ward in Childersburg under a void order there.

179.  Mr. Walker's Childersburg 'probations' were also as a result of his inability to immediately pay city fines and fees, as he was not given jail

sentences for any of these city crimes. There was no investigation into his ability to pay and he was not provided counsel there either.

180.  Mr. Walker paid as he could but was unable to pay as JCS demanded. As such, Mr. Walker was arrested and jailed upon JCS' request.

181.  Mr. Walker spent almost two weeks in jail on the false charge of FTOCO and was not given credit for these jail days against the city money he owed.

182.  Though Mr. Walker was jailed upon JCS' request, he was not afforded full credit for that time against his fines and costs.

183.  The Sylacauga city court also used a void order to put Mr. Walker on JCS probation for city fines and fees when he could not pay. There was no investigation into his ability to pay and he was not provided counsel.

184.  The pre-printed JCS probation order used in Sylacauga shows no jail sentence yet Mr. Walker was required to pay JCS its extra set-up fee and monthly "probation" fees.

185.  During his six (6) years on JCS "probation" Mr. Walker was arrested several times and spent approximately six months in jail for his

inability to pay and all resulting from the void order.   Additionally, Mr. Walker paid JCS over $6,000.

186.  Throughout this period of time, JCS provided no services to Mr. Walker and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Walker was unable to pay these fines  JCS sought to charge and collect these unlawful fees in violation of Alabama law.

187.  Mr. Walker paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

### ANTONIO CALHOUN

188.  Plaintiff Antonio Calhoun ('Mr. Calhoun') is over the age of nineteen (19) and an individual resident of Talladega, Alabama.

189.  Upon information and belief, in October 2009, Mr. Calhoun was arrested by Harpersville police and taken to the Shelby County jail where he was held pursuant to a cash bond demanded for his release.

190.  Neither Mr. Calhoun nor any of his family or friends could pay the $528 cash bond to secure his release so he was kept in jail for four (4) days before being released to go to Harpersville court.

191.  At the Harpersville Court Mr. Calhoun wore his jail jumpsuit and shackles and was ordered to JCS probation under a void order as a condition of his release from jail.

192.  Pursuant to its agreement with Harpersville, JCS demanded monthly fees for itself and added jail fees to Mr. Calhoun's balance for each of the days he was kept in jail.

193.  Despite evidence that Mr. Calhoun was poor and that he could not pay the cash bond demanded for his release, JCS kept Mr. Calhoun on 'probation' to collect the money Harpersville said Mr. Calhoun owed it. There was no investigation into his ability to pay and he was not provided counsel.

194.  Mr. Calhoun was also ordered to JCS probation by Larry Ward at Childersburg under another void order.

195.  Mr. Calhoun's Childersburg void probation order listed only traffic citations for which a jail sentence was not given and as such no sentence existed to "suspend."

196.  Throughout the years he was on JCS probation under these void orders, Mr. Calhoun was arrested several times and spent days in jail based on this illegal scheme of collection.

197.  All of the money paid to JCS for Mr. Calhoun's 'probation' was paid under duress in an attempt to keep Mr. Calhoun from being arrested and jailed and all as the result of void orders.

198.  At all times relevant to the claims herein, Mr. Calhoun was poor.  JCS Inc. provided no services and knowingly continued to demand money despite knowledge of his poverty.

**TAVELL CRAWFORD**

199.  Plaintiff Tavell Crawford ('Mr. Crawford') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama.

200.  Like the other Plaintiffs, Mr. Crawford was subjected to the illegal JCS extortion scheme by the conspiracy with the city courts in Harpersville, Sylacauga and Hoover when he was unable to immediately pay in full court fines and fees demanded.   He was ordered to JCS probation by a void order of the city court.

201.  In Sylacauga JCS demanded that Mr. Crawford repay many fines that had previously been paid in full shortly after the traffic ticket had been adjudicated. Despite the fact that Mr. Crawford had previously paid his traffic tickets in full JCS demanded additional repayment as a condition of his 'probation.'

54

202.  Pursuant to JCS' scheme, JCS demanded minimum monthly payments as a requirement for Mr. Crawford to be compliant with his 'probation' and requested that warrants be issued for his arrest when payments were not made as JCS demanded.

203.  Upon information and belief, many of the traffic crimes for which Mr. Crawford was ordered to JCS 'probation' did not have a jail sentence yet Mr. Crawford was required to pay JCS its extra set-up fee and monthly 'probation' fees and follow its requirements or face the possibility of arrest and jail with cash demanded for his release.

204.  During his seven (7) years on JCS 'probation' Mr. Crawford was arrested several times and spent several days in jail for his inability to pay. Additionally, Mr. Crawford paid JCS over $5,000. There was no investigation into his ability to pay and he was not provided counsel.

205.  Throughout this period of time, JCS provided no services to Mr. Crawford and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Crawford was unable to pay these fines and was poor, JCS sought to charge and collect these unlawful fees in violation of Alabama law.

206.  Mr. Crawford paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed all pursuant to void orders.

**LEWIS MALLORY**

207.  Plaintiff Lewis Mallory ('Mr. Mallory') is over the age of nineteen (19) and an individual resident of Childersburg, Alabama.

208.  All of Mr. Mallory's illegal 'probations' with JCS were in courts where Larry Ward was the part time judge and were all due to void orders.

209.  JCS  Mr. Mallory subject to this conspiratorial extortion scheme for over seven (7) years.

210.  At the Harpersville court Larry Ward ordered Mr. Mallory to JCS "probation" when he could not immediately pay in full fines for traffic tickets, which Mr. Mallory believes he was never adjudicated guilty. There was no investigation into his ability to pay and he was not provided counsel.

211.  Despite a necessary finding of guilt as a prerequisite for owing a city money, JCS filled in the pre-signed JCS probation order and began demanding money from Mr. Mallory.

212.  Mr. Mallory was also ordered to pay JCS "probations" from the City of Childersburg where Larry Ward was the part-time judge. There are no adjudications or pleas of guilt from Mr. Mallory on any city crimes at

Childersburg. In fact, the City of Childersburg does not have a single order evidencing Mr. Mallory's guilt of any crime.

213.  The orders underlying this "probation" were void but JCS still demanded that he pay almost $7,500 while it collected $45 a month as its profit.

214.  To enforce its demands, Mr. Mallory was arrested and jailed at the request of JCS Inc. when he did not pay as JCS demanded.

215.  Pursuant to the JCS scheme at Childersburg, Mr. Mallory was jailed for the false offense of FTOCO. There is no statute or ordinance defining FTOCO as a crime and there is no legal standard upon which to validly arrest someone for this false offense.

216.  Despite no legal basis and no probable cause Mr. Mallory was arrested, jailed, charged an additional 'warrant fee' of $317 and remained in jail until a cash bond was paid to secure his freedom all of which began with void orders from the city court.

217.  Mr. Mallory was subject to the same JCS conspiratorial extortion scheme at the city of Lincoln where JCS demanded $1,515 from Mr. Mallory.

218.  All total - over the seven (7) years Mr. Mallory was entrapped by the JCS scheme and use of void orders under which he paid JCS over

$12,000, and was arrested, jailed, and suffered endless threats of incarceration and added fees.

219.  Pursuant to JCS' conspiratorial agreements with the cities of Harpersville, Lincoln and Childersburg, JCS charged extra fees while it attempted to collect the illegal charges and requested warrants for Mr. Mallory's arrest when he did not pay as demanded.

220.  Throughout the years, Mr. Mallory was arrested several times and spent days in jail based on this illegal scheme of collection based upon void orders.

221.  All of the money paid to JCS for Mr. Mallory's 'probation' was paid under duress in an attempt to keep Mr. Mallory from being arrested and jailed and as the result of void orders.

222.  At all times relevant to the claims herein, Mr. Mallory was poor. In fact, JCS Inc. documented the fact that he was unemployed for many years. Despite its knowledge of Mr. Mallory's poverty, JCS Inc. provided no services and knowingly continued to demand money that Mr. Mallory did not legally owe.

223.  These actions based upon void orders resulted in denial of Mr. Mallory's rights under Alabama law.

**JOSHUA HALL**

224.  Plaintiff Joshua Hall ('Mr. Hall') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama, having lived in the area his whole life.

225. Mr. Hall's problems with JCS began in 2006 shortly after Childersburg began using JCS.

226.  Like many others, Mr. Hall was ordered to JCS 'probation' when he could not pay for the collection of city fines and fees under void orders of Larry Ward.

227. Mr. Hall was legally innocent of the two (2) city 'crimes' at Childersburg for which JCS was collecting money - having neither pled nor been adjudicated guilty of either 'crime.'

228.  Once in the JCS system with mounting fees and fines, Mr. Hall was continually unable to obtain a driver's license as the city would request that his driver's license be revoked for nonpayment of court fees. There was no investigation into his ability to pay and he was not provided counsel.

229.  This continued until JCS finally left the state in 2015 leaving Mr. Hall with no license, thousands of dollars paid to JCS for false charges such as FTOCO, several 'probations' with the city of Childersburg,

Harpersville, and Sylacauga, arrests, many days in jail under cash bonds demanded for his release- all pursuant to void orders.

230.  When JCS stopped working in the Harpersville city court, Mr. Hall was on warrant status with that city and was not told if that warrant had been recalled even though the city court with JCS was labeled a 'sanctioned extortion' scheme by Circuit Judge Hub Harrington.

231.  Throughout the years using void orders of the city court, Mr. Hall was arrested several times and spent days in jail based on this illegal scheme of collection.

232.  All of the money paid to JCS for Mr. Hall's 'probation' was paid under duress in an attempt to keep Mr. Hall from being arrested and jailed.

233.  At all times relevant to the claims herein, Mr. Hall was poor. JCS Inc. provided no services and knowingly continued to demand money despite knowledge of his poverty.The actions resulting from void orders denied Mr. Hall's rights under Alabama law.

**EARNEST NORWOOD**

235.  Earnest Norwood ('Mr. Norwood') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama.

236.  Mr. Norwood became disabled in early 2000 after having several back surgeries relating to work injuries.

237. Mr. Norwood's problems with JCS began when Larry Ward under a void order sent him to JCS probation when he could not immediately pay in full a traffic ticket in Childersburg.

238. Like the other Plaintiffs Mr. Norwood told Larry Ward and JCS that he was on disability and received a limited, fixed income and could not pay but that fact did not matter to Larry Ward or JCS Inc. There was no investigation into his ability to pay and he was not provided counsel.

239. Mr. Norwood was on JCS  "probation" from 2007 until June 2012 for various city charges in Harpersville, Childersburg and Calera all resulting from void orders of the city court.

240. Upon information and belief, Mr. Norwood was legally innocent of many of these charges but despite his legal innocence he was ordered to JCS "probation" for the collection of the city fines and fees that were assessed on these false "crimes."

241. Under this conspiratorial scheme and using void orders, JCS nevertheless consistently threatened Mr. Norwood with jail if he did not pay.

242. In fact, on one occasion JCS ordered Mr. Norwood to pick up trash on the road as a penalty for not paying the amount JCS demanded. When Mr. Norwood was unable to bend and pick up trash as JCS demanded due to his back injury, JCS called the police and had Mr.

Norwood taken to Shelby County jail where he was deprived of his medications and only released the next morning when his pain became unbearable.

243.  Throughout the years, Mr. Norwood was arrested, jailed and continually threatened with jail based on void orders and this illegal, conspiratorial scheme of extortion.

244.  All of the money paid to JCS for Mr. Norwood's 'probation' was paid under duress in an attempt to keep Mr. Norwood from being arrested and jailed, all resulting from void orders.

245.  At all times relevant to the claims herein, Mr. Norwood was poor. JCS provided no services and knowingly continued to demand money despite knowledge of his poverty.

246.  These actions constituted a denial of Mr. Norwood's rights under Alabama law.

**COREY KELLEY**

247.  Plaintiff Corey Kelley ('Mr. Kelley') is over the age of nineteen (19) and an individual resident of Sylacauga, Alabama, having lived in the area including Childersburg/Harpersville his whole life.

248.  Mr. Kelley's difficulties with JCS began in Harpersville after he was ordered by a void order to JCS "probation" in November 2008 because

he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

249. Upon information and belief, Mr. Kelley was not given a jail sentence yet he was illegally ordered to probation by Larry Ward, the part-time Harpersville municipal court judge. Mr. Kelley's "probations" were ordered as a result of his inability to immediately pay city fines and fees, as he was not given jail sentences for any of these city crimes.

250. After being illegally ordered to JCS probation, Mr. Kelley continued to be unable to pay the money JCS demanded so JCS requested that a warrant be issued for his arrest.

251. Pursuant to JCS' request, a warrant was issued for Mr. Kelley's non-payment. In the fall of 2010, Mr. Kelley was arrested pursuant to JCS' request and taken to the Shelby County Jail for the offense of "probation violation" which resulted from void orders.

252. Upon information and belief, Mr. Kelley stayed in jail for eight (8) days because neither he nor his family could pay the cash bond that was demanded for his freedom.

253. After his release from jail, JCS reactivated by void orders Mr. Kelley's "probation."

254. On November 17, 2010, three (3) days before the two year maximum statutory probation period for his probation was set to expire, Mr. Kelley's "probation" was inexplicably "reinstated" for an additional two (2) years at JCS Inc.'s request again using void orders of the city court.

255. JCS Inc. again used a blank, pre-signed Probation Order form, provided by Judge Larry Ward before the hearing, to fill in its chosen "requirements" for the reinstatement, i.e., continuation of Mr. Kelley's "probation."

256. JCS did not list any new charges or offenses on the pre-signed Order, instead leaving the listed "offense" blank, and simply filling in a new "fine" amount. JCS employee Lisha Kidd, who filled out the form, decided to continue to charge Mr. Kelley $145 per month, an amount which built into it JCS's own monthly $45 "probation fee."

257. Thereafter, JCS continued to demand payments from Mr. Kelley, threatening him with additional jail time if he refused to pay. Mr. Kelley continued making payments to JCS as he was able in 2011 and for part of 2012.

258. When Mr. Kelley again became unable to pay, in May 2012, JCS again requested that a warrant be issued for his arrest despite no court hearing nor any finding of Mr. Kelley's willful refusal to pay.

259.  Mr. Kelley was unable to pay as JCS demanded and was arrested and jailed upon JCS' request.

260.  Though Mr. Kelley was jailed upon JCS' request, he was not afforded full credit for that time he spent in jail against his fines and costs.

261.  During his four (4) years on JCS "probation" Mr. Kelley was arrested several times and spent several days in jail because he could not pay, all resulting from void orders of the city courts.

262.  Throughout this period of time, under this conspiratorial scheme JCS provided no services to Mr. Kelley and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Kelley was unable to pay these fines and was poor, JCS sought to extort these unlawful fees under this conspiratorial agreement with the city courts.

263.  Mr. Kelley paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

264.  These actions violated Mr. Kelley's rights under Alabama law.

**NORWOOD McDONALD**

265.  Plaintiff Norwood McDonald ('Mr. McDonald') is over the age of nineteen (19) and an individual resident of Harpersville, Alabama, having lived in the Childersburg/Harpersville area his whole life.

266.  Mr. McDonald has been disabled his entire life and is known throughout the community as a person with special needs.

267.  Mr. McDonald's difficulties with JCS began in Harpersville after he was illegally ordered by a void order to JCS "probation" in February 2007 because he could not immediately pay city fines and fees. There was no investigation into his ability to pay and he was not provided counsel.

268.  Mr. McDonald was not given a jail sentence but was illegally ordered to probation by Larry Ward, the part-time Harpersville municipal court judge.

269.  JCS used blank, pre-signed Probation Order forms which had been provided by Judge Larry Ward and filled in the blanks on the form, demanding that Mr. McDonald pay $431 in fines and court costs at a minimum monthly amount of $85 each month.

270.  Pursuant to its conspiratorial agreement with Harpersville, JCS kept $45 from each $85 monthly payment for its fees and also charged Mr. McDonald a $10 for "file setup."

271.  Later in 2007, Mr. McDonald was again illegally ordered to JCS "probation" when he could not immediately pay in full the city fines demanded. This time JCS demanded that Mr. McDonald fill out an intake form. On this form Mr. McDonald listed "disable" for employer.  He was,

and continues to be, mentally disabled receiving government disability checks each month as his only income all of which was known to JCS.

272. Despite knowing that Mr. McDonald was disabled and on a limited, fixed income which was below the federal poverty amount, JCS using a void order demanded Mr. McDonald pay a minimum of $145 per month in costs, fees, and fines, $45 of which would again go to JCS as "payment" for their "probation services."  JCS again charged Mr. McDonald an additional $10 for "file setup."

273. Using money from his disability payments, Mr. McDonald paid the amounts charged by JCS every month from February 2007 through November 2009 which included $1,110 in "probation fees" it demanded from Mr. McDonald.

274. Under this scheme, JCS staggered "probations" from city courts based upon these void orders to increase its fees and would "hold" one while collecting on another.  Even though legitimate city probation can last no longer than two years, this limitation was ignored by JCS under these void orders.   Even though Mr. McDonald, who is mentally disabled, had completed two-and-a-half years' worth of payments and committed no new offenses since his November 2007 hearing date, JCS continued to charge Mr. McDonald monthly fees in December 2009, and throughout 2010.

275.  Thus, in November 2009, though there was no new charge and no new hearing, JCS charged Mr. McDonald a new $10 "file setup" fee, and continued to demand $145 per month for the old "probation" it had placed on "hold."

276.  JCS continued to keep $45 of each monthly payment for itself, as "payment" for its "probation services."  Using the money from his disability payments, and with the threat of arrest hanging over him if he failed to pay, Mr. McDonald continued to pay JCS's fees during this time. From November 2009 through June 2010, JCS made $360 in exclusively "probation fees" from Mr. McDonald.

277.  JCS and its co-conspirator Harpersville kept Mr. McDonald in this cycle continuing to demand $145 each month from his disability check in order to keep his freedom all by virtue of void orders of the city court and the JCS scheme.

278.  All told, from February 2007 through January 2012 JCS extorted a total of $2,460 in "probation fees" from Mr. McDonald by demanding money from his governmental disability payments.

279.  Throughout this period of time, JCS provided no services to Mr. McDonald and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. McDonald was disabled, unable to pay

these fines, and poor, under this conspiratorial extortion scheme JCS demanded these unlawful fees in violation of Alabama law.

280.  Mr. McDonald paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

281.  These actions violated Mr. McDonald's rights under Alabama law.

**KHOMEINI DATCHER**

282.  Plaintiff Khomeini Datcher ('Mr. Datcher') is over the age of nineteen (19) and an individual resident of Harpersville.

283.  Mr. Datcher's difficulties with JCS Inc. and its co-conspirator cities- Childersburg, Sylacauga and Harpersville began in 2006.

284.  In fact, Mr. Datcher was ordered to five (5) separate JCS "probations" through the Town of Harpersville, three (3) separate JCS "probations" through the City of Childersburg, and two (2) separate JCS "probations" through the City of Sylacauga, all of which were based upon void orders of the city courts.

285.  All of these "probations" were instituted because Mr. Datcher was unable to immediately pay the city fines and fees the city demanded when he appeared in city court.

286. Upon information and belief, there was no finding that Mr. Datcher willfully refused to pay. Rather, there was no meaningful inquiry into Mr. Datcher's poverty prior to ordering him to the JCS "payment plan" in any of these court appearances and he was not provided counsel.

287. Mr. Datcher was ordered to JCS "probation" for the collection of purported city debts pursuant to the JCS agreement with its co-conspirator cities.

288. In fact, Mr. Datcher was legally innocent of many of the underlying city crimes for which JCS was demanding money.

289. On March 18, 2011, Mr. Datcher was arrested by Childersburg police and charged with the city crime of trespass.  He was ordered to appear in Childersburg Municipal Court.  At that time, JCS was already aware that Mr. Datcher was unemployed, and received Supplemental Security Income ("SSI") benefits.

290. Mr. Datcher appeared in Childersburg Municipal Court on the trespass charge on May 12, 2011.  The part-time judge for the Childersburg Municipal Court was Larry Ward.  Mr. Datcher did not plead guilty of the trespass charge and the court did not adjudicate Mr. Datcher guilty of the trespass charge.

291. Mr. Datcher was legally innocent of the city crime of trespass.

292.  At the time of Mr. Datcher's appearance in Court, on May 12, 2011, JCS had a pre-signed "Order of Probation" form, which had been signed by part-time judge Larry Ward prior to Mr. Datcher's appearance in Court.  Though there had been no adjudication of the charge, on that day, a JCS employee, Lisha Kidd, filled in the form, requiring Mr. Datcher to pay $145 per month, with $45 of each $145 monthly fee going directly to JCS. That void order was then used by JCS in its collection scheme.

293.  Though he was unemployed and received only monthly SSI benefits, Mr. Datcher began making payments based upon the court order JCS filled out.

294.  Mr. Datcher did not know that JCS Inc. was a private company. Rather, he believed the "probation" officer was a city agent - as they presented themselves to be.

295.  On May 3, 2011, Mr. Datcher was arrested and charged with "menacing" and "resisting arrest."  He appeared in Childersburg Municipal Court on June 9, 2011 for both these charges.  Mr. Ward was still the Childersburg Municipal Court judge at the time.  Again, the Childersburg Municipal Court did not adjudicate the charges against Mr. Datcher and Mr. Datcher did not plead guilty to these charges.

296.  At the time of Mr. Datcher's appearance in Court, on June 9, 2011, JCS had a pre-signed "Order of Probation" form, which had been signed by part-time judge Larry Ward prior to Mr. Datcher's appearance in Court.  Though there had been no adjudication of the charge, on that day, a JCS employee, filled in the form, requiring Mr. Datcher to pay $160 per month, with $45 of each $160 monthly fee going to JCS Inc.

297.  Throughout the remainder of 2011, 2012, 2013, and for the first five and a half (5.5) months of 2014, Mr. Datcher continued to make payments on this "probation," paying JCS $654 during this time just for JCS's "probation fees" all pursuant to void orders.

298.  In accordance with its policy, when Mr. Datcher was unable to pay, JCS threatened Mr. Datcher with jail time.  This "probation period" did not conclude until June 20, 2014, over three (3) full years after it began.

299.  Meanwhile, on July 3, 2013, JCS changed the status of Mr. Datcher's June 9, 2011 "probation" from "hold" to "active."  Thus, on June 20, 2014, when his initial "probation period" had supposedly been completed, JCS continued to demand money from Mr. Datcher to avoid being arrested and jailed.

300.  Using void orders, JCS forced Mr. Datcher to continue to make these payments until November 17, 2014, almost three and a half (3.5) years after this "probation" began.

301.  Throughout this period of time, JCS provided no services to Mr. Datcher and acted merely as a collection agency charging additional fees. Despite knowledge that Mr. Datcher was disabled, unable to pay these fines, and poor, under this conspiratorial extortion scheme JCS demanded these unlawful fees all under void orders.

302.  Mr. Datcher paid JCS thousands of dollars in an attempt to stay out of jail. All these payments were made under duress and yet he was still arrested and jailed.

303.  These actions violated Mr. Datcher's rights under Alabama law.

## Count One - Declaratory Relief
## Probation Orders With No Jail Sentence Are Void

304.  JCS' scheme at Alabama city courts used "probation" and a form "probation order" it drafted and printed as collection tools.  JCS did not use any civil methods of collection to collect the city fines and fees but instead relied upon the "order" of the city court which JCS preprinted as a form document and provided to the city courts.

305.  Under the agreement and practice used by JCS with Alabama cities, the city and its court agreed to issue court orders requiring "probation" and the payment of fees to JCS by those who sent to JCS for collection.  The document "ordered" each person to pay JCS a $10 set up fee and then monthly fees of $35 - $45 per month.

306.  Legitimate Probation can be offered only when someone has received a suspended jail sentence for a crime for which the person has pled or been adjudicated guilty.  Additionally, the person has the right to accept or reject the offer of probation and to have an attorney present as an advisor.  Upon expiration of the probation period, the sentence becomes satisfied.  On the other hand, if probation is revoked the suspended jail sentence must then be served.

307. Since the JCS scheme used "probation" under orders it provided the city court solely as a tool to collect money, the existence or absence of a suspended sentence was unimportant because people in the Alabama cities under contract with JCS got ordered to probation with JCS because they could not pay their fine in full regardless of the existence of a suspended sentence. Once they paid their fine in full, their probation with JCS was ended.

74

308.  Some of the Plaintiffs were ordered to JCS probation without any suspended sentence ever being adjudicated.  Such orders are void.

309. Under this system and by agreement with cities, many administrative and judicial functions of the municipal court were unlawfully delegated to JCS, clothing it with the color of state law for the collection of court fines, costs and private fees.  Under this scheme JCS' employees were held out to the Plaintiffs as "probation officers" acting "on behalf of" the municipalities. The cities' conspiratorial participation with JCS, including using JCS provided form orders, gave JCS the appearance of government authority when in fact it was a "for profit" private entity highly financially interested.

310.  JCS was only allowed to continue "probation" as long as the person had an outstanding balance of fines, costs and fees. Once the city was paid in full, JCS "probation" ends. As explained by JCS in its marketing materials that it used with its co-conspirator cities: "The faster they complete their sentence [i.e., pay their fines, costs and JCS, fees], the sooner they may be released from supervision":

311.  All of the Plaintiffs were placed on "probation" with JCS under this practice even when they had not been given a suspended jail sentenced.

312.  All of the Plaintiffs were ordered to JCS as a "payment plan" and were charged additional fees for JCS.

313.  The "probation orders" sending persons without suspended sentences to JCS for collection of fines were void but were used nonetheless for the collection of fees by JCS and resulted in other abuses in this collection scheme.

314.  Once JCS was in possession of a "probation order" for an individual, those individuals were subjected to JCS policy and practice, threatened and subject to arrest, detention, and incarceration.

315.  Incarceration of individuals such as the Plaintiffs  who could not pay their fines, costs, and the added JCS Inc. fees was accomplished by JCS  seeking warrants against them for charges of failure to pay, failure to comply or even "failure to obey court order," though there is no such state statute or city ordinance which defines this as a criminal act.

316.  Plaintiffs request that this Court declare that JCS' "Probation orders" that do not contain a jail sentence be null and void.

## Count Two - Declaratory Relief
## Probation Orders with No Underlying Finding of Guilt Are Void

317.   The Plaintiffs were ordered to JCS probation without any court order adjudicating a finding of guilt for the underlying offense for which they were placed on "probation."

318.   In some instances, some of the Plaintiffs were charged with an offense for which there no adjudication.   For some of those individuals, there existed signed but otherwise blank court documents with no finding of guilt, some were blank entirely and in some cases no court documents even exist for an underlying charge to support any post adjudication action such as probation.   All of these underlying "orders" are void and provide no support for a "probation order," much less for any collection of fines or costs and added fees.

319.   Plaintiffs request that this Court declare that unsigned, blank, or non-existent orders of adjudication for city charges to be void and of no support for the collection of fines or costs based upon such charge and of no support for probation orders to the collection of fines or costs and to be void.

320. Plaintiffs request that this Court declare that JCS Inc.'s 'Probation Orders' which were based on city charges for which there was no adjudication of the underlying charge to be null and void.

## Count Three - Declaratory Relief
## Blank and Unsigned Probation Orders Are Void

321.  Some of the Plaintiffs were pursued for collection by JCS based upon a "probation order" which either is blank, unsigned or entirely missing.

322. Plaintiffs request that this Court declare that JCS' "Probation orders" that: 1) do not exist, or 2) are blank, or 3) are unsigned to be null and void and that those provide no basis for actions by JCS.

## Count Four - Declaratory Relief
## Probation Orders Required to Place a Financially Interested Party As a "Neutral" Court Officer Are Void

323. Plaintiffs request that this Court declare the JCS "Probation Orders" void because the "probation" placed a financially interested party in the position of a "probation officer" who is required to be neutral.

324. All of the "probation orders" under which JCS operated, required payments to JCS and imposed restrictions of the person's liberty but were eliminated when the amount of money JCS demanded was paid.

325.  The financial interests of JCS, as a for profit entity, was known to its city co-conspirators which agreed to order those appearing before their courts to pay JCS's fees.

326.  Despite being clothed with the appearance of a court official and called a "probation officer," the JCS employees were not neutral court officials but instead were financially motivated with no training or function of real probation services.

327.  In fact, even JCS contract explicitly agreed in many instances that JCS, though a financially interested party, will provide testimony stating: "the [probation] 'officer' will testify as to the circumstances of the case."

328.  By using a "probation order" of its own design, JCS, with the cooperation of its co-conspirator cities, adopted the appearance of court authority to cloak its extortionate actions.

329.  JCS had a personal, financial interest to conduct its role as a "probation officer" in a way that maximized its personal profit and not as a neutral public court officer.

330.  JCS used rooms inside the city buildings that also housed the municipal courts and its employees often sat in the courtroom near the

judge and advised the judge about how to handle the cases of "probationers" and potential "probationers."

331. Despite the lack of authority to do so, JCS, a private actor with a financial stake in the outcome, playing the role of a neutral probation office, used threats of revoking probation, increased fines and costs, arrest and jail time for purposes of extorting the collection.

332. Using its "probation order," JCS set payment amounts and reporting schedules and recommended when the individual's "probation" should be revoked, or when to impose additional fines and costs.

333. Under JCS' system and these "probation orders," JCS determination to request incarceration of an individual and/or impose unreasonable release requirements was routinely accepted by city personnel without conducting delinquency or probation hearings and without making any findings, much less any determination of an ability to pay or contempt.

334. JCS conspired with the cities and the cities' courts to require the "probation orders" under which periods of "probation" for purposes of collecting fines and fees to routinely exceed the two-year statutory maximum, all of which result in action to detain and otherwise incarcerate individuals without any jurisdiction to do so.

335.  Under the JCS system, JCS, as a private, for-profit corporation was presented to perform "probation" and to provide advice, recommendations, and testimony by representatives of this private entity.

336. In contrast to the traditional and longstanding role of the probation officer --such as the role performed by Alabama State Probation Officers and United States Probation Officers – JCS had a direct financial stake to conduct its role as a probation officer in a way that maximized its personal profit and not as a neutral public court officer.

337. Because this non-neutral actor's purpose and focus was to profit from this position, there was a clear expectation that those financial interests would affect its decisions. There is also overwhelming evidence that these financial interests had an impact on every decision of JCS' "probation officers." Because this private entity had a significant, personal, financial interest in how these cases were managed and resolved, unlike a traditional neutral judicial actor, prosecuting authority, or probation department, JCS' policies and practices violate the longstanding restrictions against such self-interested financial arrangements in Alabama courts of justice.

338.  Under the JCS scheme and once in possession of a "probation order," JCS could not only decide whether to initiate revocation

proceedings, but it could also influence what conditions were imposed. It could then make rules and determine whether and when to petition for revocation based on the perceived violation of those rules or other conditions. Then, JCS served as the main witness or, as often happens, JCS' allegations were treated as evidence at any post-adjudication proceeding. JCS' recommendations include whether the person should be placed back on probation for an extended period (and charged additional fees) and/or jailed.

339. All the Plaintiffs were impoverished at the time of the charges made against them, when "probation orders" were made.  Each was unable to pay the fines and/or costs and fees demanded by JCS due to their poverty and for those arrested, their arrests and incarcerations were based on JCS' recommendation and void orders.

340. Using these illegal "probation orders" under the policy and practice of JCS and the municipalities with which it contracted, unpaid fines and costs were unlawfully converted to undetermined days in jail for which the "offenders" were sometimes charged by the day for their time in jail and were often given no credit for time spent in jail against the fines levied.

341.  The "probation orders," contract agreements, and forms drafted by JCS were uniformly used by it and the Alabama cities where it operated.

342.  With a "probation order" for an individual, JCS used threats of revoking probation, increased fines and costs, and jail time to extort collection.  Using this "probation order" should an individual fail to pay to the satisfaction of JCS, JCS would determine that the individual's "probation" should be revoked.  Under the system operated jointly by JCS and municipal courts, JCS' recommendation of incarcerating an individual and/or imposing unreasonable bond requirements was routinely accepted without conducting delinquency or probation hearings and without making any findings, much less any determination of ability to pay or appointment of counsel before taking such punitive action.

343.  After initiating revocation under its "probation order," JCS  and municipal courts did not give adequate notice of the nature of any lawful charge, failed to conduct hearings, failed to make written findings concerning the reasons for revoking probation or the evidence relied upon, and failed to make written findings concerning any willful nonpayment of fines and costs before imposing incarceration for failure to pay fines and costs – all without providing counsel for the "offenders."

344. As a financially interested and motivated party, JCS' used "probation orders" to impose onerous fees on debtors who were unable to

promptly pay in full municipal fines or costs, and threatening them with arrest if they failed to make payments.

345. Similarly, as a financially interested and motivated party, JCS used "probation orders" to JCS' benefit to seek the arrest and imprisonment of debtors for failure to pay without any determination that the nonpayment was willful or any other inquiry into indigency or ability to pay.

346. As a proximate consequence of these actions, Plaintiffs suffered the payment of fees, injuries to their liberty and dignity, such as having fines, costs, and fees far in excess of their initial penalties levied against them, facing the constant threat of arrest for nonpayment even when never convicted of a jailable offense or any offense at all, having fines and/or costs converted to jail sentences, being unlawfully incarcerated for indefinite periods of time, and having their probation extended for longer than the court-imposed 24-month maximum.

347. Plaintiffs and Class members request that this Court declare that JCS' "Probation Orders" placing a financially interested party in a position that is required to be held by a neutral officer to be null and void.

## Count Five
## Money Had and Received

348.   JCS charged the Plaintiffs monthly fees if they did not pay the fines and costs claimed for a city charge within a certain number of days. Pursuant to its contract and joint practice with its co-conspirator cities, JCS charged a $10 setup fee and charged an additional $35-$45 monthly fee for each month the person was on JCS' "probation."

349.  JCS also determined and assessed a minimum, monthly fee each person had to pay it to "stay current."

350.  When a person made a payment to JCS, the JCS employee decided the amount it would keep and the amount it would send to its co-conspirator City to reduce the person's city debt.

351.  These monthly fees were not charged to those who immediately paid the city fines and costs when adjudicated or to people who paid the fines online or to people who were allowed to make periodic payments to the city at the window.

352.  Neither JCS nor its co-conspirator cities had legal authority to charge these fees.

353. Charging monthly fees for post-conviction fine collection is beyond the authority of the municipal court which is required by Alabama

statute to uniformly process traffic infractions and penalties for misdemeanors in accordance with specified maximum fines. See Ala. Code Section 12-14-8. Those JCS fees are neither justified as court costs nor fines.

354. These extra fees resulted in people being charged amounts that exceeded statutory maximums for the city "crime" for which the fees were assessed.

355. JCS unlawfully charged and collected these fees which were also paid under duress to avoid arrest and jail.

356. JCS owes the Plaintiffs for money had and received from the payment of these illegal charges.

**Count Six**
**JCS's Contracts Binding a Court Are Void**

357. A real controversy exists between these parties regarding the validity of the JCS form contract and the legality of the actions and "probation orders" under that contract such that declaratory relief is appropriate. Plaintiffs seek declaratory relief declaring void the contract between JCS and its co-conspirator cities named herein.

358. First, Plaintiffs request the Court to declare that the JCS contracts with its co-conspirator cities void *ab initio* because the agreement

exceeded the statutory and Alabama constitutional limitations on municipalities as the mayor and city council had no authority to contractually bind its municipal court.  As noted above, JCS is no longer operating in the state of Alabama and the contracts have been terminated such that no other parties are necessary for determination of the relief sought.

359. The agreement between JCS and its co-conspirator cities violated the separation of powers doctrine embodied in the Alabama Constitution.  See ALA. CONST., Art. III, § 43.   As a result, those agreements are void and due to be declared a nullity.

360.  Alabama state law also dictates a separation of the branches of government.  Under that doctrine, legislative powers granted to cities and towns are exercised by the city council, Ala. Code § 11-43-43, while the mayor of the city is responsible for executive duties.  Ala. Code § 11-43-83. If the town establishes a municipal court, its administration is supervised by the Chief Justice of Alabama. Ala. Code § 12-2-7 et. seq.; ALA. CONST., Art. VI, § 139.

361. Municipalities are prohibited from adopting laws, ordinances and policies that conflict with state law.  Ala. Code § 11-45-1.  See also ALA. CONST. Art. IV § 89.

362.  A city mayor has the executive power to execute and enforce contracts and the city council has the legislative power to enact regulations and ordinances, but neither the mayor nor the council has the power to invade the administration of its judiciary.

363.  All of the cities that contracted with JCS exceeded its statutory authority and acted in conflict with state statute and constitutional limitations when it agreed with JCS to bind its municipal court to issue probation orders requiring fees for JCS to be entered by the city judge. That action essentially sold the court process for purposes of increasing income to the city.

364.  The illegal agreement and policy of JCS invades and overrides the judicial authority and court administration reserved to the municipal judge and the Chief Justice.

365.  Second, the JCS contract violated the uniformity requirements of Alabama law.

366.  Alabama Code § 12-14-8 requires uniformity in processing traffic infractions and penalties for misdemeanors in accordance with specified maximum fines.  But under the JCS contract, people who could not immediately pay a fine or court costs were charged fees, while those who could immediately pay were not.  Also, "offenders" within the JCS

scheme with its co-conspirator cities were processed and fined differently than "offenders" in municipal jurisdictions that did not contract with JCS. This violates the uniformity requirements of Alabama Code § 12-14-8.

367.  The JCS contract also violates the procedures established by the Alabama Administrative Office of Courts by imposing fees only on "offenders" who cannot pay immediately by creating other "rules" for further penalizing individuals who cannot pay as directed.  "Offenders" who are able to immediately pay are charged one rate, but those who are unable to immediately pay, are required to pay monthly fees to JCS Inc.

368.  Third, the contracts between JCS and Alabama cities, as designated previously, granted an exclusive franchise for provision of private "probation" services. Upon information and belief, these contracts were not competitively bid, as required by ALA. CONST. Art. I, § 22 and Ala. Code § 41-16-50. Because the contracts were not bid, they are void and unenforceable.

369.  Plaintiffs request the Court to declare the collection actions of JCS Inc. taken under these contracts to be void under the premises discussed above.  Under this void agreement, JCS implemented policies and practices to pursue the Plaintiffs where there is no jurisdiction or authority to do so under Alabama law, doing so intentionally in an effort to

extort payment of fines and costs from impoverished people. These efforts have resulted in the illegal prosecution and incarceration of Plaintiffs beyond the limited jurisdiction of the municipal courts.

370. Fourth, the contracts between JCS and the Alabama cities previously named violated public policy. Each city contract with JCS that included an agreement to include JCS payments "in every court order" sold its police power to enforce collection of city money.  This violates public policy as well as the state constitution.

371.  The result of this consistent systematic policy and practice of JCS is essentially a debtor's prison for fines and charges levied by JCS under a void contract with the various municipalities with which it worked.

372.  Plaintiffs request that this Court declare that contract under which JCS operated in the Alabama cities and courts designated previously herein to be null and void.

## Count Seven
### JCS Breached its Contract
### Damaging Third Party Beneficiary Plaintiffs

373.  If the Court does not find the JCS contract void **ab initio** for the reasons stated above, then, in the alternative, the Plaintiffs assert these additional claims as third-party beneficiaries of the contract provisions

between JCS and the Alabama cities designated previously under these facts.

374. That contract states: "JCS shall comply with all provisions of state and federal law." (JCS Contract Exhibit A)

375. The Plaintiffs, like other JCS "probationers", were the intended beneficiaries of the contract provisions requiring compliance with state law.

376. As stated in detail above, JCS' entire "probation" for collection scheme was predicated upon void city probation orders.  Its actions under those void orders violate the law.  As such, JCS breached its contract causing damage to the plaintiffs.

377. JCS breached each of its contracts by not complying with state statues and violating the civil rights of each 'probationer' by requiring extra fees, threatening arrests and jailing, and requesting warrants when money was not paid as JCS demanded. All of these JCS activities were purportedly legitimized by 'probation orders' that were void, as each probation order was based on an illegal agreement.

378. All of the Plaintiffs were damaged by JCS' breach of its contract promise to abide by applicable laws.

WHEREFORE, Plaintiffs demands judgment against the defendants for compensatory and punitive damages, plus costs.

## Count Eight - Conspiracy between JCS
## And Susan Fuqua to Violate Plaintiffs' Rights Under Alabama Law

379.        Defendants JCS Inc. and Susan Fuqua are liable for their conspiracy to commit the tortious conduct described herein.

380.        JCS Inc. actively concealed its payments to Ms. Fuqua and her role as its lobbyist. In fact, Plaintiffs in the federal lawsuit Ray et. al. v JCS et. al. [ND AL 2:12-cv-02819-RDP] vigorously pursued discovery regarding JCS' corporate structure and its agents here in Alabama. Nevertheless, JCS did not disclose material, relevant information that was repeatedly requested by the plaintiffs. In particular, the plaintiffs in that action requested that JCS produce the agreement in which JCS shareholders sold the company to CHC Companies, Inc., executed on September 30, 2011. JCS produced a highly redacted copy several years after it was requested. CHC Companies, Inc. finally produced an unredacted copy of the agreement with appendices and exhibits after Judge Cornelius ordered it to be produced after conducting an in camera review. This document was finally produced on July 18, 2017, and it revealed that Susan Fuqua had a verbal agreement with JCS under which she was paid as an independent contractor, for her to assist JCS in marketing and keep it informed on court issues that could affect it.

381.   Ms. Fuqua concealed the fact that JCS Inc. was paying her and that she was a lobbyist for JCS and its related companies. In fact, the long-time city judge Brad Bishop provided sworn testimony in 2017 that he was unaware that Ms. Fuqua was a paid lobbyist for JCS, despite working with her since 2004.

382.   Ms. Fuqua did not file the requisite notice required by the Alabama Ethics Commission for lobbyists for any of the years in which she was paid by JCS Inc.

383.   Ms. Fuqua's participation on behalf of JCS furthered the conspiratorial actions by JCS and the various Alabama cities in which it operated.

WHEREFORE, Plaintiffs request compensatory and punitive damages from these co-conspirators for the threats, intimidation, arrests and jailing that they endured as a result of their conspiracy to violate their rights under Alabama law, from which these co-conspirators profited.

## Count Nine - Conspiracy between JCS
## And The City of Harpersville to Violate Plaintiffs' Rights Under Alabama Law

384.     JCS conspired with the City of Harpersville to violate Plaintiffs' rights under Alabama law as set forth in the following paragraphs of this Count.

385. The Town of Harpersville contracted with JCS on March 3, 2005. The JCS form contract was signed by the city mayor.  As in other cities, Harpersville agreed to have its court order the payment of fees to JCS by each person sent to "probation" for fine collection.

386. Harpersville also hired Larry Ward as its part time municipal judge.  Ward's full time job was selling municipal bonds and giving cities financial advice - not practicing law. In fact, Ward never practiced law but had assisted Harpersville in issuing municipal bonds whose payments were thereafter largely funded by revenue from city fines which Ward levied. Upon information and belief, Ward facilitated the sale of Harpersville municipal bond warrants by his employer Morgan Keegan in 2010 which were underwritten based on Harpersville financial statements showing approximately 50% of the city revenue coming from its city court fines levied under Larry Ward.

387.  During his tenure at Harpersville, Larry Ward had a personal, financial interest in ensuring that the Harpersville court generated money for the Town to support the bond issue all of which was known to the Town officials who participated in the bond issue.

388.  Like Larry Ward, JCS had a significant financial stake in the proceedings, as it only made money if people continued to be placed on 'probation' and ordered to pay fees all of which constituted voidable orders and practices under Alabama law to those appearing before the city court.

389.  As part of the practice at Harpersville with JCS, Larry Ward typically presigned blank 'probation' orders provided to him by JCS which the JCS employees then filled out without any oversight being undertaken by the City.   Many times "probation" was assigned for collection even though there was no underlying suspended jail sentence and often for charges upon which there had been no finding of guilt.

390.  The Town's focus on revenue collection and its knowing employment of JCS and Ward, each with financial interests in a judicial process, established a long-term practice of abuse routinely denying due process and other rights to persons such as the plaintiffs as was found by Judge Harrington in the order referenced above.

391.  To give JCS the appearance of authority, a JCS employee with City approval often sat in the mayor's chambers and received 'probationers' who were escorted into the chambers by Harpersville police after being sent to "probation."

392.  On March 4, 2014 the Alabama Judicial Inquiry Commission issued Advisory Opinion 14-926, after conducting an investigation of Larry Ward and entered a lengthy opinion critical of the deficiencies in his actions as a city judge operating at Harpersville jointly with JCS.

393. After reviewing Ward's improper actions with JCS at Harpersville, the Judicial Inquiry Commission gave directions on how municipal courts should operate:

    a. COURT RECORDS
    That orders of the court are duly signed by the judge in a timely manner; that blank orders are never signed by the judge to be filled in by staff; that execution of orders not be delegated to staff by use of signature stamps; that all plea agreements, waivers of counsel, and other forms be properly executed and maintained; that counsel be appointed for indigent defendants where appropriate; that all orders and records of the court be retained by the court clerk as required by law; that the amount of fines imposed and court costs and fees assessed be limited to those allowed by law; that proper corrective action be taken upon discovery that the amount of such fines, costs, or fees was excessive and that traffic tickets be timely forwarded to the Department of Public Safety as required by law.

b. PROBATION

That probation be used only when a suspended sentence is imposed following conviction of an offense; that probation be imposed only after a properly executed order of conviction has been entered; that all probation orders be executed by the judge at the time the defendant is placed on probation and advised of the conditions of probation; that periods of probation be neither imposed nor extended beyond the time authorized by law; that petitions for revocation of probation be processed in accordance with due process requirements, including proper notice to the defendant; and written findings of the grounds for revocation of probation be recorded.

c. COUNSEL, INCARCERATION, AND PRE-TRIAL DIVERSION

That incarcerated defendants be provided timely initial appearance hearings as provided by law; that defendants be informed of their right to counsel; that defendants be given a reasonable time to secure an attorney prior to arraignment or a decision on pre-trial diversion; that any bond set should be reasonable, with consideration of the defendant's ability to make bond; that defendants not remain incarcerated beyond a court date due simply to administrative failures in the court; that defendants not be incarcerated for nonpayment of fines, costs, and restitution without the judge first conducting an inquiry as to the reasons for nonpayment; that defendants not be incarcerated for failure to pay fines, costs, and restitution beyond the maximum time allowed by law for such incarceration; that incarcerated defendants be properly credited on fines and costs with time served; that defendants not be incarcerated for nonpayment of fines, costs, and restitution, where the defendant has failed to pay because of indigency; and that any finding of contempt for nonpayment of fine, costs, and restitution be based on a petition for contempt and a hearing after notice.

d. PRIVATE PROBATION

That private probation or other services used by the court be

reviewed on a consistent basis to ensure there is no usurpation of the authority of the court, and to prevent such agencies from creating the perception that they have the authority to make the final determination of conditions of probation or to incarcerate offenders for noncompliance with court orders; that such agencies not be delegated the authority to make indigency determinations or other determinations relative to incarceration for noncompliance; and that all actions regarding probation be subject to review by the judge to ensure that such actions do not violate an offender's rights of due process or equal protection of the law.

e. JUDICIAL ENGAGEMENT
That sufficient time is committed by the judge to the court to insure that the judge and the other officials of the court protect the due process rights of all individuals appearing before the court.

394. When the Judicial Inquiry Commission findings were made, JCS was operating in 112 cities.  Ward was serving as a city judge in several other cities as well, including Childersburg.

395. WHEREFORE, Plaintiffs request compensatory and punitive damages from these co-conspirators for the threats, intimidation, arrests and jailing that they endured as a result of their conspiracy to violate their rights under Alabama law, from which these co-conspirators profited.

## Count Ten - Conspiracy between JCS
## And The City of Childersburg to Violate Plaintiffs' Rights Under Alabama Law

396.  JCS conspired with the City of Childersburg to violate Plaintiffs' rights under Alabama law as set forth in the following paragraphs of this Count.

397.  JCS entered into a contract with Childersburg and its court in 2005 signed by the City's former mayor hiring JCS for the collection of court fines and costs.  That relationship continued until it terminated in May of 2015, after Childersburg was sued in Ray.  During that ten years there was concerted consistent action between JCS and the municipal court showing evidence of their agreement, practice and understanding, using void orders and voidable practices under Alabama law.

398.  Again the contract was the JCS form which provided that the municipal judge, (Larry Ward), would order payment to JCS of a set-up fee and monthly fees in his orders which sent people to JCS. In practice, those "orders" were preprinted and supplied by JCS to Ward who signed them in blank for JCS's use.

399.  This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a 'probation officer.'

400.  In furtherance of the understanding and agreement between JCS and the Childersburg Municipal Court, Judge Ward consistently sent persons appearing before him to "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when those were assessed. This referral to JCS "probation" occurred whether there was a suspended jail sentence or not, and required those individuals to pay additional JCS fees.

401.  In ordering people to JCS "probation" for collection of fines and court costs, Ward consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed.  Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Ward placed persons on probation without further inquiry allowing JCS to use his pre-signed blank orders as the basis for this referral.

402.  The actions of Judge Ward in furtherance of the conspiratorial understanding and agreement with JCS, were done with full understanding and acknowledgment that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation" and that its interests

were harmed if an individual sent to JCS was formally declared to be indigent because JCS agreed to not charge people probation fees who the court declared to be indigent.

403. This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the consistent failure of Judge Ward to appoint counsel to those he ordered to JCS 'probation', by the use of JCS' pre-printed probation order, by Judge Ward pre-signed orders in blank, and by language included in those forms above the offender's signature line stating: "I have counsel or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

404. In furtherance of this understanding between JCS and the City of Childersburg Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey a court order after JCS requested a petition to revoke probation. The warrants issued by the city court were based upon JCS' institution of the petition for revocation. The agreement and understanding between JCS and the city municipal court in Harpersville was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant from the City.

405. In furtherance of this conspiratorial agreement and understanding, after JCS petitioned for revocation beginning the process to acquire a warrant, neither JCS nor the municipal court took steps to provide counsel for the persons pursued or to inform them of this right. Notice about these proceedings, if any, was given by JCS - not the city court.

406. The petitions for revocation sought by JCS under its agreement and understanding with Childersburg Municipal Court were all predicated on failure of the individual to pay the fines and fees demanded. The petitions were dismissed if such payment was forthcoming and "probation" itself was promptly terminated when the fees, fines and costs were fully paid.

407. In furtherance of the conspiratorial agreement and understanding between JCS and the city court of Childersburg, JCS was allowed to determine the monthly payments required and the allocation of payments between JCS or the City without any review by the City.

408. This conspiratorial agreement and understanding between JCS and the municipal court of Childersburg is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

409. These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty.

410. WHEREFORE, Plaintiffs request compensatory and punitive damages from these co-conspirators for the threats, intimidation, arrests and jailing that they endured as a result of their conspiracy to violate their rights under Alabama law, from which these co-conspirators profited.

## Count Eleven - Conspiracy between JCS
## And The City of Sylacauga and Sylacauga's City Court to Violate Plaintiffs' Rights Under Alabama Law

411. JCS conspired with the City of Sylacauga and Sylacauga's City Court to violate Plaintiffs' rights under Alabama law as set forth in the following paragraphs of this Count.

412. JCS entered into a contract with Sylacauga and its City court in 2009 for the collection of fines and costs. The contract was signed by the Sylacauga mayor, Sam Wright, and the city judge, Barry Vaughn, after which there was concerted consistent action between JCS and the municipal court showing evidence of their agreement and understanding.

413. This agreement provided that the municipal judge, Barry Vaughn, would order people he sent to JCS to pay JCS a $10 set-up fee and a $40 monthly fee.

414. This agreement also stated that JCS would provide testimony "as to the circumstances of the case" as a "probation officer."In furtherance of the understanding and agreement between JCS and the Sylacauga Municipal Court, Barry Vaughn consistently placed persons appearing before him on "probation" with JCS for the collection of fines and court costs when they could not immediately pay these fines and court costs to the municipal court when they were assessed. This referral to JCS "probation" occurred regardless of the existence of a suspended jail sentence and required those individuals to pay additional JCS fees.

415. In ordering people to JCS "probation" for collection of fines and court costs, Judge Vaughn consistently failed to consider the persons' poverty, even when they complained to the court they could not immediately pay the fines, costs and fees when they were imposed. Instead of consideration of their poverty, and in furtherance of the conspiratorial understanding and agreement with JCS, Judge Vaughn placed persons on probation without further inquiry.

416.  The actions of the Sylacauga judge were in furtherance of the conspiratorial understanding and agreement with JCS, and with knowledge that JCS had financial interests in extending the paid supervision of individuals placed with it for "probation."  Those financial interests, in fact, were harmed if an individual sent to JCS was formally declared to be indigent since JCS agreed to not charge indigent people probation fees.

417.  This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court to make any indigency determinations and by JCS' policy that it has no responsibility to address the poverty of the person sent to it even when it possessed specific information about the person showing their disabilities, unemployment, and the lack of income.

418.  This conspiratorial agreement and understanding between JCS and the municipal court of Sylacauga is further shown by the consistent failure of the court there to appoint counsel for those he ordered to JCS 'probation.' Additionally, Judge Vaughn allowed JCS to use his signature stamp to 'sign' JCS' pre-printed probation order.  That form order included the following language above the offender's signature line. "I have counsel

or have waived my right to counsel for all proceedings to this date and have received a copy of this ORDER."

419.  In furtherance of this understanding between JCS and the City of Sylacauga Municipal Court, the court there routinely issued arrest warrants for failure to appear, failure to pay or failure to obey court order after JCS requested a petition to revoke probation.  The agreement and understanding between JCS and the city municipal court was further implemented by JCS providing to the court its petition for revocation as the tool to acquire the warrant.

420. The petitions for revocation sought by JCS under its agreement, practice and understanding with Sylacauga's Municipal Court were all based upon failure of the individual to pay the fines and fees demanded.  The petitions were dismissed if such payment was forthcoming and "probation" itself was terminated when the fees, fines and costs were fully paid. These petitions were accepted by the city court as the basis for arrest warrants on charges such as failure to obey, failure to appear, failure to pay and failure to obey court order.

421. In furtherance of the conspiratorial agreement and understanding between JCS and Sylacauga's city court, JCS was allowed

to determine the monthly payments required and to allocate payments between JCS or the City.

422.  This conspiratorial agreement and understanding between JCS and Sylacauga's municipal court is further shown by the hundreds of people who were kept on JCS probation beyond the statutory maximum of two (2) years during which time JCS continued to demand monthly fees.

423.  These concerted efforts between the city court and JCS, including the city judge and the other employees of the court, show an agreement and understanding that warrants would be issued if money was not paid, while ignoring the requirement of consideration of poverty as required under Alabama law.

424.  WHEREFORE, Plaintiffs request compensatory and punitive damages from these co-conspirators for the threats, intimidation, arrests and jailing that they endured as a result of their conspiracy to violate their rights under Alabama law, from which these co-conspirators profited.

Plaintiffs request trial by jury on all claims so triable.

Respectfully submitted this 12th day of October, 2018,

/s/ Lloyd W. Gathings
Lloyd W. Gathings (GAT001)
William A. Lattimore (LAT021)

<u>OF COUNSEL:</u>
GATHINGS LAW
2204 Lakeshore Drive, Suite 406
Birmingham, Alabama 35209
Telephone: (205) 322-1201
Facsimile: (205) 322-1202
LGathings@gathingslaw.com
WLattimore@gathingslaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 12th day of October, 2018, I filed the foregoing motion using the Northern District of Alabama's CM/ECF electronic filing system, which will automatically serve a true and accurate copy of the foregoing on each of the following counselors of record in this matter:

Will Hill Tankersley, Esq.
Balch & Bingham LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, AL 35203

F. Lane Finch, Jr., Esq.
Brian Richardson, Esq.
Swift Currie McGhee & Hiers, LLP
2 North 20th Street
Suite 1405
Birmingham, AL 35203

Michael L. Jackson, Esq.
Larry S. Logsdon, Esq.
Wesley K. Winborn, Esq.
Wallace, Jordan, Ratliff & Brandt
P.O. Box 530910
Birmingham, AL 35253

Joel E. Dillard, Esq.
David McKnight, Esq.
Donald R. James, Jr., Esq.
Baxley, Dillard, McKnight, James & McElroy
2700 Highway 280
Suite 110 East
Birmingham, AL 35223

Wilson F. Green, Esq.
Fleenor & Green, LLP
1657 McFarland Blvd. North
Suite G2A
Tuscaloosa, AL 35406

/s/ Lloyd W. Gathings
OF COUNSEL